JUDGE BRICCETTI

**CARUSO GLYNN, LLC**
Attorney for Plaintiff
*Lawrence C. Glynn*
36 Peck Slip
New York, New York 10038
(718) 570-3338
Attorney: Lawrence C. Glynn (LG-6431)
CG File No.:  88.071108.01

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

CARUSO GLYNN, LLC,

                   Plaintiff,

      -against-

SAI TRUST and ROBERT MEMBRENO,
Individually and as Trustee for SAI TRUST,

                 Defendants.
------------------------------------------------------x

Case No.:

**COMPLAINT**

      Plaintiff, Caruso Glynn, LLC, complaining of the Defendants alleges upon information and belief, as follows:

**Parties**

    1.    At all material times, plaintiff was a New York corporation with a principal place of business located at 36 Peck Slip, New York, New York.

    2.    At all material times, defendant SAI Trust ("SAI") was and now is a California corporation or other business entity doing business within the State of New York with a principal place of business at 2072-B Walsh Avenue, Santa Clara, CA 95050.

3.      At all material times, defendant SAI was and now is a California corporation or other business entity transacting business within the State of New York with a principal place of business 2072-B Walsh Avenue, Santa Clara, CA 95050.

4.      At all material times, defendant Robert Membreno ("Membreno") was and now is a resident of the State of California with an address at 2072-B Walsh Avenue, Santa Clara, CA 95050.

### Jursidiction

5.      This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

6.      This is an action to recover plaintiff's reasonable attorney's fees in accordance with a contingency fee agreement between Plaintiff and defendants Robert Membreno, as Trustee of SAI Trust, and SAI Trust.

7.      This action is also filed under and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

### Background

8.      On October 8, 2009, Plaintiff entered into an agreement with SAI to continue handling its lawsuit involving a complex royalties dispute with Calpine Corp. A detailed substantive and procedural history of the underlying bankruptcy action is set forth in the Decision and Order of this Court dated June 9, 2009 in *Robert Membreno as trustee of SAI Trust v. Calpine Corp., et al.*, 406 B.R. 463 (S.D.N.Y. 2009), ("Decision and Order") which is annexed hereto as Exhibit A and is hereby incorporated by reference.

9.      Under the retainer agreement, Plaintiff agreed to continue to handle the case against Calpine on a contingency fee basis of 22.5% of the gross amount covered plus disbursements. A copy of the retainer agreement has been annexed hereto as Exhibit B.

2

10.    Thereafter, in or about March 2010, SAI and Calpine settled the matter.

11.    At the time of the settlement, Plaintiff was still counsel of record for SAI.

12.    However, SAI, in an attempt to prevent Plaintiff from recovering its rightful fee, consummated the settlement using new counsel.

13.    The amount of the settlement between SAI and Calpine was $835,000.00 in cash and stock. A copy of the settlement agreement between SAI and Calpine has been annexed hereto as Exhibit C and is hereby incorporated by reference.

14.    This matter is not under the purview of Part 137 of the Rules of the Chief administrator of the Courts as the amount in controversy exceeds $50,000.00.

### First Cause of Action
### (Breach of Contract)

15.    On October 8, 2009, Plaintiff and Defendants entered into a valid retainer agreement whereby Plaintiff would represent Defendants in prosecution of their claims against Calpine.

16.    By the terms of the retainer agreement, Plaintiff was to receive 22.5% of any gross recovery received from Calpine plus out of pocket disbursements.

17.    Thereafter, in or about March 2010, Defendants settled their claims with Calpine for the amount of $835,000.00 in cash and stock.

18.    For this firm's efforts in enforcing the terms of the Agreement between Calpine and SAI, Plaintiff is entitled to his reasonable attorney's fees of 22.5% of the settlement.

19.    The settlement consisted of the issuance of 48,863 shares in Calpine to SAI Trust valued at Calpine's closing share price on the date of execution of said agreement. [Exhibit C, §1(a)]

20.    The agreement is signed by both parties, but undated.

3

21.     The average share price for Calpine (stock symbol CPN) for the month of March 2010 was $11.53.

22.     The cash component of the settlement between Calpine and SAI was thus $835,000 less 48,863 shares x $11.53 ($563,390.39) or $271,609.61. [Exhibit C, §1(b)]

23.     The share price of Calpine as of market's close on June 20, 2011, is $15.52.

24.     Accordingly, the settlement amount, valued as of June 20, 2011, is the aforementioned cash component of $271,609.61 plus 48,863 shares valued at $15.52 ($758,353.76) for a total of $1,029,963.37.

25.     Plaintiff's reasonable attorney's fees, based upon this settlement amount, total $231,741.76.

26.     To date, SAI has failed to pay Plaintiff its reasonable attorney's fees

27.     In light of the foregoing, Plaintiff has suffered damages in the amount of $231,741.76.

## Second Cause of Action
## (Account Stated)

28.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "27" as though more fully set forth herein at length.

29.     On November 2, 2009, Plaintiff sent to Defendants an invoice confirming that the matter was being handled on a contingency fee basis. A copy of same has been annexed hereto as Exhibit D.

30.     At no time did Defendants object to this invoice.

31.     Plaintiff's reasonable attorney's fees, based upon this settlement described herein, total $231,741.76.

32.     To date, SAI has failed to pay Plaintiff its reasonable attorney's fees.

33.     In light of the foregoing, Plaintiff has suffered damages in the amount of $231,741.76.

## Third Cause of Action
### (Quantum Meruit)

34.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "33" as though more fully set forth herein at length.

35.    Plaintiff is entitled to recover fees in *quantum meruit*.

## Fourth Cause of Action
### (Breach of Contract)

36.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "35" as though more fully set forth herein at length.

37.    From a period of April 2001, Calpine had improperly included allocated expenses for its 18 other geothermal plants in the monthly NPI. See Ex. A, Decision & Order, p7.

38.    Due to the efforts of Lawrence C. Glynn in vigorously litigating SAI's claims, Judge Marrero found that Calpine breached the agreement beginning in April 2001 when it unilaterally began charging Allocated Expenses. Ex. A, pp 23-24.

39.    Beginning in August 2009, due entirely to efforts of Lawrence C. Glynn in prosecuting SAI's claims against Calpine, Calpine ceased charging SAI for "Allocated Expenses" in its monthly Net Profit Interest ("NPI") statement.

40.    Plaintiff seeks attorney's fees in the amount of 22.5% of the amount of monthly Allocated Expenses for each month from August 2009 through May 2011 in which Calpine ceased charging Allocated Expenses.

## Fifth Cause of Action
### (Declaratory Judgment)

41.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "40" as though more fully set forth herein at length.

42.     Going forward, until the expiration of the underlying agreement in 2017, plaintiff is entitled to reasonable attorney's fees in the amount of 22.5% for each and every month in which Allocated Expenses are not charged by Calpine to SAI as this represents a portion of the gross recovery directly attributed to Plaintiff's efforts.

43.     Accordingly, plaintiff requests declaratory relief awarding attorney's fees in the amount of 22.5% of the amount of monthly Allocated Expenses for each month that SAI is not charged Allocated Expenses from June 2011 through and until May, 2017 when the underlying agreement expires.

WHEREFORE, plaintiff requests:

(a)     That process in due form of law may issue against Defendant citing them to appear and answer all and singular the matters aforesaid;

(b)     That judgment may be entered in favor of Plaintiff and against Defendants on the First Cause of Action for the amount of $231,741.76;

(c)     That judgment may be entered in favor of Plaintiff and against Defendants on the Second Cause of Action for the amount of $231,741.76;

(d)     That judgment may be entered in favor of Plaintiff and against Defendants on the Third Cause of Action seeking *quantum meruit*;

6

(e)     That judgment may be entered in favor of Plaintiff and against Defendant on the Fourth Cause of Action awarding Plaintiff 22.5% of the amount of Allocated Expenses that were not charged by Defendant to SAI between August 2009 and May 2011;

(f)     That judgment may be entered in favor of Plaintiff and against Defendant on the Fifth Cause of Action declaring that Plaintiff is entitled to attorney's fees in the amount of 22.5% of the amount of monthly Allocated Expenses for each month that SAI is not charged Allocated Expenses from June 2011 through and until May, 2017 when the underlying agreement expires, and

(g)     That this Court will grant to Plaintiff such other and further relief as may be just and proper, including an award of prejudgment interest and costs.

Dated: New York, New York
          June 20, 2011

                    Yours, etc.,

                    CARUSO GLYNN, LLC
                    Attorneys for Plaintiff
                    Lawrence C. Glynn

                    By: _____
                    Lawrence C. Glynn
                    36 Peck Slip
                    New York, New York 10038
                    (718) 570-3338
                    File No.:   88.071108.01

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
In re                         :

CALPINE CORP. et al.,         :

                              :          Chapter 11 Case
                              :          No. 05-B-60200(BRL)
         Debtor-Appellee.     :          Jointly Administered
------------------------------:
ROBERT MEMBRENO as trustee    :
of SAI TRUST,
                              :
         Appellant,           :          District Court
                              :          08 Civ. 9797 (VM)
  -  against  -               :
                              :          DECISION AND ORDER
CALPINE CORP. et al.,         :
                              :
         Appellees.           :
------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-9-09

VICTOR MARRERO, United States District Judge.

      In this appeal from a decision of the Bankruptcy Court,
claimant-appellant is Robert Membreno, as trustee of the SAI
Trust (referred to as "SAI Trust").   Debtors-appellees are
Calpine Corporation and its affiliated reorganized debtors
(collectively, "Calpine").   SAI Trust appeals from the
Bankruptcy Court's memorandum decision dated September 26,
2008 and order dated September 30, 2008 granting Calpine's
motion for summary adjudication on and discharging claims
numbered 6309, 6314, 6315, 6316, 6327, and 6328, and denying
SAI Trust's motion for summary adjudication on those claims.

      For the reasons stated below, the decision and order of
the Bankruptcy Court are REVERSED in part and AFFIRMED in
part.


Exhibit
A

# I. BACKGROUND

A. FACTUAL BACKGROUND[1]

## 1.   Agreement for Purchase

In May of 1987, SAI Geothermal, Inc. ("SAI Geothermal") entered into an "Agreement for Purchase and Sale of Asset" (the "Agreement for Purchase") with Freeport McMoran Resource Partners, LP ("Freeport"), through which SAI Geothermal sold to Freeport its interest in a power plant known as West Ford Flat. (See Agreement for Purchase, A-1048 through A-1118.) The parties also agreed that Freeport would pay SAI Geothermal a monthly payment of 6% of the West Ford Flat plant's net income. This monthly payment is referred to as the Net Profits Interest ("NPI"). SAI Geothermal subsequently transferred a portion of its right to receive the NPI to SAI Trust, which is entitled to a monthly NPI payment of 4.55% of net income. (See Declaration of Robert Membreno in Support of Motion for Summary Judgment, dated August 12, 2008 ("Membreno Decl."), ¶ 5, A-1033.) Freeport assigned its rights and obligations under the Agreement for Purchase to the predecessor entity to Calpine in 1990. (See id. ¶ 6, A-1033.)

The parties do not dispute that the term "Project," as used in the Agreement for Purchase, refers to the West Ford

---

[1]   The following facts are derived from the appellate record . Facts statements not in the record are indicated by "A ..."

Flat power plant.  The Agreement for Purchase defines net income as gross revenues from the West Ford Flat plant minus: (1) "all Project direct operating expenses (excluding depreciation)"; (2) "general and administrative expenses associated with the Project"; (3) "the cost of any Project related capital additions made subsequent to the Date of First Commercial Operation"; and (4) "if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of project financing."   (Agreement for Purchase, 21, A-1068.)   The Agreement for Purchase defines "Net Profits Interest" as, "with respect to the Project, the right to receive a payment each month ... in an amount equal to 6% of Net Income for the month."  (Id.)

The Agreement for Purchase specifies that the calculation of direct operating expenses and general and administrative expenses shall be governed by "the Accounting Procedure provided in Exhibit F."   (Id.)   Exhibit F is entitled "Accounting Procedure Joint Operations," and lists twelve categories of "Direct Charges," including "Other Expenditures." (Agreement for Purchase, Ex. F at 2 3, A-1105 to A-1106.)  "Other Expenditures" is defined as "[a]ny other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is

incurured by the Operator in the necessary and proper conduct of the Joint Operations." (Id. 3, A-1106.)

The Agreement for Purchase also requires, within sixty days of the end of each fiscal year, a statement "certified by [Freeport's] chief financial officer showing in reasonable detail the calculation of the Net Profits Interest." (Agreement for Purchase ¶ 1.6, A-1053.) SAI Geothermal, and subsequently SAI Trust, "shall have the right, upon reasonable notice ... to audit [Freeport's] records to determine whether the calculation of the Net Profits Interest during the fiscal year then ended was in accordance with" the Agreement for Purchase. (A-1053 to A-1054.)

2.    1989 NPI Statement Explanation

On December 13, 1989, Freeport wrote to SAI Trust with an "explanation of the line items comprising the SAIT-APT Net Profits Interest Statement for the West Ford Flat power plant," attaching a copy of the August 1989 NPI statement. (Letter from Freeport to R.J. Membreno, dated December 13, 1989, A-1122.)  The document describes thirteen line items: electric revenue, interest income from overnight deposits, escrow balance, royalty payments, lease operating expenses, overhead, property taxes, capital additions (major construction), capital additions (overhead), capital additions (development capital), project financing, invested capital,

and loan proceeds.  (See id., A-1122 to A-1124.)  Lease operating expenses are described as: "Actual costs incurred in the operation of the Plant.  Labor costs and related payroll burden are limited to those individuals identified as billable under Exhibit F of the Agreement for Purchase and Sale of Asset ...."  (Id., A-1123.)  Overhead is described as: "Computed at 15% of Lease Operating Expenses as specified in the Agreement."  (Id.)

3.  **1992 Judgment After Trial**

At some point after NPI payments began, a dispute arose between SAI Trust and Freeport, and a trial was held in the California Superior Court for the County of Santa Clara, in the matter of Membreno v. Freeport McMoran Resource Partners, LP, No. 708898.  On May 11, 1992, a judgment (the "1992 Judgment") was entered, ordering that "[w]ith respect to the calculation of Invested Capital" as used to determine NPI payments, defendants could not use Council of Petroleum Accountants Societies, Inc. ("COPAS") percentage rates "to determine the amount of ... overhead with respect to the construction of" the West Ford Flat power plant because those rates "were not a part of the Agreement."  (1992 Judgment 3, A 1328.)

4.    1995 Settlement Agreement

Subsequently, another dispute arose relating to an audit by SAI Trust of the operations of the West Ford Flat power plant for part of 1990 and all of 1991.    In a settlement agreement between Calpine, Freeport, and SAI Trust, dated February 28, 1995 (the "Settlement Agreement"), the parties agreed that

> adjustments be made to previously issued NPI statements prepared by Calpine Geysers, to the manner by which future NPI statements will be prepared, to the payment of net profits found owing to SAI Trust as the result of the 1990 and 1991 audit, and to the payment of net profits for 1992 and thereafter.

(Settlement Agreement 3, A-1316.)    The Settlement Agreement details, among other things, the adjustments to be made to calculations of "Overnight Interest" and "Escrow Balance," as well as changes in debt amortization resulting from a new loan with a lower interest rate.

The Settlement Agreement also states,

> Except as specifically set forth herein, nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement for Purchase, specifically including, but not limited, to Sections 1.6 and 9.5.    Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPINE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

(Id. 8-9, A-1321 to A-1322.)

5.   <u>Consolidation of Calpine Operations</u>

The West Ford Flat plant is located at the Geysers steam field ("the Geysers"), in Sonoma County, California. By 1998, Calpine owned or had interests in four power plants at the Geysers. In 1999, Calpine acquired fourteen plants at the Geysers. Calpine now owns nineteen out of twenty-two power plants at the Geysers site. (<u>See</u> Declaration of Guy Tipton in Support of Calpine's Motion for Summary Judgment, dated August 13, 2008, ¶ 6, A-999.)

In 1999, "Calpine began to streamline and consolidate the operation of the plants and the steam fields into operational areas, and all its Geysers units into one consolidated operation." (<u>Id.</u>) Calpine then "consolidated its operation and business units with the intent to achieve efficiencies and cost savings associated with economies of scale." (<u>Id.</u>)

6.   <u>2001 Changes to NPI Calculations and Certification</u>

Beginning in April 2001 with the NPI statement for January 2001, the NPI statements prepared by Calpine include a line item called "Allocated Expenses." SAI Trust contends that the Allocated Expenses figure relies upon "budgeted figures, as opposed to actual figures," and that the NPI statements containing this line item have included "costs and expenses attributable to facilities other than West Ford Flat which are not properly attributable to West Ford Flat under

of certified NPI statements has prevented it from auditing the NPI statements since 2001, as it is entitled to do under the Agreement for Purchase.

B. PROCEDURAL HISTORY

SAI Trust filed six proofs of claim relating to the facts described above against six different entities in the Calpine bankruptcy cases on July 27, 2006. On April 5, 2007, SAI Trust amended its claims to assert $245,723.09 in damages. Calpine objected to the proofs of claim on April 11, 2007.

The Bankruptcy Court confirmed Calpine's sixth amended joint plan of reorganization on December 19, 2007, and that plan took effect on January 31, 2008. SAI Trust and Calpine filed the instant cross-motions on August 13, 2008; Calpine moved for summary adjudication discharging the six SAI claims, and SAI Trust moved for summary judgment on those claims.

SAI Trust argued that the 2001 change in NPI calculations and Calpine's failure to certify NPI statements since 2001 constituted breaches of the Agreement for Purchase. SAI Trust also argued that the method for calculating NPI payments was already the subject of the 1992 Judgment, as well as the Settlement Agreement from 1995, and that Calpine was precluded from contesting whether Allocated Expenses may be included in NPI calculations. Finally, in its opening summary judgment papers SAI Trust sought attorneys' fees pursuant to the

JUDGE BRICCETTI

**CARUSO GLYNN, LLC**
Attorney for Plaintiff
*Lawrence C. Glynn*
36 Peck Slip
New York, New York 10038
(718) 570-3338
Attorney: Lawrence C. Glynn (LG-6431)
CG File No.: 88.071108.01

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CARUSO GLYNN, LLC,                              Case No.:

                    Plaintiff,

        -against-                               **COMPLAINT**

SAI TRUST and ROBERT MEMBRENO,
Individually and as Trustee for SAI TRUST,

                    Defendants.
-------------------------------------------------------x

        Plaintiff, Caruso Glynn, LLC, complaining of the Defendants alleges upon information and belief,

as follows:

**Parties**

1.      At all material times, plaintiff was a New York corporation with a principal place of business

located at 36 Peck Slip, New York, New York.

2.      At all material times, defendant SAI Trust ("SAI") was and now is a California corporation

or other business entity doing business within the State of New York with a principal place of business at

2072-B Walsh Avenue, Santa Clara, CA 95050.

3.     At all material times, defendant SAI was and now is a California corporation or other business entity transacting business within the State of New York with a principal place of business 2072-B Walsh Avenue, Santa Clara, CA 95050.

4.     At all material times, defendant Robert Membreno ("Membreno") was and now is a resident of the State of California with an address at 2072-B Walsh Avenue, Santa Clara, CA 95050.

**Jursidiction**

5.     This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

6.     This is an action to recover plaintiff's reasonable attorney's fees in accordance with a contingency fee agreement between Plaintiff and defendants Robert Membreno, as Trustee of SAI Trust, and SAI Trust.

7.     This action is also filed under and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

**Background**

8.     On October 8, 2009, Plaintiff entered into an agreement with SAI to continue handling its lawsuit involving a complex royalties dispute with Calpine Corp. A detailed substantive and procedural history of the underlying bankruptcy action is set forth in the Decision and Order of this Court dated June 9, 2009 in *Robert Membreno as trustee of SAI Trust v. Calpine Corp., et al.*, 406 B.R. 463 (S.D.N.Y. 2009), ("Decision and Order") which is annexed hereto as Exhibit A and is hereby incorporated by reference.

9.     Under the retainer agreement, Plaintiff agreed to continue to handle the case against Calpine on a contingency fee basis of 22.5% of the gross amount covered plus disbursements. A copy of the retainer agreement has been annexed hereto as Exhibit B.

2

10.     Thereafter, in or about March 2010, SAI and Calpine settled the matter.

11.     At the time of the settlement, Plaintiff was still counsel of record for SAI.

12.     However, SAI, in an attempt to prevent Plaintiff from recovering its rightful fee, consummated the settlement using new counsel.

13.     The amount of the settlement between SAI and Calpine was $835,000.00 in cash and stock. A copy of the settlement agreement between SAI and Calpine has been annexed hereto as Exhibit C and is hereby incorporated by reference.

14.     This matter is not under the purview of Part 137 of the Rules of the Chief administrator of the Courts as the amount in controversy exceeds $50,000.00.

### First Cause of Action
### (Breach of Contract)

15.     On October 8, 2009, Plaintiff and Defendants entered into a valid retainer agreement whereby Plaintiff would represent Defendants in prosecution of their claims against Calpine.

16.     By the terms of the retainer agreement, Plaintiff was to receive 22.5% of any gross recovery received from Calpine plus out of pocket disbursements.

17.     Thereafter, in or about March 2010, Defendants settled their claims with Calpine for the amount of $835,000.00 in cash and stock.

18.     For this firm's efforts in enforcing the terms of the Agreement between Calpine and SAI, Plaintiff is entitled to his reasonable attorney's fees of 22.5% of the settlement.

19.     The settlement consisted of the issuance of 48,863 shares in Calpine to SAI Trust valued at Calpine's closing share price on the date of execution of said agreement. [Exhibit C, §1(a)]

20.     The agreement is signed by both parties, but undated.

3

21.     The average share price for Calpine (stock symbol CPN) for the month of March 2010 was $11.53.

22.     The cash component of the settlement between Calpine and SAI was thus $835,000 less 48,863 shares x $11.53 ($563,390.39) or $271,609.61. [Exhibit C, §1(b)]

23.     The share price of Calpine as of market's close on June 20, 2011, is $15.52.

24.     Accordingly, the settlement amount, valued as of June 20, 2011, is the aforementioned cash component of $271,609.61 plus 48,863 shares valued at $15.52 ($758,353.76) for a total of $1,029,963.37.

25.     Plaintiff's reasonable attorney's fees, based upon this settlement amount, total $231,741.76.

26.     To date, SAI has failed to pay Plaintiff its reasonable attorney's fees

27.     In light of the foregoing, Plaintiff has suffered damages in the amount of $231,741.76.

## Second Cause of Action
### (Account Stated)

28.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "27" as though more fully set forth herein at length.

29.     On November 2, 2009, Plaintiff sent to Defendants an invoice confirming that the matter was being handled on a contingency fee basis. A copy of same has been annexed hereto as Exhibit D.

30.     At no time did Defendants object to this invoice.

31.     Plaintiff's reasonable attorney's fees, based upon this settlement described herein, total $231,741.76.

32.     To date, SAI has failed to pay Plaintiff its reasonable attorney's fees.

33.     In light of the foregoing, Plaintiff has suffered damages in the amount of $231,741.76.

4

### Third Cause of Action
### (Quantum Meruit)

34.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "33" as though more fully set forth herein at length.

35.     Plaintiff is entitled to recover fees in *quantum meruit*.

### Fourth Cause of Action
### (Breach of Contract)

36.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "35" as though more fully set forth herein at length.

37.     From a period of April 2001, Calpine had improperly included allocated expenses for its 18 other geothermal plants in the monthly NPI. See Ex. A, Decision & Order, p7.

38.     Due to the efforts of Lawrence C. Glynn in vigorously litigating SAI's claims, Judge Marrero found that Calpine breached the agreement beginning in April 2001 when it unilaterally began charging Allocated Expenses. Ex. A, pp 23-24.

39.     Beginning in August 2009, due entirely to efforts of Lawrence C. Glynn in prosecuting SAI's claims against Calpine, Calpine ceased charging SAI for "Allocated Expenses" in its monthly Net Profit Interest ("NPI") statement.

40.     Plaintiff seeks attorney's fees in the amount of 22.5% of the amount of monthly Allocated Expenses for each month from August 2009 through May 2011 in which Calpine ceased charging Allocated Expenses.

5

### Fifth Cause of Action
### (Declaratory Judgment)

41.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "40" as though more fully set forth herein at length.

42.    Going forward, until the expiration of the underlying agreement in 2017, plaintiff is entitled to reasonable attorney's fees in the amount of 22.5% for each and every month in which Allocated Expenses are not charged by Calpine to SAI as this represents a portion of the gross recovery directly attributed to Plaintiff's efforts.

43.    Accordingly, plaintiff requests declaratory relief awarding attorney's fees in the amount of 22.5% of the amount of monthly Allocated Expenses for each month that SAI is not charged Allocated Expenses from June 2011 through and until May, 2017 when the underlying agreement expires.


WHEREFORE, plaintiff requests:

(a)    That process in due form of law may issue against Defendant citing them to appear and answer all and singular the matters aforesaid;

(b)    That judgment may be entered in favor of Plaintiff and against Defendants on the First Cause of Action for the amount of $231,741.76;

(c)    That judgment may be entered in favor of Plaintiff and against Defendants on the Second Cause of Action for the amount of $231,741.76;

(d)    That judgment may be entered in favor of Plaintiff and against Defendants on the Third Cause of Action seeking *quantum meruit*;

(e)  That judgment may be entered in favor of Plaintiff and against Defendant on the Fourth Cause of Action awarding Plaintiff 22.5% of the amount of Allocated Expenses that were not charged by Defendant to SAI between August 2009 and May 2011;

(f)  That judgment may be entered in favor of Plaintiff and against Defendant on the Fifth Cause of Action declaring that Plaintiff is entitled to attorney's fees in the amount of 22.5% of the amount of monthly Allocated Expenses for each month that SAI is not charged Allocated Expenses from June 2011 through and until May, 2017 when the underlying agreement expires, and

(g)  That this Court will grant to Plaintiff such other and further relief as may be just and proper, including an award of prejudgment interest and costs.

Dated:  New York, New York
        June 20, 2011

                    Yours, etc.,

                    **CARUSO GLYNN, LLC**
                    Attorneys for Plaintiff
                    Lawrence C. Glynn

                    By: _____
                    Lawrence C. Glynn
                    36 Peck Slip
                    New York, New York 10038
                    (718) 570-3338
                    File No.:  88.071108.01

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-9-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
In re                         :
                              :
CALPINE CORP. et al.,         :      Chapter 11 Case
                              :      No. 05-B-60200(BRL)
                              :      Jointly Administered
        Debtor-Appellee.      :
------------------------------:
ROBERT MEMBRENO as trustee    :
of SAI TRUST,                 :
                              :      District Court
        Appellant,            :      08 Civ. 9797 (VM)
                              :
  - against -                 :
                              :      DECISION AND ORDER
CALPINE CORP. et al.,         :
                              :
        Appellees.            :
------------------------------X

**VICTOR MARRERO, United States District Judge.**

In this appeal from a decision of the Bankruptcy Court, claimant-appellant is Robert Membreno, as trustee of the SAI Trust (referred to as "SAI Trust"). Debtors-appellees are Calpine Corporation and its affiliated reorganized debtors (collectively, "Calpine"). SAI Trust appeals from the Bankruptcy Court's memorandum decision dated September 26, 2008 and order dated September 30, 2008 granting Calpine's motion for summary adjudication on and discharging claims numbered 6309, 6314, 6315, 6316, 6327, and 6328, and denying SAI Trust's motion for summary adjudication on those claims.

For the reasons stated below, the decision and order of the Bankruptcy Court are REVERSED in part and AFFIRMED in part.



Exhibit
A

# I. BACKGROUND

## A. FACTUAL BACKGROUND[1]

### 1. Agreement for Purchase

In May of 1987, SAI Geothermal, Inc. ("SAI Geothermal") entered into an "Agreement for Purchase and Sale of Asset" (the "Agreement for Purchase") with Freeport McMoran Resource Partners, LP ("Freeport"), through which SAI Geothermal sold to Freeport its interest in a power plant known as West Ford Flat. (See Agreement for Purchase, A-1048 through A-1118.) The parties also agreed that Freeport would pay SAI Geothermal a monthly payment of 6% of the West Ford Flat plant's net income. This monthly payment is referred to as the Net Profits Interest ("NPI"). SAI Geothermal subsequently transferred a portion of its right to receive the NPI to SAI Trust, which is entitled to a monthly NPI payment of 4.55% of net income. (See Declaration of Robert Membreno in Support of Motion for Summary Judgment, dated August 12, 2008 ("Membreno Decl."), ¶ 5, A-1033.) Freeport assigned its rights and obligations under the Agreement for Purchase to the predecessor entity to Calpine in 1990. (See id. ¶ 6, A-1033.)

The parties do not dispute that the term "Project," as used in the Agreement for Purchase, refers to the West Ford

---

[1] The following facts are derived from the appellate record. Below statements in the record are indicated by "A-."

Flat power plant.  The Agreement for Purchase defines net income as gross revenues from the West Ford Flat plant minus: (1) "all Project direct operating expenses (excluding depreciation)"; (2) "general and administrative expenses associated with the Project"; (3) "the cost of any Project related capital additions made subsequent to the Date of First Commercial Operation"; and (4) "if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of project financing."  (Agreement for Purchase, 21, A-1068.)  The Agreement for Purchase defines "Net Profits Interest" as, "with respect to the Project, the right to receive a payment each month ... in an amount equal to 6% of Net Income for the month."  (<u>Id.</u>)

The Agreement for Purchase specifies that the calculation of direct operating expenses and general and administrative expenses shall be governed by "the Accounting Procedure provided in Exhibit F."  (<u>Id.</u>)  Exhibit F is entitled "Accounting Procedure Joint Operations," and lists twelve categories of "Direct Charges," including "Other Expenditures." (Agreement for Purchase, Ex. F at 2 3, A-1105 to A-1106.)  "Other Expenditures" is defined as "[a]ny other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is

incurured by the Operator in the necessary and proper conduct of the Joint Operations."  (Id. 3, A-1106.)

The Agreement for Purchase also requires, within sixty days of the end of each fiscal year, a statement "certified by [Freeport's] chief financial officer showing in reasonable detail the calculation of the Net Profits Interest." (Agreement for Purchase ¶ 1.6, A-1053.)  SAI Geothermal, and subsequently SAI Trust, "shall have the right, upon reasonable notice ... to audit [Freeport's] records to determine whether the calculation of the Net Profits Interest during the fiscal year then ended was in accordance with" the Agreement for Purchase.  (A-1053 to A-1054.)

## 2.   1989 NPI Statement Explanation

On December 13, 1989, Freeport wrote to SAI Trust with an "explanation of the line items comprising the SAIT-APT Net Profits Interest Statement for the West Ford Flat power plant," attaching a copy of the August 1989 NPI statement. (Letter from Freeport to R.J. Membreno, dated December 13, 1989, A-1122.)  The document describes thirteen line items: electric revenue, interest income from overnight deposits, escrow balance, royalty payments, lease operating expenses, overhead, property taxes, capital additions (major construction), capital additions (overhead), capital additions (development capital), project financing, invested capital,

and loan proceeds.   (See id., A-1122 to A-1124.)   Lease
operating expenses are described as: "Actual costs incurred in
the operation of the Plant.   Labor costs and related payroll
burden are limited to those individuals identified as billable
under Exhibit F of the Agreement for Purchase and Sale of
Asset ...."   (Id., A-1123.)   Overhead is described as:
"Computed at 15% of Lease Operating Expenses as specified in
the Agreement."   (Id.)

   3.   1992 Judgment After Trial

   At some point after NPI payments began, a dispute arose
between SAI Trust and Freeport, and a trial was held in the
California Superior Court for the County of Santa Clara, in
the matter of Membreno v. Freeport McMoran Resource Partners,
LP, No. 708898.   On May 11, 1992, a judgment (the "1992
Judgment") was entered, ordering that "[w]ith respect to the
calculation of Invested Capital" as used to determine NPI
payments, defendants could not use Council of Petroleum
Accountants Societies, Inc. ("COPAS") percentage rates "to
determine the amount of ... overhead with respect to the
construction of" the West Ford Flat power plant because those
rates "were not a part of the Agreement." (1992 Judgment 3,
A 1328.)

### 4.   1995 Settlement Agreement

Subsequently, another dispute arose relating to an audit by SAI Trust of the operations of the West Ford Flat power plant for part of 1990 and all of 1991.   In a settlement agreement between Calpine, Freeport, and SAI Trust, dated February 28, 1995 (the "Settlement Agreement"), the parties agreed that

> adjustments be made to previously issued NPI statements prepared by Calpine Geysers, to the manner by which future NPI statements will be prepared, to the payment of net profits found owing to SAI Trust as the result of the 1990 and 1991 audit, and to the payment of net profits for 1992 and thereafter.

(Settlement Agreement 3, A-1316.)   The Settlement Agreement details, among other things, the adjustments to be made to calculations of "Overnight Interest" and "Escrow Balance," as well as changes in debt amortization resulting from a new loan with a lower interest rate.

The Settlement Agreement also states,

> Except as specifically set forth herein, nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement for Purchase, specifically including, but not limited, to Sections 1.6 and 9.5.   Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPINE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

(Id. 9-9, A-1321 to A-1322.)

5.   <u>Consolidation of Calpine Operations</u>

The West Ford Flat plant is located at the Geysers steam field ("the Geysers"), in Sonoma County, California.  By 1998, Calpine owned or had interests in four power plants at the Geysers.   In 1999, Calpine acquired fourteen plants at the Geysers.  Calpine now owns nineteen out of twenty-two power plants at the Geysers site.  (<u>See</u> Declaration of Guy Tipton in Support of Calpine's Motion for Summary Judgment, dated August 13, 2008, ¶ 6, A-999.)

In 1999, "Calpine began to streamline and consolidate the operation of the plants and the steam fields into operational areas, and all its Geysers units into one consolidated operation."  (<u>Id.</u>)  Calpine then "consolidated its operation and business units with the intent to achieve efficiencies and cost savings associated with economies of scale."  (<u>Id.</u>)

6.   <u>2001 Changes to NPI Calculations and Certification</u>

Beginning in April 2001 with the NPI statement for January 2001, the NPI statements prepared by Calpine include a line item called "Allocated Expenses."  SAI Trust contends that the Allocated Expenses figure relies upon "budgeted figures, as opposed to actual figures," and that the NPI statements containing this line item have included 'costs and expenses attributable to facilities other than West Ford Flat which are not properly attributable to West Ford Flat under

of certified NPI statements has prevented it from auditing the NPI statements since 2001, as it is entitled to do under the Agreement for Purchase.

B.   <u>PROCEDURAL HISTORY</u>

SAI Trust filed six proofs of claim relating to the facts described above against six different entities in the Calpine bankruptcy cases on July 27, 2006.  On April 5, 2007, SAI Trust amended its claims to assert $245,723.09 in damages. Calpine objected to the proofs of claim on April 11, 2007.

The Bankruptcy Court confirmed Calpine's sixth amended joint plan of reorganization on December 19, 2007, and that plan took effect on January 31, 2008.  SAI Trust and Calpine filed the instant cross-motions on August 13, 2008; Calpine moved for summary adjudication discharging the six SAI claims, and SAI Trust moved for summary judgment on those claims.

SAI Trust argued that the 2001 change in NPI calculations and Calpine's failure to certify NPI statements since 2001 constituted breaches of the Agreement for Purchase.  SAI Trust also argued that the method for calculating NPI payments was already the subject of the 1992 Judgment, as well as the Settlement Agreement from 1995, and that Calpine was precluded from contesting whether Allocated Expenses may be included in NPI calculations.  Finally, in its opening summary judgment papers SAI Trust sought attorneys' fees pursuant to the

Agreement for Purchase, as well as damages of $583,698.61. In its reply papers, SAI Trust sought a judgment of $748,824.49, a figure that includes attorneys' fees.

Calpine argued that the Allocated Expenses fell within the direct operating expenses which the Agreement for Purchase permits Calpine to include in its NPI calculations; that only expenses attributable to the West Ford Flat plant are included in the Allocated Expenses line item; and that neither the 1992 Judgment nor the 1995 Settlement Agreement precluded Calpine from including such expenses in the NPI calculations. Calpine also argued that SAI Trust could not prove that any damages were proximately caused by Calpine's failure to certify NPI statements.

On September 24, 2008, the Bankruptcy Court heard oral argument and denied SAI Trust's petition for attorneys' fees. On September 26, 2008, the Bankruptcy Court issued a memorandum decision granting Calpine's motion for summary adjudication to discharge the six claims and denying SAI Trust's motion for summary judgment. The Bankruptcy Court applied California law in finding that Section 9.1 of the Agreement for Purchase was "clear and unambiguous on its face" in "call[ing] for the deduction of all 'direct operating expenses' from the calculation of net income." (A-1757) (emphasis in original). The Bankruptcy Court determined that

"the language of section 9.1 is broad enough to encompass overhead costs allocated by [Calpine] to the West Ford Plant." (Id.)   The Bankruptcy Court noted that Exhibit F of the Agreement for Purchase "identifie[d] twelve permissible categories," and that one of those categories was a "catch-all provision" allowing for the deduction of "any expenditure, incurred 'in the necessary and proper conduct of the [West Ford Flat plant].'" (alterations added) (A-1758).   The Bankruptcy Court concluded, "Clearly the overhead allocations deducted by Calpine were 'necessary and proper' to the operation of the West Ford Plant once Calpine began operating the West Ford Plant as a part of the centralized Geysers." (Id.)

The Bankruptcy Court also found that Calpine had not deducted expenses from NPI payments "that were attributable to any plant other than the West Ford Plant." (A-1757.)   The Bankruptcy Court observed that SAI Trust's reading of section 9.1 "would result in a windfall to SAI Trust allowing it to avoid application of any direct operating expenses associated with centralized operations and maintenance and properly allocated to the West Ford Plant." (A-1757 to A-1758.)

In addition, the Bankruptcy Court pointed out that SAI Trust "sold its management interest in the West Ford Plant" by signing the Agreement for Purchase, and that there was

"nothing in the [Agreement for Purchase] that can be read or construed to limit the Reorganized Debtors' ability to manage the operations of the West Ford Plant as part of the consolidated Geysers unit." (A-1758.)

The Bankruptcy Court also rejected SAI Trust's estoppel arguments, finding "no possible estoppel or preclusive effects from the resolution of either the 1995 dispute or the 1992 State Court Action." (A-1759.) The court noted that the disputes were resolved "years before [Calpine] made the decision to consolidate the operations at the Geysers and neither disagreement addressed the method of calculating 'operating expenses' at issue here." (Id.)

Finally, the Bankruptcy Court determined that SAI Trust could not prove "any damages proximately caused from Calpine's failure to provide certified NPI statements," noting that "SAI Trust's attempt to massage its damages claim from approximately $245,000 as set forth in its proofs of claim to over $700,000 in its summary judgment pleading is inappropriate and without justification." (Id.; id. n.2)

By order dated September 30, 2008, the Bankruptcy Court granted Calpine's motion for summary adjudication, denied SAI Trust's motion for summary judgment, and disallowed and expunged SAI Trust's six claims. The Bankruptcy Court did not address SAI Trust's argument that Calpine had breached the

implied covenant of good faith and fair dealing.  SAI Trust appealed the September 26, 2008 memorandum decision and the September 30, 2008 order to this Court.

## II. DISCUSSION

### A.   LEGAL STANDARD

A district court reviews a bankruptcy court's factual findings under a clearly erroneous standard and reviews its legal conclusions de novo.  See In re Duffy, 344 B.R. 237, 242 (S.D.N.Y. 2006).

In connection with a motion under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the evidence "show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Id. at 248.  A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.  The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).  The moving party bears the burden

of proving that no genuine issue of material fact exists, or that due to the paucity of evidence presented by the non-movant no rational jury could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., Inc., 22 F.3d 1214, 1223-24 (2d Cir. 1994). When deciding cross-motions for summary judgment, the standard to be applied is the same as that for individual summary judgment motions, and a court must consider each motion independent of the other. Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (internal quotation mark and citation omitted).

The Agreement for Purchase specifies that California law applies. (See Agreement for Purchase ¶ 9.6, § 10(f).) Under California law, a court interprets a contract "by examining the contract's language, the parties' their intentions as expressed in the contract and the circumstances under which the parties contracted." Kassbaum v. Steppenwolf Prods., Inc., 236 F.3d 487, 491 (9th Cir. 2000).

Summary judgment in a contract dispute is normally appropriate if the contract is not ambiguous. See Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) ("We may grant summary judgment motions touching upon contract interpretation when the agreement is unambiguous."). A contract is ambiguous if it is susceptible to more than one reasonable interpretation. See ASP Props.

Group v. Fard, Inc., 133 Cal. App. 4th 1257, 1270 (Cal. Ct. App. 2005).

However, a court applying California contract law may also consider extrinsic evidence regarding contract interpretation, even if it does not find the language of the contract to be ambiguous. "In contrast to many other states, California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous." Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 826 (9th Cir. 2001). Under California law, "the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641, 644 (Cal. 1968); see also Foad Consulting Group, 270 F.3d at 826 (quoting Pacific Gas & Elec., 442 P.2d at 644).

A bankruptcy court's denial of a request to amend a claim is reviewed for abuse of discretion. See In re Enron Corp., 419 F.3d 115, 124 (2d Cir. 2005); In re Calpine Corp., No. 07 Civ. 3493, 2007 WL 4326738, at *3 (S.D.N.Y. Nov. 21, 2007).

## B.   APPLICATION

The Court will first address the Bankruptcy Court's determination that neither the 1992 Judgment nor the 1995 Settlement Agreement have any effect on the issues implicated by SAI Trust's six claims.  The Court will next consider the Bankruptcy Court's conclusion that Calpine's use of the Allocated Expenses line item in calculating NPI payments comports with the Agreement for Purchase, as well as the determination that SAI Trust failed to demonstrate that it suffered damages as a result of Calpine's failure to certify the NPI statements since 2001.  The Court will then address SAI Trust's argument that Calpine has breached the implied covenant of good faith and fair dealing inherent in all contracts.  Finally the Court will consider SAI Trust's request for attorneys' fees.

### 1.   1992 Judgment

The Bankruptcy Court ruled that the 1992 Judgment had "no possible estoppel or preclusive effects" because the 1992 Judgment was handed down "years before [Calpine's] management made the decision to consolidate the operations at the Geysers" and because the disagreement in the 1992 state court action did not address "the method of calculating 'operating expenses' at issue here."  (A-1759.)

"In deciding the preclusive effect of a state court judgment in federal court," a bankruptcy court should apply "the law of the state that rendered the judgment to determine whether the courts of that state would afford the judgment preclusive effect." In re Weiss, 255 B.R. 115, 118 (S.D.N.Y. 2000.)  Under California law, a party is precluded from relitigating an issue addressed in an earlier action if the following conditions are met:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

In re Cantrell, 329 F.3d 1119, 1123 (9th Cir. 2003) (internal quotation marks and citation omitted).

SAI Trust contends that the issue of whether Calpine may use Allocated Expenses in calculating NPI payments was already the subject of the 1992 Judgment because that judgment represents the trial court's rejection of "an attempt by Calpine to unilaterally alter the manner in which NPI was calculated." (Appellant's Br. 24-25.)  In the 1992 Judgment, the California Superior Court determined that "[w]ith respect to the calculation of Invested Capital," Calpine's successor, Freeport, had wrongly used COPAS percentage rates in its

calculations.   (1992 Judgment 3, A-1328.)   The Superior Court ruled that the COPAS percentage rates "were not a part of the Agreement [for Purchase]" and that Freeport "may not use those COPAS percentage rates to determine the amount of its overhead with respect to the construction" of the West Ford Flat plant. (Id.)   The Superior Court ordered that SAI Trust be paid $58,000.00 in additional NPI payments, based on the "recalculation of the proper overhead attributable to the construction of the project." (Id.)

The Court affirms the Bankruptcy Court's determination on this issue.   The 1992 Judgment concerned sections of the Agreement for Purchase that are not at issue here, and SAI Trust has failed to carry its burden of demonstrating that all of the collateral estoppel factors have been met.   The Superior Court's ruling on the calculation of Invested Capital, which is the subject of what SAI Trust holds out as the relevant portion of the 1992 Judgment, was not a final ruling on the issue of the items that may be used in calculating NPI payments.   Although the SAI Trust characterizes the Superior Court's statement that "the COPAS percentage rates utilized by defendants were not a part of the Agreement [for Purchase]" as a ruling that NPI calculations can be based only on line items or other elements that are explicitly part of the Agreement for Purchase, the Court

rejects this interpretation. The 1992 Judgment gives no indication that it addresses the appropriate method for carrying out all facets of NPI payment calculations. The issue of whether the category of Allocated Expenses, as used by Calpine, may be included in NPI calculations was not "actually litigated" or "necessarily decided" in the 1992 Judgment, <u>Cantrell</u>, 329 F.3d at 1123. Therefore, the Bankruptcy Court correctly ruled that the 1992 Judgment has no preclusive effect on this action.

### 2.   1995 Settlement Agreement

In addition to finding no preclusive effect from the 1992 Judgment, the Bankruptcy Court found that the 1995 Settlement Agreement had "no possible estoppel or preclusive effects" because the 1995 Settlement Agreement was handed down "years before [Calpine's] management made the decision to consolidate the operations at the Geysers" and because the disagreement in the 1992 state court action did not address "the method of calculating 'operating expenses' at issue here." (A-1759.)

The Court affirms the Bankruptcy Court's determination that the 1995 Settlement Agreement has no preclusive effect in this action. The 1995 Settlement Agreement is not a final judgment on the merits, and the issue of whether the Allocated Expenses line item, as used by Calpine, may be included in NPI calculations was not "actually litigated" or "necessarily

decided" by the 1995 Settlement Agreement. <u>Cantrell</u>, 329 F.3d at 1123.

### 3.   Allocated Expenses in NPI Calculations

The Bankruptcy Court determined that Calpine's use of the Allocated Expenses line item in calculating NPI payments, which began in 2001, was permissible under the Agreement for Purchase. SAI Trust argues that the Bankruptcy Court erred in interpreting the Agreement for Purchase "to cover 18 plants that were never contemplated at the time the agreement was entered into in 1987," as well as in "ignoring the term 'project'" as it was used in the Agreement for Purchase and "holding that the term 'direct operating expenses' was broad enough to include expenses derived from these 18 other plants." (Appellant's Br. 18.) SAI Trust's argument is based in part on the course of dealing between the parties in the period between 1989 and 2001. Calpine does not address this argument, and contends that "[t]here is nothing in the [Agreement for Purchase] that prohibits Calpine from allocating the West Ford Plant's share of the twelve categories of expenses in Exhibit F." (Appellee's Br. 13.)

The Court finds that the Bankruptcy Court erred when it failed to consider the course of dealing between the parties from 1989 to 2001 in its interpretation of the Agreement for Purchase. Under California law, extrinsic evidence may be

used to interpret the terms of a contract if "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible," Pacific Gas & Elec., 442 P.2d at 644, even if the language of the contract is not ambiguous. See Foad Consulting Group, 270 F.3d at 826. Although the parol evidence rule "generally prohibits the introduction of any extrinsic evidence ... to vary, alter or add to the terms of an integrated written instrument," this does not "prohibit the introduction of extrinsic evidence to explain the meaning of a written contract" when "the meaning urged is one to which the written contract terms are reasonably susceptible." Casa Herrera, Inc. v. Beydoun, 83 P.3d 497, 502 (Cal. 2004) (internal quotation marks and citations omitted).

A course of dealing is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Cal. Com. Code § 1303(b). Contract parties' "prior course of dealings may determine the meaning of a contract term or may add an agreed but unstated term." Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc., 89 Cal. App. 4th 1042, 1051 (Cal. Ct. App. 2001). The explanation of the NPI statements sent by Calpine's

predecessor to SAI Trust in December 1989, combined with NPI payments from 1989 to 2001 consistent with this explanation, created a course of dealing sufficient to explain the meaning of the contract terms in dispute here.  See, e.g., id. (conduct that was consistent across dozens of transactions was a course of conduct incorporating terms of a written agreement into an oral agreement); Insurance Co. of No. Am. v. NNR Aircargo Serv. (USA), Inc., 201 F.3d 1111, 1114 (9th Cir. 2000) ("receipt of 47 identical invoices for 47 separate transactions" was sufficient to establish course of dealing with respect to a term inherent to the type of contract at issue).

    The existence of a course of dealing would normally be a question of fact that the Bankruptcy Court would determine in the first instance, but the facts surrounding the course of dealing are not in dispute.  This Court may thus interpret the Agreement for Purchase in light of the course of dealing.[2]

    When the parties' prior course of conduct is considered, the Court finds that the Agreement for Purchase does not permit the inclusion of the Allocated Expenses line item.  The

---

[2]   Although several courts in the Ninth Circuit have held that "[a]n inference of the parties' common understanding that is based upon a prior course of dealing is a question of fact," Insurance Co., 201 F.3d at 1113 (citing In re CFLC, Inc., 166 F.3d 1012, 1017 (9th Cir. 1999)), conclusion appears to be based upon cases from the Second and Seventh Circuits that do not apply California law.  See CFLC, 166 F.3d at 1017 (citing New Moon Shipping Co., Ltd. v. Man B&W Diesel, Ag, 121 F.3d 24, 31 (2d Cir. 1997) (citing Capitol Converting Equip., Inc. v. LEP Transp., Inc., 965 F.2d 391, 395 (7th Cir. 1992))

meaning of the Agreement for Purchase suggested by the December 1989 explanation and the NPI payments from 1989 to 2001, with respect to calculation of NPI payments, is that the line items to be included in the NPI calculations were those reflected in the December 1989 explanation and the NPI payments from 1989 to 2001. At the very least, the course of dealing shows that the parties did not contemplate that NPI calculations would include an Allocated Expenses line item reflecting the West Ford Flat plant's share of consolidated business operations expenses. This interpretation is one to which the terms of the Agreement for Purchase are "reasonably susceptible," <u>Casa Herrera</u>, 83 P.3d at 502, in part because at the time the Agreement for Purchase was signed Freeport was not operating the West Ford Flat plant as part of a consolidated enterprise, and Calpine did not begin to consolidate operations at the Geysers until at least 1999, and possibly later.

This course of dealing continued even after Calpine began to acquire interests in other power plants at the Geysers. Calpine contends that by 1999 it owned fourteen plants at the Geysers, and that it began to consolidate its operations at the Geysers that same year. However, Calpine did not add the Allocated Expenses line item to NPI calculations for the West Ford Flat plant until 2001. At no time was there mutual

assent to the addition of the Allocated Expenses line item, and the NPI payments from 2001 forward cannot constitute a subsequent course of dealing affecting the interpretation of the Agreement for Purchase because that conduct is not "fairly to be regarded as establishing a common basis of understanding" between the parties. Cal. Com. Code § 1303(b).

The Bankruptcy Court's denial of SAI Trust's motion for summary judgment and grant of Calpine's application for summary adjudication are reversed as to the use of the Allocated Expenses line item in the calculation of NPI payments. The Court notes that the Bankruptcy Court's determination that SAI Trust's damages claim of "over $700,000 in its summary judgment pleading is inappropriate and without justification" (A-1759) is based partly on its finding that there was no breach of the Agreement for Purchase. The Bankruptcy Court did not consider the course of dealing between the parties from 1989 to 2001 in reaching its conclusion. A ruling based upon an erroneous view of the law is an abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990). The Court therefore reverses the Bankruptcy Court's denial of SAI Trust's damages claim with respect to the addition of the Allocated Expenses line item beginning in 2001.

The Court does not have information regarding the steps SAI Trust took to contest the change to the NPI payments that occurred in 2001, beyond SAI Trust's assertion in its appellate brief that it brought the matter to Calpine's attention. (See Appellant's Br. 15.) Assuming, however, that SAI Trust has not forfeited its objection to the use of the Allocated Expenses line item, the Bankruptcy Court should determine and award SAI Trust the damages caused by Calpine's inclusion of the Allocated Expenses line items from 2001 forward.

### 4. Damages from Failure to Certify NPI Statements

SAI Trust appeals the Bankruptcy Court's finding that SAI Trust was not able to prove that it suffered damages proximately caused by Calpine's failure to certify NPI statements beginning in 2001. The Bankruptcy Court found that Calpine had "provided SAI Trust with the underlying information necessary to confirm [its] calculations of NPI. Specifically, each month SAI Trust receives financial reports which provide detailed information on, among other things, monthly revenue, monthly interest calculations and costs associated with the West Ford Plant." (A-1759.)

SAI Trust contends that when calculating the Allocated Expenses line item, Calpine has used budgeted or projected expenses "that may or may not have ever been actually

incurred," and that Calpine's failure to annually certify the NPI statements has reinforced or exemplified "the reality that no one on behalf of [Calpine] is willing to ascribe their name to such questionable accounting practices." (Appellant's Br. 38.)   SAI Trust argues that the Agreement for Purchase authorizes it to conduct an audit of the annual certifications, but that it was prevented from conducting any audit of the NPI statements, and thus investigating the basis for the Allocated Expenses line items, when Calpine stopped providing the certifications in 2001.

Although there may be outstanding factual questions regarding the precise composition of the Allocated Expenses line item, the Court affirms the Bankruptcy Court's determination that SAI Trust did not show that it suffered damages proximately caused by Calpine's failure to annually certify the NPI statements.   It is not clear that SAI Trust was actually prevented from carrying out an audit of the records that were provided to it by Calpine, even if those records were not certified.   However, the absence of an audit has not caused damages to SAI Trust; rather, it was the use of the Allocated Expenses line item in the NPI calculations that caused damages to SAI Trust.

5.   Implied Covenant of Good Faith and Fair Dealing

The Bankruptcy Court did not rule on SAI Trust's claim

that Calpine breached the implied covenant of good faith and fair dealing.  Because the Court is not required to resolve any factual disputes to address this claim, the Court will rule on the merits of the implied covenant claim.  See, e.g., In re Treco, 240 F.3d 148, 163 (2d Cir. 2001) (affirming district court's determination of forum clause selection argument that was not addressed by the bankruptcy court); In re Persky, 893 F.2d 15, 17-18 (2d Cir. 1989) (resolving standing claim not addressed by the bankruptcy court).

In its summary judgment papers and in its papers on appeal, SAI Trust argues that Calpine breached the implied covenant when it changed its accounting methods with respect to the West Ford Flat plant, stopped providing certified NPI statements, and used projected or inaccurate figures in its NPI calculations, "all in contradiction to that which was set forth in the Agreement for Purchase."  (A-1402; Appellant's Br. 40.)

Under California law, a claim for breach of the implied covenant of good faith and fair dealing cannot be sustained if the basis for that claim is duplicative of a breach of contract claim.  See Careau & Co. v. Security Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1271, 1395 (Cal. Ct. App. 1990).  SAI Trust's claim for breach of the implied covenant relies on precisely the conduct complained of in the breach of

contract claim.  The implied covenant claim should therefore be dismissed.

### 6.  Attorneys' Fees

The Bankruptcy Court denied SAI Trust's request for attorneys' fees at the hearing on this matter, before it issued its memorandum decision denying SAI Trust's motion for summary judgment and granting Calpine's application for summary adjudication.  Section 9.3 of the Agreement for Purchase provides that the prevailing party shall recover its "attorneys' fees and other costs incurred" in "any legal action ... brought for the enforcement" of the Agreement for Purchase.  (A-1064.)  Because the Court has determined that Calpine has breached the Agreement for Purchase such that SAI Trust should be granted summary judgment and Calpine should be denied summary adjudication on the issue of the use of the Allocated Expenses line item, SAI Trust is entitled to attorneys' fees and other costs with respect to the litigation of this issue.  The Bankruptcy Court's ruling on attorneys' fees is therefore reversed.

### III. ORDER

For the reasons stated above, it is hereby

ORDERED that the order of the Bankruptcy Court dated September 30, 2008, based on its decision dated September 26, 2008 granting the motion of the Reorganized Debtors

("Calpine") for summary adjudication disallowing claims numbered 6309, 6314, 6315, 6316, 6327, and 6328 filed by Robert Membreno, as trustee of SAI Trust ("SAI Trust"), denying the motion of SAI Trust for summary judgment on those Proofs of Claim, and disallowing and expunging those claims, is REVERSED as to the finding that Calpine did not breach the Agreement for Purchase, the rejection of SAI Trust's damages claim for that breach, and the ruling denying SAI Trust's request for attorneys' fees; and is AFFIRMED as to the finding that SAI Trust did not prove any damages proximately caused by Calpine's failure to provide certified Net Profits Interest statements. It is further

ORDERED that the action is remanded to the Bankruptcy Court for further proceedings consistent with this opinion, including the dismissal of the claim for breach of the implied covenant of good faith and fair dealing, and a determination and award of damages and attorneys' fees.

The Clerk of the Court is directed to withdraw any pending motions and to close this case.

SO ORDERED.

Dated: New York, New York
       9 June 2009

Victor Marrero
U.S.D.J.

# SAI Trust v. Calpine

From: **Lawrence Glynn** (glynn04@hotmail.com)

Sent: Thu 10/08/09 11:06 AM

To: mgm9@aol.com; skipperjm@yahoo.com

    1 attachment

    sai.bill.sept.09.pdf (66.9 KB)

**Attn: Robert Membreno/Marc Membreno**

Dear Robert and Marc,

Please be advised that I am in the process of winding down my employment at Nicoletti Hornig & Sweeney. Please be advised that this WILL NOT effect my ability to provide you the same quality representation going forward. I will continue to personally work on all of my clients' cases, including yours under my own firm whose details are set forth below. You will note that with respect to your case, I personally have performed 99% of the work.

Please be advised that through August, 2009, SAI has a balance of $9,847.64 with Nicoletti Hornig & Sweeney. I ask that you continue to pay this balance in the same way as you have for the last year, which usually is $2,500 - $5,000 per month.

Please be advised that my new firm is:

Caruso Glynn, LLC

Tax I.D. # 27-0317708

53-04 193rd Street

Fresh Meadows, New York 11365

(718) 570-3338

e-mail: glynn04@hotmail.com

There is a balance from September 1, 2009 through September 30, 2009 of $6,752.00. My invoice is attached herewith. I request that you make this payment directly to my new firm at the above address. Also, as the Southern District Court has ruled that Calpine is ultimately responsible for all attorneys' fees, I propose that going forward, I will continue to handle this matter on a contingency fee basis. Accordingly, you will not receive any further invoices in this matter (save for invoices from Nicoletti Hornig & Sweeney for the balance owed prior to September 1, 2009) and I will NOT be paid until SAI Trust is paid. The contingency fee will be an extremely reasonable 22.5% of the gross recovery (not including past attorneys' fees and accounting fees) plus necessary out of pocket expenses (for copying, printing, etc.) Please confirm your agreement to these terms.

If you would prefer to stay with a time basis, please advise. However, please note that my fee in this matter has increased from $260.00 to $320.00 per hour.

Sincerely,

Lawrence Caruso Glynn

Caruso Glynn, LLC

Hotmail: Powerful Free email with security by Microsoft. Get it now

Exhibit
B

G.      WHEREAS, on or about April 5, 2007 Calpine filed its Eleventh Omnibus Objection [Docket No. 4248] in which Calpine objected to the SAI Trust Claims as unliquidated and invalid (the "Eleventh Omnibus Objection").

H.      WHEREAS, on or about June 11, 2007 SAI Trust filed Amended Proofs of Claim, Nos. 6309, 6314, 6315, 6316, 6327, and 6328, respectively, each seeking unsecured non-priority claim damages, plus interest, cost and attorneys fees in an estimated amount of $245,723.09, arising from the claims set forth in the First California Case (the "Amended SAI Trust Claims").

I.      WHEREAS, on or about August 7, 2007, Calpine filed its Eighteenth Omnibus Objection [Docket No. 5560] in which Calpine objected to the SAI Trust claims as invalid and without merit (the "Eighteenth Omnibus Objection") and on or about September 20, 2007, Calpine filed its Twenty-Second Omnibus Objection [Docket No. 6054] further objecting to SAI Trust's Amended Proofs of Claim.

J.      WHEREAS, on or about December 19, 2007, the Bankruptcy Court approved the Debtors' Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"). The Plan became effective on January 31, 2008.

K.      WHEREAS, after the Bankruptcy Court approved the Plan, Calpine and SAI Trust continued to dispute the claims asserted in SAI Trust's Amended Proofs of Claim. Between August, 2008 and September, 2008 Calpine and SAI Trust briefed and argued cross-motions for summary judgment and adjudication in the Bankruptcy Court. [Docket Nos. 7913-7919, 7952-7957 and 7959-7962].

L.      WHEREAS, on or about September 30, 2009, the Bankruptcy Court entered its "Order Granting Reorganized Debtors' Motion for Summary Adjudication Discharging SAI Trust's Claim Nos. 6309, 6314, 6315, 6316, 6327 and 6328 and Denying SAI Trust's Motion for Summary Judgment" (the "Bankruptcy Court Order") [Docket No. 7981] and the "Memorandum Decision on Reorganized Debtors' Motion for Summary Adjudication of SAI Claims and SAI Trust's Countermotion for Summary Judgment (the "Bankruptcy Court Decision").   The Bankruptcy Court granted Calpine's Motion for Summary Judgment and denied SAI Trust's Motion for Summary Judgment

M.      WHEREAS, SAI Trust timely appealed the Bankruptcy Court's Order and Decision to the United States District Court for the Southern District of New York (the "District Court") in an appeal entitled In re Calpine Corporation, Case No. 08-civ-9797 (Southern District of New York).  Between December 2009 and January 2010, the Parties briefed SAI Trust's appeal to the District Court.

N.      WHEREAS, on or about June 9, 2009, the District Court entered its order affirming-in-part and reversing-in-part the Bankruptcy Court's Order and remanding to the Bankruptcy Court for a calculation of damages pursuant to its ruling (the "District Court Order") [Docket No. 13], which District Court Order was entered by the Clerk for the Southern District of New York on June 15, 2009.

2

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement (the "Agreement") dated as of March __, 2010 (the "Effective Date"), is by, between and among Calpine Corporation, Freeport McMoran Resource Partners, LP, Santa Rosa Geothermal Company, LP, Sonoma Geothermal Partners, L.P.; Calpine Sonoma, Inc.; and Calpine Geysers Company, L.P. (collectively, "Calpine Entities") and Robert Membreno, Trustee of the SAI Trust ("SAI Trust"). The Calpine Entities and SAI Trust are referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

A.      WHEREAS, on or about May 17, 1987, SAI Geothermal, Inc. and Freeport McMoran Resources Partners, L.P. entered into an agreement entitled "Agreement For Purchase And Sale of Assets" (the "Agreement For Purchase"), which Agreement For Purchase was properly assigned to various parties over the years.

B.      WHEREAS, on May 11, 1994, a Judgment Following Court Trial was entered in the Superior Court of California, County of Santa Clara, entitled *Robert J. Membreno, Trustee of The SAI Trust v. Freeport McMoran Resource Partners, Limited Partnership, Calpine Corporation, Santa Rosa Geothermal Company, L.P., Sonoma Geothermal Partners L.P., Calpine Sonoma, Inc., et al*, Case No. 708898, consolidated with 708899, addressing, among other things, various aspects of the Agreement For Purchase (the "1994 Judgment").

C.      WHEREAS, on or about December 31, 1994 Calpine Corporation ("Calpine") entered into a Settlement Agreement (the "1994 Settlement Agreement") addressing, among other things, net profit interest payment ("NPI") issues raised by SAI Trust at that time, which preserved the Agreement For Purchase and rights and remedies therein.

D.      WHEREAS, on or about May 26, 2005 SAI Trust filed a complaint against the Calpine Entities in the Superior Court Of California, County Of Santa Clara, entitled *Robert Membreno, Trustee of the SAI Trust v. Freeport McMoran Resource Partners, a Limited Partnership, Santa Rosa Geothermal Company, L.P., Sonoma Geothermal Partners, L.P., Calpine Sonoma, Inc., Calpine Geysers Company, L.P., Calpine Corporation, et al.*, Case No. 105cv041957, seeking, among other things, accounting, damages for breach of the Agreement For Purchase related to the determination of monthly NPI payments, declaratory relief and specific performance (the "First California Case").

E.      WHEREAS, on or about December 20, 2005, Calpine and certain of its affiliates, including the Calpine Entities, filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy code (the "Bankruptcy Code"), which are jointly administered in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

F.      WHEREAS, on or about July 25, 2006, SAI Trust timely filed Proofs of Claim Nos. 2672, 2677, 2678, 2798, 2799, 2800, and 2802, respectively, each seeking unsecured non-priority claim damages, plus interest, costs and attorneys fees arising from the claims set forth in the First California Case (the "Original SAI Trust Claims").

*Exhibit C*

O.     WHEREAS, on or about December 19, 2009, SAI Trust filed a complaint in the Superior Court of California for the County of Santa Clara entitled *Robert Membreno, Trustee of the SAI Trust v. Freeport McMoran Resource Partners, a Limited Partnership, Santa Rosa Geothermal Company, L.P., Sonoma Geothermal Partners, L.P., Calpine Sonoma, Inc., Calpine Geysers Company, L.P., Calpine Corporation, et al.*, Case No. 109cv159712, seeking, among other things, accounting, damages for breach of the Agreement For Purchase related to the determination of monthly NPI payments, declaratory relief and specific performance (the "Second California Case").

P.     WHEREAS, SAI Trust's Amended Proofs of Claim are currently pending before the Bankruptcy Court and SAI Trust asserts damages for pre-petition, post-petition and post-emergence claims through December 31, 2009 in excess of $1,000,000.

Q.     WHEREAS, the Parties believe it to be in their respective best interests to enter this Agreement to resolve issues raised by SAI Trust in the First California Action, SAI Trust's Original Claims, SAI Trusts Amended Claims, and the Second California Action.

## AGREEMENT

NOW, THEREFORE in consideration of the mutual obligations and agreements contained herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Settlement Amount And Allowed Claim.  Pursuant to this Agreement and the Plan, Calpine shall provide SAI Trust a payment of cash and stock as set forth herein (the "Settlement Amount").

(a)     Allowed Claim.  In accordance with the Plan, SAI Trust is allowed a general unsecured claim in the amount of $1,000,000, which claim shall be satisfied in accordance with the Plan (the "SAI Trust Allowed Claim").  Calpine shall make a single distribution of 48,863 shares of Calpine Corporation  (stock symbol "CPN") Common Stock to SAI Trust on account of the SAI Trust Allowed Claim (the "SAI Trust Settlement Shares"), and SAI Trust shall not have any rights to, or be entitled to, any further stock distribution as part of this Agreement.

(b)     Additional Cash Payment.  In addition to the Allowed Claim, Calpine shall cause to be paid to SAI Trust a cash payment in an amount to determined as follows.  The SAI Trust Settlement Shares shall be valued at the closing price on the Transfer Date as defined in 1(c) (the "SAI Trust Settlement Shares Value").  Within five (5) business days from the Transfer Date, Calpine shall cause to be paid to SAI Trust a cash payment in the amount of $835,000 less the SAI Trust Settlement Shares Value.

(c)     Transfer of Common Stock.

(i)     Upon the Execution of this Agreement, Calpine shall instruct its transfer agent, Computershare Limited ("ComputerShare"), in writing to transfer the SAI Trust Settlement Shares to SAI Trust, or its designated qualified intermediary, in accordance with the Plan.  The date on which all Settlement Shares are transferred to and received by SAI Trust or its

3

designated qualified intermediary shall be the <u>Transfer Date</u>. The Transfer Date shall be no later than two business days after this Agreement is executed and in no event later than March 31, 2010.

   2.    <u>Stipulations Of Dismissal</u>.  Within three (3) business days after the Calpine Entities cause to be paid the Additional Cash Payment pursuant to Section 1 (b) of this Agreement, SAI Trust shall file stipulations that voluntarily dismiss the First California Case and the Second California Case with prejudice.

   3.    <u>Mutual Releases</u>.  Effective on the first business day after both SAI Trust files the Stipulations of Dismissal and the Calpine Entities cause to be paid the Additional Cash Payment (the "<u>Release Effective Date</u>"), the Parties do for themselves and their respective shareholders, agents, representatives, principals, employees, attorneys, trustees, owners, directors, officers, insurance carriers, subsidiaries, divisions, affiliate corporations, predecessors, successors and assigns, if any, (collectively, the "<u>Releasing Parties</u>") forever release, acquit, and discharge each other party and their respective shareholders, agents, representatives, principals, employees, attorneys, trustees, owners, directors, officers, insurance carriers, subsidiaries, divisions, affiliate corporations, predecessors, successors and assigns, if any, (collectively, the "<u>Released Parties</u>") of and from all claims, cross-claims, counter-claims, liabilities, demands, obligations, debts, indemnities, actions, or causes of action (however denominated), whether in law, contract, statute or in equity, direct or indirect, whether known or unknown, foreseen or not foreseen, or present or contingent, for any injury, damage, obligation, or loss whatsoever, including but not limited to compensatory damages, statutory liquidated damages, exemplary damages, punitive damages, losses, costs, expenses, or attorneys' fees, which each ever had or now has, owns, or claims to have as of December 31, 2009 against Calpine Corporation, Freeport McMoran Resource Partners, LP, Santa Rosa Geothermal Company, L.P, Sonoma Geothermal Partners, L.P.; Calpine Sonoma, Inc.; and Calpine Geysers Company, L.P. if by SAI Trust and against SAI Trust if a Calpine Entity, including any and all claims related to any and all allegations that were brought or could have been brought by any Party with respect to the subject matter of the First California Case, the Second California Case, Original SAI Trust Claims or Amended SAI Trust Claims.  Without limiting the foregoing, SAI Trust specifically releases any and all claims to seek an accounting or certification of any records by or from the Calpine Entities for time periods prior to December 31, 2009.  (All claims released in paragraph 3 are collectively the "<u>Released Claims</u>").

   4.    <u>Mutual Covenant Not To Sue</u>.  Without limiting the foregoing release in Section 3, and subject to the terms of this Agreement, the Parties hereby covenant and agree that, from and after the Release Effective Date, they shall not institute, bring or commence any action in any court, arbitration, or other forum against any Party that in any way arises from, is related to, or concerns the Released Claims.

   5.    California Code § 1542.  The Parties, with respect to the Released Claims, as of the Release Effective Date, shall knowingly, voluntarily, intentionally and expressly waive, as against the Released Parties, any and all rights and benefits conferred by California Civil Code Section 1542 and any law of any state or territory of the United States or principle of common law that is similar to Section 1542, which provides:

-4-

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

The Parties hereby acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code was separately bargained for.

6.    The Parties Ongoing Business Relationship.  The Parties recognize that their business relationship will continue into the future, until the expiration of the Agreement for Purchase.  In order to reduce the potential for any future lawsuits between the Parties related to the Agreement for Purchase, NPI payments or any aspect of the Parties' ongoing business relationship, the Parties agree that prior to service of any complaint, motion, lawsuit, or any action seeking any form of relief from an administrative or judicial body, they will conduct a one-day session of non-binding mediation.  Unless the Parties agree otherwise in writing, the mediation shall occur no later than thirty (30) days after a written request for mediation by either Party.  The mediation shall take place in Northern California at a location mutually convenient to the Parties.

7.    Reservation Of Rights.  Except as specifically set forth in paragraphs 3 and 4 of this Agreement, nothing herein shall otherwise affect, modify, alter, or alter the rights, duties or obligations of SAI Trust and the Calpine Entities in and under the Agreement for Purchase, the 1994 Judgment, or the 1994 Settlement Agreement, specifically including, but not limited to, the Agreement For Purchase-Section 1.2 Purchase Price, Section 1.5 Payment of Net Profits Interest, Section 1.6 Audit Rights of Seller, Section 9.3 Expenses; Attorney's Fees, Section 9.5 Assignment, and Section 9.10 Certain Definitions and the 1994 Settlement Agreement, paragraph 8 A.

8.    Court Jurisdiction.  Jurisdiction (and all Parties shall consent to such retention of jurisdiction) to resolve any disputes or controversies arising from or related to this Agreement shall be held by the state courts in and for the State of California and in the county(ies) with proper venue.  Any motion or application brought before the court to resolve a dispute arising from or related to this Agreement shall be brought on proper notice and in accordance with relevant California Rules of Civil Procedure and local rules of the applicable county.

9.    Representations and Warranties.  Each Party specifically warrants and represents to the other Parties that it has full authority to enter into this Agreement, which Agreement constitutes a legal, valid and binding obligation of such Party.  SAI specifically warrants and represent to the Calpine Entities that: (a) prior to the execution of this Agreement, they have not in any capacity assigned, pledged or otherwise sold or transferred, either by instrument or otherwise, to any person or entity, all or any portion of their claims against the Calpine Entities that are released under this Agreement; and (b) the Released Claims are owned by SAI Trust and are completely free of any encumbrances.  The Calpine Entities specifically warrant and represent to SAI that (a) prior to the execution of this Agreement, they have not in any capacity assigned, pledged or otherwise sold or transferred, either by instrument or otherwise, to any person or entity, all or any portion of their claims against SAI that are released under this

5

Agreement and (2) Bankruptcy Court consent of this Agreement is not required or authority to enter into this Agreement is provided for in the Plan. In executing this Agreement, each Party specifically warrants and represents that (i) it has been fully informed of the Agreement's terms, contents, conditions and effects regarding the same; (ii) it has had a full and complete opportunity to discuss this Agreement with its attorney or attorneys; (iii) it is not relying in any respect on any statement or representation made by any other Party (other than the statements and representations expressly set forth in this Agreement); (iv) it has obtained all approvals necessary to enter into, execute and perform this Agreement; and (v) no Party has made any promise or representation of any kind to it separate and apart from what is expressly contained in this Agreement.

10.    Survival of Representations.  The representations and warranties set forth herein shall survive the completion of all actions contemplated herein.  Other provisions hereof which require action after execution hereof shall survive the execution hereof.

11.    Materiality.    The statements, representations and acknowledgments in this Agreement are not mere recitations; rather, they are understood and relied upon as part of this Agreement by the Parties and are material hereto.

12.    No Admissions.  The Parties agree that this Agreement is a compromise and settlement of disputed claims and causes of action.  Nothing contained herein shall be construed as an admission of liability or damages by, on behalf of, or against any Party.  All communications (whether oral or in writing) between and/or among the Parties, their counsel, and/or their respective representatives relating to, concerning, or in connection with this Agreement, or the matters covered hereby and thereby, shall be governed and protected in accordance with Federal Rule of Evidence 408 and the applicable state equivalent to the fullest extent permitted by law.

13.    Other Documents.  If any additional documents are necessary or desirable to accomplish the purpose(s) of this Agreement or to establish the rights or discharge the obligations of any Party hereto, such additional instruments will be promptly executed and delivered upon the request of any other Party.

14.    Entire Agreement.  Except as stated in paragraph 7 of this Agreement, this Agreement constitutes the final and complete agreement of the Parties with respect to its subject matter, and supersedes all prior negotiations, discussions, offers, promises, representations, communications and agreements, whether oral or written, regarding Released Claims.  No statement made or action taken in the negotiation of the Agreement may be relied upon or used by any Party for any purpose whatsoever.

15.    Construction of Agreement.  The Parties agree that any ambiguity in this Agreement is not to be construed against any other Party on the grounds that such Party drafted the Agreement, but shall be construed as if all Parties jointly prepared this Agreement and any uncertainty or ambiguity shall not on that ground be interpreted against any one Party.  Any prior drafts of this Agreement shall not be used to determine the intent of the Parties.  Further, the advice of legal counsel has been obtained by all Parties prior to each Party's execution of the Agreement.  The Parties enter into this Agreement freely and voluntarily and with a full

6

understanding of its terms and significance. If any of the provisions, terms, clauses, or waivers or releases of claims or rights contained in this Agreement are declared illegal, unenforceable or ineffective in a legal or other forum or proceeding, such provisions, terms, clauses or waivers and release of claims or rights shall be deemed severable, such that all other provisions, terms, clauses and waivers and releases of claims and rights contained in this Agreement shall remain valid and binding upon all the Parties.

16.    <u>Admissibility of Agreement.</u> This Agreement and the negotiations, actions, and discussions relating to this Agreement shall not be admissible in any lawsuit, arbitration, action, or other proceeding brought by any Party against any other Party, except as shall be necessary to enforce the terms of this Agreement.

17.    <u>No Rights in Third Parties.</u> Nothing in this Agreement is intended to or does create any rights in third parties.

18.    <u>Successors and Assigns.</u> This Agreement shall be binding upon the Parties hereto and their respective successors and permitted assigns and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Except as otherwise provided herein, no Party may assign its rights or delegate its obligations hereunder without the prior written consent of the other Party, which consent shall not be reasonably withheld. Nothing herein shall preclude either Party from assigning this Agreement to an entity that succeeds to all or substantially all of the assets or business of the assigning Party, provided that the succeeding entity agrees to be bound by the terms hereof either in writing or by operation of law.

19.    <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with California law applicable to contracts made and fully performed in the state of California.

20.    <u>Headings.</u> The headings in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

21.    <u>Expenses.</u> Except as provided otherwise in this Agreement, each Party shall be solely responsible for the attorneys' fees, costs, and expenses, if any, incurred by that Party in connection with the First California Case, Second California Case, Original SAI Trust Claims, Amended SAI Trust Claims, or this Agreement.

22.    <u>Amendments.</u> This Agreement may not be amended or modified except by a writing, signed by each Party to be bound thereby, or signed by each Party's respective attorney as authorized.

23.    <u>Specific Performance.</u> The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that any Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by any other Party and/or to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which they are entitled pursuant to the terms of this Agreement at law or in equity.

7

24.    **Waiver.**  Any waiver by any Party of any provision of this Agreement or any right hereunder shall be effective only if in writing signed by that Party and identifying this Agreement by name and date.  Any waiver of any provision of this Agreement or of any right hereunder shall not be deemed a continuing waiver and shall not prevent or estop such Party from thereafter enforcing such provision or right.  The failure of any Party to insist in any one or more instance upon the strict performance by the other Parties of any of the terms or provisions of this Agreement shall not be construed as a waiver or relinquishment for the future of any such terms or provisions, but the same shall continue in full force and effect.

25.    **Counterparts.**  This Agreement may be signed in any number of counterparts and each counterpart shall represent a fully executed original as if signed by all Parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives effective as of the date above.

By _____  
Name: W. Thaddeus Miller  
Title: Executive Vice President and  
Chief Legal Officer  
Calpine Corporation  
717 Texas Ave, Suite 1000  
Houston, TX 77002  

By _____  
Name: Robert Membreno  
Title: _____  
_____  
_____  
_____  

Calpine Corporation on behalf of all Calpine Entities

Trustee of the SAI Trust, on behalf of the SAI Trust.

8

24.     <u>Waiver.</u>  Any waiver by any Party of any provision of this Agreement or any right hereunder shall be effective only if in writing signed by that Party and identifying this Agreement by name and date.  Any waiver of any provision of this Agreement or of any right hereunder shall not be deemed a continuing waiver and shall not prevent or estop such Party from thereafter enforcing such provision or right.  The failure of any Party to insist in any one or more instance upon the strict performance by the other Parties of any of the terms or provisions of this Agreement shall not be construed as a waiver or relinquishment for the future of any such terms or provisions, but the same shall continue in full force and effect.

25.     <u>Counterparts.</u>  This Agreement may be signed in any number of counterparts and each counterpart shall represent a fully executed original as if signed by all Parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives effective as of the date above.

By _____
Name:  W. Thaddeus Miller
Title:  Executive Vice President and
Chief Legal Officer
Calpine Corporation
717 Texas Ave, Suite 1000
Houston, TX 77002

Calpine Corporation on behalf of all Calpine Entities

By _____
Name:  Robert Membreno
Title:  _____
_____
_____
_____

Trustee of the SAI Trust, on behalf of the SAI Trust.

8

# CARUSO GLYNN, LLC

53-04 193rd STREET
FRESH MEADOWS, NEW YORK 11365
TELEPHONE: (718) 570-3338
FACSIMILE: (718) 747-6169
E-MAIL: lglynn@carusoglynn.com
www.carusoglynn.com
TAX I.D. No. 27-0317708

November 2, 2009

File No.:    88.071108
Invoice No.:   2

SAI Trust
2072-B Wals Avenue
Santa Clara, California 95050
Attn:   Robert Membreno/Marc Membreno

## Description of Services - SAI Trust (In re Calpine)
**Bankruptcy Case No.:   05-60200(BRL)**
**United States District Court, Southern District of New York Case No.:  08 Civ. 9797 (VM)**
**United States Court of Appeals for the Second Circuit Case No.:  09-2953-cv**

| Date | File No. | Description of Services | Hours | Fee |
|------|----------|-------------------------|-------|-----|
| 10/2/09 | 88.071108 | Begin review/analysis of entire docket (bankruptcy and southern district actions) in preparation for appeal. | 4.1 | No Charge |
| 10/5/09 | 88.071108 | Continued review/analysis of entire docket (bankruptcy and southern district actions) in preparation for appeal. | 2.7 | No Charge |
| 10/8/09 | 88.071108 | Receipt and review correspondence from Marc Membreno Re: September NPI; inquiry as to how to proceed further. | .1 | No Charge |
| 10/8/09 | 88.071108 | Draft e-mail correspondence responding to inquiry and providing proposed further course of strategy for both existing litigation and potential future actions. | .7 | No Charge |



Exhibit D

| Date | File No. | Description of Services | Hours | Fee |
|---|---|---|---|---|
| 10/12/09 | 88.071108 | Continued review/analysis of entire docket (bankruptcy and southern district actions) in preparation for appeal. | 3.6 | No Charge |
| 10/19/090 | 88.071108 | Continued review/analysis of entire docket (bankruptcy and southern district actions) in preparation for appeal. | 2.2 | No Charge |
| 10/30/09 | 88.071108 | Teleconference with defense counsel Re: advising of new firm details; continued settlement discussions. | 3 | No Charge |
| 10/31/09 | 88.071108 | Draft proposed settlement outline for defense counsel and advising of new terms re: attorneys' fees which are to be ultimately paid by Calpine as per the ruling of Judge Marerro. | 1.2 | No Charge |
| | | **Total** | **14.9** | |

**Disbursements**

| | | |
|---|---|---|
| In-House Photocopies (.10 per copy) | | $0.00 |
| Postage | | 0.00 |

**Attorney**

| | | |
|---|---|---|
| Lawrence C. Glynn | 14.9 hours at $320 per hour | Contingency Fee; Fee Waived |
| | Total Fees | $0.00 |
| | Total Disbursements | 0.00 |
| | Previous Balance | $6,752.00 |
| | Payment(s) Received (Thank You) | - $2,000.00 |
| | **Balance Due Now** | **$4,752.00** |