HILL RIVKINS LLP
45 Broadway – Suite 1500
New York, NY 10006
Telephone: 212-669-0600
Facsimile: 212-669-0698
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARUSO GLYNN, LLC<br><br>     Plaintiff,<br><br> -Against-<br><br>SAI TRUST and ROBERT MEMBRENO,<br>Individually and as Trustee for SAI TRUST,<br><br><br>     Defendants. | Civil Action No.: 7:11-cv-4360 (VB)<br>ECF CASE |

**DEFENDANTS/ COUNTERCLAIM PLAINTIFFS, SAI TRUST
AND ROBERT MEMBRENO'S MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Of Counsel:

        John J. Sullivan, Esq.
        HILL RIVKINS LLP
        Attorneys for Defendants/ Counterclaim
        Plaintiffs SAI TRUST and ROBERT
        MEMBRENO
        45 Broadway, Suite 1500
        New York, NY 10006
        (212) 669-0600
        <u>jsullivan@hillrivkins.com</u>

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

POINT I
THE PLAINTIFF CANNOT MAINTAIN AN
 ACTION FOR BREACH OF CONTRACT
OF A PURPORTED CONTINGENCY FEE
 AGREEMENT UNDER NEW YORK LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

      A.   SAI Never Agreed to Pay CG a Contingency Fee . . . . . . . . . . . . . . . . . . . .   2

      B.   SAI's Express Rejection of a Contingency Fee
          Forecloses any Claims for Breach of Contract
          or Account Stated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8


POINT II
CG CANNOT RECOVER FOR ACCOUNT STATED . . . . . . . . . . . . . . . . . . . . . . . .   10

POINT III
SAI'S TERMINATION OF CG FOR CAUSE PRECLUDES
ANY CAUSES OF ACTION FOR *QUANTUM MERUIT*
OR ON A CHARGING LIEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

POINT IV
SAI IS ENTITLED TO A REFUND OF LEGAL
 FEES IMPROPERLY CHARGED FOR TIME
 SPENT WHILE MR. GLYNN WAS STILL
 EMPLOYED BY NHS AND WHILE CG WAS
 TRYING TO CONVINCE SAI TO AGREE
 TO A CONTINGENCY FEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

**TABLE OF AUTHORITIES**

**CASE LAW**

Cannon v. First National Bank of East Islip,
469 N.Y.S.2d 101 (App. Div. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

Compagnola v. Mulholland, Minion & Roe,
555 N.E.2d 611, 614 (N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

Development Specialists, Inc. v. Akin Gum Strauss Hauer & Feld LLP
480 B.R. 145, 167 (S.D.N.Y. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Fariello v. Checkmate Holdings, LLC,
918 N.Y.S.2d 408, 409 (App. Div. 1st Dep't 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

Feldman v. Talon Paint Products, Inc.,
2002 WL 31385826, at *5 (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Greene v. Greene,
436 N.E.2d 496, 499 (N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

Harley & Browne v. Ressler & Ressler,
957 F. Supp. 44, 48-49 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

In re Joint Eastern & Southern District Asbestos Litigation,
710 B.R. 710, 865 (E.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

In re Wasserman,
845 N.Y.S.2d 127, 127 (2d Dep't 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Jacobson v. Sassower,
489 N.E.2d 1283, 1284 (N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3, 17, 19

King v. Fox,
418 F.3d 121, 135 (2d Cir. 2005) ("King I") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

King v. Fox,
851 N.E.2d 1184, 1191 (N.Y. 2006) ("King II"). . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-3, 8-9

Liddle & Robinson, LLP v. Garrett,
720 F. Supp. 2d 417, 424-26 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9-11

Mar Oil, S.A. v. Morrissey,
 982 F.2d 830 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

Nabi v. Sells,
  892 N.Y.S.2d 41, 43-44 (App. Div. 1st Dep't 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8-9

Selective Ins. Co, of Amer. v. Mazure,
  772 N.Y.S.2d 12 (App. Div. 1st Dep't 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

## STATUTORY AUTHORITY

  Section 475 of the New York Judiciary Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 17

## PRELIMINARY STATEMENT

Defendants/Counterclaim Plaintiffs, SAI TRUST (hereinafter "SAI") and trustee ,

ROBERT MEMBREÑO, hereby submit this memorandum of law in support of their motion for

summary judgment to dismiss the complaint of the Plaintiff/Counterclaim Defendant, CARUSO

GLYNN LLC (hereinafter "CG") and to recover the sum of $4,320.16 on their counterclaim

against CG.   As set out in detail below, CG's complaint[1] is entirely lacking in merit, in that it

alleges patently false facts and legal conclusions that CG has no possibility of establishing.  The

undisputed facts, which are set out in the accompanying Declarations and summarized in SAI's

Rule 56.1 Statement of Undisputed Material Facts, establish that the plaintiff never did more

than propose a contingency fee arrangement, a proposal that SAI expressly rejected no more than

two months later.  CG even acknowledged SAI's rejection of its proposal in December 2009 and

"acquiesce[d] and agree[d] to remain on a time basis".  CG thereafter sued SAI in New York

State Civil Court seeking to collect what it claimed were unpaid hourly fees, acknowledging

under oath the parties' agreement for an hourly fee structure.  Nevertheless, in this action CG

attempts to unilaterally resurrect its contingency fee proposal, a strategy that has absolutely no

support under New York law and is directly at odds with all established precedent.  SAI not only

paid CG for all the hourly work for which it justifiably could have billed SAI, but actually

---

[1] The defendants served and filed their answer with counterclaim on January 8, 2013, at approximately 11:56am, via ECF [ECF Docket Entry No. 26].  On January 17, 2013, SAI received via regular mail a copy of a purported amended complaint, bearing a date of January 8, 2013.  The amended complaint was not docketed on ECF until January 18, 2013 [ECF Docket Entry No. 27].  At the time of the service of the defendants' answer, no amended complaint had been filed or served, so that the plaintiff was obligated to seek leave to file the amended complaint, which was never done.  Nevertheless, to the extent the Court should grant leave to amend, this motion also seeks dismissal of the additional cause of action added by the amended complaint, which seeks enforcement of a charging lien.

overpaid CG due to CG's improper billing practices.  Accordingly, the complaint must be dismissed and SAI is entitled to judgment on its counterclaim.[2]

**POINT I      THE PLAINTIFF CANNOT MAINTAIN AN ACTION FOR BREACH OF CONTRACT OF A PURPORTED CONTINGENCY FEE AGREEMENT UNDER NEW YORK LAW**

CG's causes of action based on a purported agreement for a contingency fee must necessarily be dismissed.  CG cannot sustain its burden to demonstrate that the parties ever had an enforceable contingency fee agreement, because SAI never expressed any agreement to the Plaintiff's proposal.  To the contrary, SAI unequivocally rejected the contingency fee proposal and directed that CG was to represent it on an hourly basis.  CG acknowledged receipt of SAI's directive and confirmed on multiple occasions in December 2009 that its representation of SAI would be on an hourly basis.  Even if the Plaintiff could somehow demonstrate that SAI had ever agreed to a contingency fee arrangement, New York law unequivocally holds that a client may terminate a contingency fee agreement at any time, and that the attorney may not thereafter maintain any cause of action beyond *quantum meruit*, whether for breach of contract or any other theory.  King v. Fox, 851 N.E.2d 1184, 1191-92 (N.Y. 2006).  Accordingly, CG's First, Second, Fourth, and Fifth Causes of action must each be dismissed.

**A.      SAI Never Agreed to Pay CG a Contingency Fee**

CG's entire claim rests on a purported contingency fee agreement that never existed.  CG therefore cannot satisfy the significant burden that New York public policy places upon it as the attorney to demonstrate that SAI ever agreed to its mere proposal for a contingency fee.  Public policy requires that "courts pay particular attention to fee arrangements between attorneys and their clients" and places upon the attorney the burden to demonstrate that the client agreed to the

---

[2] Because CG's claims are so lacking in merit, SAI reserves the right to move for sanctions should CG offer opposition to this motion that violates the standards of F.R.C.P. 11(b).

purported fee agreement with full knowledge of the facts.  Jacobson v. Sassower, 489 N.E.2d

1283, 1284 (N.Y. 1985).  As the New York Court of Appeals has stated:

> the relationship between an attorney and his client is a fiduciary one and the
> attorney cannot take advantage of his superior knowledge and position.  The basic
> rule, as stated in an early case, is that "an attorney who seeks to avail himself of a
> contract made with his client, is bound to establish affirmatively that it was made
> by the client with full knowledge of all the material circumstances known to the
> attorney, and was in every respect free from fraud on his part, or misconception
> on the part of the client, and that a reasonable use was made by the attorney of the
> confidence reposed in him".  Under this rule it is not necessary for the client to
> show that the agreement was obtained by fraud or undue influence on the part of
> the attorney although, of course, that would make the agreement unenforceable if
> it were proven.  Even in the absence of such misconduct the agreement may be
> invalid if it appears that the attorney "got the better of the bargain", unless he can
> show that the client was fully aware of the consequences and that there was no
> exploitation of the client's confidence in the attorney.

Greene v. Greene, 436 N.E.2d 496, 499 (N.Y. 1982) (citations omitted); see, also, King v. Fox,

418 F.3d 121, 135 (2d Cir. 2005) ("King I").  New York law places "the burden on attorneys

who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully

known and understood by their clients".  King v. Fox, 851 N.E.2d 1184, 1191 (N.Y. 2006)

("King II").  "Contingent fee agreements must be warranted by the circumstances of the case and

*desired by the client* who has been fully informed of his fee options."  In re Joint Eastern &

Southern District Asbestos Litigation, 710 B.R. 710, 865 (E.D.N.Y. 1991) (emphasis added).

Because CG can point to no expression of agreement by SAI to CG's mere proposal for a

contingency fee arrangement, CG cannot satisfy its burden in this case to demonstrate that SAI

ever explicitly or implicitly desired a contingency fee arrangement or agreed to CG's proposal

with a full knowledge of the circumstances surrounding the proposal.

By an e-mail on October 8, 2009, CG's principal, Lawrence C. Glynn, for the first time

notified SAI that he was resigning from NHS and forming his own firm.  In that e-mail, he

proposed either a 22.5% contingency fee or an increased hourly rate over what NHS had been

charging for his time, as follows:

> Also, as the Southern District Court has ruled that Calpine is ultimately
> responsible for all attorneys' fees, I ***propose*** that going forward, I will continue to
> handle this matter on a contingency fee basis. Accordingly, you will not receive
> any further invoices in this matter (save for invoices from Nicoletti Horning &
> Sweeney for the balance owed prior to September 1, 2009) and I will NOT be
> paid until SAI Trust is paid. The contingency fee will be extremely reasonable
> 22.5% of the gross recovery (not including past attorneys' fees and accounting
> fees) plus necessary out of pocket expenses (for copying, printing, etc) ***Please
> confirm your agreement to these terms.***

> If you would prefer to stay with a time basis, please advise. However, please note
> that my fee in this matter has increased from $260.00 to $320.00 per hour.

(Exh. C)[3] (emphasis added)[4]. On October 20, 2009, Marc Membreño, acting on behalf of SAI

and his father, Robert, wrote to Mr. Glynn via e-mail, stating that he was confused by CG's

contingency fee proposal, because under a hypothetical settlement scenario, CG would be

entitled to a fee comparable to the $175,000 in fees NHS had already earned on an hourly basis.

(Exh. AA at 1-2). He also requested confirmation that SAI's "other option is continuing with the

hourly rate which has now risen some 23% since your departure". Mr. Glynn replied that day

that the proposed contingency fee "would be a contingency only on the damages not including

attorney's fees and accounting fees" owed by Calpine. (Exh. AA at 1). SAI did not express any

agreement to the contingency proposal, after either the October 8, 2009, e-mail or the October 20

e-mail exchange. (R. Membreño Decl. ¶ 17; Sullivan Decl. Exh. AAA at 7-9)).

---

[3] Exhibits A through N referred to herein are attached to the Moving Declaration of Robert
Membreño, dated February 15, 2013, accompanying this motion. Exhibits AA through MM
referred to herein are attached to the Moving Declaration of Marc Membreño, dated February 15,
2013, also accompanying this motion.
[4] In its original complaint, CG described its October 8, 2009, e-mail proposal as "the retainer
agreement" (Complaint ¶ 9 [ECF Docket Entry #1]). In its amended complaint, however, it
describes the October 8, 2009, e-mail proposal as "the engagement letter" (Amended Complaint
¶ 9 ([ECF Docket Entry No. 27]).

Early in November 2009, CG sent an invoice to SAI listing various time entries for work performed in the month of October 2009, but omitting any charges for that work.  (R. Membreño Dec. ¶ 20, Exh. D; M. Membreño Decl. ¶ 8, Exh. BB).  On November 23, 2009, Marc Membreño, acting on behalf of SAI, wrote to CG asking why the invoice stated "No Charge". (M. Membreño Decl. ¶ 8, Exh. BB at 1).  Mr. Glynn of CG replied the same day that "[a]s of October 1, 2009, I'm handling the matter on a contingency fee basis going forward".  (*Id.*).  On December 8, 2009, Marc Membreño, wrote to Mr. Glynn to inform CG that "[w]e are very concerned with your statement that as of October 1st, you are handling the matter of a contingency fee basis.  We have always and continue to work with our counsel on a time basis." Marc Membreño explained that the litigation was been ongoing since 2004, and that all prior counsel had billed on a time basis, billing approximately $188,000 in fees in sum.  He concluded by stating that "at this late stage of the case, we do not agree with adopting a contingency fee", as it would place SAI in a difficult position with both Calpine and the bankruptcy court.  (M. Membreño Decl. ¶ 10, Exh. CC at 2-3).  Mr. Glynn replied that date with an acknowledgement that he had "arbitrarily changed my fee arrangement with SAI".  (M. Membreño Dec. ¶ 10, Exh. CC at 1).

On December 11, 2009, Marc Membreño again wrote to CG on behalf of SAI to advise that SAI "will not accept payment of a contingency fee.  The agreement between Caruso Glynn and SAI Trust was for payment on a time basis (as with all previous firms in the case), and to change to a different methodology is unacceptable 'because it changes the professional contractual relationship between the parties'."  (M. Membreño ¶ 11, Exh. DD at 4).  Mr. Glynn replied that afternoon that he "will nevertheless acquiesce and agree to remain on a time basis". (M. Membreño Decl. ¶ 11, Exh. DD at 3).  He also stated that "SAI never affirmatively stated

that it wished to continue on a time basis and *implicitly* agreed to the contingency arrangement".
(Exh. DD at 3) (emphasis added).   Even CG's admission that the supposed agreement was only
"implicit" is not supported by the parties' exchange of correspondence.  The initial October 8,
2009, simply "propose[d]" a contingency fee, and also advised that if the SAI wished to continue
on a time basis, the hourly rate for Mr. Glynn's time would increase from $265 to $320.  (Exh. C
at 1-2).  SAI questioned the proposal on October 20, with its request for additional information
regarding both options.  (Exh. AA at 1-2).  At no time, however, did SAI ever communicate
anything that could be deemed an explicit or implicit expression of consent.  (R. Membreño
Decl. ¶¶ 17-18; Sullivan Decl. Exh. AAA at 7-9).

Aside from the lack of any expression of consent from SAI, CG made clear throughout
this period that it never intended to collect a contingency fee from SAI, but instead had made the
proposal because it expected Calpine to pay the fee.  Mr. Glynn made the initial October 8, 2009,
proposal for a contingency fee, "as the Southern District Court has ruled that Calpine is
ultimately responsible for all attorneys' fees".  (Exh. C).  In his October 20 e-mail, Mr. Glynn
wrote that "as the Southern District has ruled that Calpine must pay attorney's [sic] fees, under
either a contingency or on a time basis, it is ultimately Calpine who will pay, not SAI Trust", and
"again, it is Calpine, not SAI Trust, who will ultimately pay my fees".  (Exh. AA at 1).

When Marc Membreño wrote to Mr. Glynn on November 23, 2009, in response to CG's
submission of an invoice dated November 3, 2009, to inquire why the invoice said "No Charge"
for fees,  Mr. Glynn replied that day that

> [a]s of October 1, 2009, I'm handling this matter on a contingency fee basis going
> forward.  You will recall that I will take my fee if and when we recover from
> Calpine.  I did this because *ultimately Calpine must pay my fee, not SAI*.  The
> fee I will insist Calpine pay is a very reasonable 22.5% of the recovery, not
> including any past attorney's fees/accounting fees ultimately recovered.  I believe
> this is mutually beneficial to both myself and SAI as *SAI will not be burdened*

6

> ***with attorney's fees going forward***.  That is why there is "no charge" on the
> October invoice.  Please note that I must still account for my time in the event that
> Judge Lifland decides Calpine should pay only my hourly rate and not a
> contingency fee.

(Exh.BB at 1) (emphasis added).  CG therefore proposed the contingency fee not as something that it ever expected SAI to pay, but solely as a means to increase the fees it believed that Calpine would have to pay under any settlement or judgment.  Because CG advised that only Calpine would ever pay a contingency fee, and because SAI never expressed any consent to the contingency fee proposal, CG cannot demonstrate an agreement between it and SAI for SAI to pay the contingency fee it now seeks to collect.

In Mar Oil, S.A. v. Morrissey, 982 F.2d 830 (2d Cir. 1993), the Second Circuit affirmed the district court's finding that the client had not agreed to a contingency fee arrangement.  At the outset of the representation, the client had signed a retainer agreement with the attorney calling for an hourly fee.  Both before and after the signed retainer, the client had rejected the attorney's proposal for a contingency arrangement.  Once a settlement appeared imminent, the client arranged to have the client hurriedly sign a new document, which among other things, purported to include a large contingency fee that was disproportionate to the amount and substance of work the attorney had provided.  The court held that the purported agreement was unenforceable as a contingency fee agreement.

> [I]f the attorney has reason to believe that the client does not have a complete
> understanding of a purported contract between them that he is asking the client to
> sign, the attorney must, in order to make the agreement enforceable, discuss the
> terms with the client to ensure that the client is "fully and fairly informed of the
> consequences."

982 F.2d at 839 (quoting Greene, 436 N.E.2d at 500).  Consequently, the court disregarded the signed agreement, because the attorney had failed to properly and fully explain the import of the contingency fee purportedly set out in the agreement.

In this case, in response to CG's October 8, 2009, proposal for a contingency fee, SAI sought an explanation as to the import of the proposal. SAI expressed specific concern that it would be obligated to pay a contingency fee that was higher than the fees it had already paid to NHS for the lion's share of the work. (Exh. AA at 1-2). CG never provided any explanation that it would look to SAI for payment of a contingency fee. To the contrary, CG repeatedly represented to SAI that it would look only to Calpine for payment of its proposed contingency fee. If CG ever had any intention that it would look to collect a contingency fee from SAI, it was obligated to explain that fact and obtain SAI's express consent to the proposal. It did neither, and cannot now seek to remedy these critical omissions by resurrecting a proposal that was never accepted and subsequently rejected.

**B.    SAI's Express Rejection of a Contingency Fee Forecloses any Claims for Breach of Contract or Account Stated**

Even if SAI had at some point agreed to a contingency fee agreement, "it is well settled that the client may terminate the contingent fee agreement at any time, leaving the lawyer no cause of action for breach of contract, only *quantum meruit*". King II, 851 N.E.2d at 1191-92; see, also, Compagnola v. Mulholland, Minion & Roe, 555 N.E.2d 611, 614 (N.Y. 1990); Nabi v. Sells, 892 N.Y.S.2d 41, 43-44 (App. Div. 1st Dep't 2009).[5] There can be no dispute that in December 2009 SAI unequivocally advised CG that "we do not agree with adopting a contingency fee" (Exh. CC at 2-3) and that "will not accept payment of a contingency fee" (Exh. DD at 4). CG acknowledged the instruction and stated that it would "acquiesce and agree to remain on a time basis". (Exh. DD at 3). Mr. Glynn even has previously admitted this fact

---

[5]The rule permitting recovery in *quantum* meruit, however, is also limited because it does not apply when an attorney is discharged for cause. As set out in Point III below, however, SAI discharged CG for cause, foreclosing the right to any recovery even for *quantum meruit* or under a charging lien.

under oath and stated in an affirmation he submitted to Queens County Civil Court in prior litigation involving the same legal work that CG "acquiesced and agreed to instead bill the client on a time basis".  (Exh. M ¶ 8).  Under New York law, SAI had an absolute right to reject the contingency fee arrangement, which it did within two months of CG's proposal, without ever having accepted the proposal.  Consequently, CG's "exclusive remedy is *quantum meruit*".  Fariello v. Checkmate Holdings, LLC, 918 N.Y.S.2d 408, 409 (App. Div. 1ˢᵗ Dep't 2011).  Accordingly, all causes of action in CG's Amended Complaint arising from the supposed contingency fee, including the account stated cause of action, would have to be dismissed.  Liddle & Robinson, LLP v. Garrett, 720 F. Supp. 2d 417, 424-26 (S.D.N.Y. 2010); King II, 851 N.E.2d at 1191-92; Fariello, 82 A.D.2d 437, 918 N.Y.S.2d at 409.  Any contrary arguments that CG might assert are patently frivolous.

Any claim by CG that it can unilaterally resurrect a contingency fee agreement that has been rejected is similarly meritless.

> [D]ue to the special relationship of the utmost trust and confidence between a client and an attorney***, the client has the right to discharge the attorney at any time, for any reason, or for no reason, regardless of any particularized retainer agreement, and the client should not be compelled to pay damages for exercising the absolute right to cancel the contract***.  Against the client's unqualified right to terminate the attorney-client relationship is balanced the notion that a client should not be unjustly enriched at the attorney's expense or take undue advantage of the attorney, and therefore the attorney is entitled to recover the reasonable value of services rendered.  After the termination of the relationship, the client and attorney of course remain free to reach a new agreement that, in lieu of a fixed dollar amount for the *quantum meruit* value of services rendered, the discharged attorney shall receive as compensation a contingent percentage of the recovery, determined either at the time of substitution or the conclusion of the case.  However, ***such an arrangement of payment cannot be compelled by the attorney; it can only be reached with the consent of the client***.

Nabi, 892 N.Y.S.2d at 43-44 (citations omitted & emphasis added).

Because the client has the absolute right to terminate a retainer or other compensation agreement with an attorney, the rule limiting recovery to *quantum meruit* applies even if the attorney keeps providing legal services after termination of the agreement.  In <u>Selective Ins. Co,</u> <u>of Amer. v. Mazure</u>, 772 N.Y.S.2d 12 (App. Div. 1st Dep't 2004), the insurance company client had terminated the retainer with its law firm, although it requested that the firm continue working on files for a two month period.  Although the trial court had awarded fees for the two month period based on the rate set out in the terminated agreement, the Appellate Division modified the award to limit recovery to *quantum meruit*, which was calculated based on the number of hours worked at the firm's standard hourly rate.  772 N.Y.S.2d at 455.  Unlike even the parties in <u>Mazure</u>, CG and SAI had an express agreement, confirmed by CG on December 11, 2009, under which CG would be compensated on an hourly basis.  Accordingly, CG cannot demonstrate that it was ever entitled to anything other than the reasonable value of its services, computed on an hourly basis.

In any event, as set out in further detail in Point III below, SAI discharged CG no later than February 5, 2010, when it instructed CG to cease all communications with Calpine and any further analysis of legal matters on the case.  The rejection of the contingency fee proposal and the termination of CG's services for cause preclude any recovery for a contingency fee.

**POINT II     CG CANNOT RECOVER FOR ACCOUNT STATED**

As set out immediately above, New York law limits an attorney to recovery in *quantum meruit* after the client rejects or terminates a contingency fee arrangement, precluding causes of action for both breach of contract and account stated.  <u>Liddle & Robinson</u>, 720 F. Supp. 2d at 424-26.  In addition, CG cannot make out an account stated claim based on its supposed

contingency fee invoice because the document did not contain a statement for a sum certain due, and CG cannot show that SAI ever accepted a statement contingency fee without objection.

An attorney can maintain an account stated only in matters where it has billed by the hour. Development Specialists, Inc. v. Akin Gum Strauss Hauer & Feld LLP, 480 B.R. 145, 167 (S.D.N.Y. 2012). In addition, an attorney must show that it actually billed its client for a sum certain before it can maintain an account stated claim. In Cannon v. First National Bank of East Islip, 469 N.Y.S.2d 101 (App. Div. 1983), the court dismissed an attorney's account stated claim where the attorney had simply submitted monthly statements that detailed the legal work performed, but did not set out an amount due.

> Since the monthly reports contained no reference to any sums due, they did not constitute accounts stated and plaintiff's acceptance of the monthly payments did not constitute an accord and satisfaction because there was no indication that plaintiff intended to accept a new performance in discharge of an unresolved obligation.

469 N.Y.S.2d at 102.

In this case, GC maintains that its November 2, 2009, statement, which contains the language "fee waived" (Amended Complaint Exh. D; R. Membreño Decl. Exh. D) constitutes an account stated for a contingency fee of $259,996.79.[6] However, nowhere does the original November 2009 statement ever set out an amount due for this figure. In fact, an exhaustive search of the record fails to reveal any statement where CG demanded the sum of $259,996.79 of

---

[6] The only amount shown in the supposed contingency fee invoice was a prior balance from the invoice that CG improperly submitted on October 8, 2009, for legal worked performed by Mr. Glynn while he was still employed as an associate for NHS. As shown in Point IV below, such billing requires a refund to SAI.

SAI, other than its complaints.  The failure to state a specific amount due is fatal to any claim for an account stated.  <u>Cannon</u>, 469 N.Y.S.2d at 102).[7]

Even if CG's statement had contained a specific amount due, it cannot maintain the account stated cause of action because it is undisputed that SAI promptly objected to the arrangement.  <u>Feldman v. Talon Paint Products, Inc.</u>, 2002 WL 31385826, at *5 (S.D.N.Y. 2002).  SAI first questioned the original November 2, 2009, "Contingency fee; Fee Waived" invoice within three weeks of sending, on November 23, 2009.  (Exh. AA at 1-2).  Thereafter, on December 8, 2009, SAI wrote to CG that "[w]e are very concerned with your statement that as of October 1st, you are handling the matter on a contingency fee basis.  We have always and will continue to work with our counsel on a time basis", and that "we do not agree with adopting a contingency fee".  (Exh. CC at 2-3).  After CG attempted later that day to convince SAI to agree to the contingency fee by lowering the fee to 8%, SAI replied in no uncertain terms on December 11, 2009, that SAI would "not accept payment of a contingency fee".  (Exh. DD at 4).  Not only did CG acknowledge SAI's objections but replied later that day that it would "acquiesce and agree to remain on a time basis".  (Exh. DD at 3).  In <u>Feldman</u>, Judge Chin cited to the client's timely objections to the statements to not only deny the attorney's motion for summary judgment, but also *sua sponte* dismiss the account stated cause of action.  2002 WL 31385826, at *1.

---

[7] The Second Department's holding in <u>Cannon</u> also precludes any argument that CG might make that it was entitled to revive its contingency fee proposal on the basis of an accord and satisfaction, which any event it has not pled, in either its original complaint or amended complaint.

12

**POINT III**   **SAI'S TERMINATION OF CG FOR CAUSE PRECLUDES ANY CAUSES OF ACTION FOR *QUANTUM MERUIT* OR ON A CHARGING LIEN**

SAI discharged CG for cause, based on CG's self-interested dealings with Calpine and because of its failure to comprehend the nature of the settlement offers over which it was supposedly negotiating.  Where an attorney is discharged for cause, it has no cause of action for *quantum meruit* or for satisfaction of charging lien under Section 475 of the New York Judiciary Act.  Harley & Browne v. Ressler & Ressler, 957 F. Supp. 44, 48-49 (S.D.N.Y. 1997); Compagnola v. Mulholland, Minion & Roe, 555 N.E.2d 611, 614 (N.Y. 1990).  Accordingly, CG's third cause of action for *quantum meruit* and the sixth cause of action in its purported amended complaint must be dismissed.

Although the errors and omissions in Mr. Glynn's legal work began while he still was employed by NHS, the serious mistakes continued throughout his representation of SAI, including after the formation of CG, as he attempted in vain to negotiate a settlement with Calpine.  CG's failure to reach a settlement was due in large part to its woefully misguided attempts to extract payment of its proposed contingency fee from Calpine, as well as Mr. Glynn's failure to comprehend the nature of the settlement offers made by Calpine's counsel.  CG's demands for payment of the proposed contingency fee inflated the settlement demands authorized by SAI from the low $800,000 range to as high as $975,000.  (R. Membreño Decl. ¶¶ 35-38).

In August 2009, approximately two months after the district court decision in favor of SAI[8], Mr. Glynn, as an associate employed by NHS and acting on behalf of SAI, had begun

---

[8] CG's complaint and amended complaint both allege at paragraphs 38 and 39 that SAI's success in the Calpine litigation was due the efforts of Mr. Glynn's "vigorously litigating SAI's claims".  However, both complaints fail to mention that at all times mentioned, Mr. Glynn's "efforts" were as an associate employed by NHS, not as the principal of CG.  Neither Judge Marrero's decision

settlement negotiations with Calpine's attorneys.   Calpine's first offer to SAI was for payment "consistent with Calpine's bankruptcy procedures and is an allowed general unsecured claim of $700,000". (Exh. A at 2).  Mr. Glynn apparently understood this to mean that "Calpine is offering to pay SAI Trust the amount of $700,000 for all claims through the date of any settlement agreement", and that SAI would insist on immediate payment of the entire $700,000" if it were to accept. (*Id.*).  On September 4, 2009, Mr. Glynn sent Calpine's counsel a settlement demand of $960,466.94, and stated that "SAI accepts that settlement will be in the form of an approved general unsecured claim".  (Exh. A-1).  By October 5, 2009, shortly before Mr. Glynn's departure from NHS, Mr. Glynn issued a "counterproposal of an unsecured claim of $825,000", to which Calpine's counsel responded with an offer of $740,000.  (Exh. B at 3-4).

On or about  December 16, 2009, SAI learned for the first time, from separate counsel, not from Mr. Glynn, that Calpine's offer of a general unsecured claim meant that payment would be in the form of issuance of Calpine stock rather than cash, under the terms of Calpine's bankruptcy reorganization plan.  (R. Membreño Decl. ¶ 31; M. Membreño Decl. ¶ 14, Exh. FF). SAI called this fact to Mr. Glynn's attention and directed that he was "not authorized to communicate or negotiate with Calpine or file any action in New York absent instructions from SAI Trust".  (M. Membreño Decl. ¶ 14, Exh. FF).  In reply, Mr. Glynn admitted that he was unaware of this fact, replying that "[t]his is the first I have ever learned of such a thing".  (*Id.*). Although Calpine's counsel had informed Mr. Glynn in August 2009 that its offers were "consistent with Calpine's bankruptcy procedures and is an allowed general unsecured claim", and Mr. Glynn confirmed "accept[ance]" of same to Calpine's counsel no later than September 4, 2009, he apparently did not bother to begin any review of Calpine's reorganization plan until

---

nor Calpine's decision in August 2009 to cease improperly deducting allocating expenses from the monthly profit payments can be used to measure the success of CG in representing SAI.

December 3, 2009, and did not conduct any detailed analysis until December 29, 2009  (SAI

Rule 56.1 Statement ¶¶ 60-61; Exhibit J at 1, 3).  Not until December 28, 2009, did he finally

attempt to inform SAI by e-mail of the meaning of a general unsecured claim.  (Exh. F).

Nevertheless, in that same e-mail, he falsely stated that " I have in no way committed SAIT to

acceptance of a general unsecured claim and have consistently insisted that any settlement be a

full cash settlement" (Exh. F at 1-2), a statement that cannot be reconciled with the

correspondence of August-October 2009 (Exhs. A, A-1, B).

By the end of December 2009 and early January 2010, SAI had been forced to conclude

that Mr. Glynn had grossly misunderstood the nature of the settlement offers from Calpine.

Whereas Mr. Glynn erroneously believed that any settlement would be in cash, and represented

same to SAI, Calpine's offer of a general unsecured claim in accordance with the reorganization

plan actually meant that SAI would be receiving a quantity of shares of stock in Calpine.  (R.

Membreño Decl. ¶¶ 31-34; M. Membreño Decl. ¶¶ 14, 17, Exhs.  FF at 1-2, GG at 1-2).  In fact,

on December 21, 2009, Mr. Glynn wrote to SAI that "[a]s for the payment being made in stock

as opposed to cash, your e-mail of last week was the first I had ever heard of such a thing".

(Exh. GG at 1).  The number of Calpine shares SAI would receive under a general unsecured

claim would be calculated by dividing the amount of the settlement offer by the share price in

effect on the date of Calpine's emergence from bankruptcy, less retention of 10 or 15 percent.

((R. Membreño Decl. ¶¶ 31, M. Membreño Decl. ¶¶ 14, 17, Exh. HH at 2).  Calpine's share price

in early 2010 happened to be approximately only 70% of what it had been on the date of its

emergence from bankruptcy.  Consequently, a proposed settlement of $850,000 would have been

worth approximately only $491,500 at that time.  (Exh. HH at 2).  Mr. Glynn responded to SAI's

questions about the nature of the settlement by disingenuously implying that he actually had

understood the nature of Calpine's offer: "Which is why I have not entertained Calpine's illusory settlement proposals". (Exh. HH at 1).

In a final attempt to involve CG in the settlement negotiations with Calpine, on February 2, 2010, SAI instructed Mr. Glynn to communicate a specific settlement proposal to Calpine, based on a mixture of cash and stock. (R. Membreño Decl. ¶ 35; Exh. II at 3-4). Mr. Glynn acknowledged receipt on that date, but advised that "the ball is still in Calpine's court" to respond to his previous settlement demand for a $975,000 "all cash settlement". (Exh. II at 3). SAI immediately wrote back for explanation as to when the $975,000 settlement proposal was made and how it was calculated. (Exh. II at 2). Mr. Glynn responded two days later that it had been made in early December 2009 and included an allowance for his proposed contingency fee. (Exh. II at 1). Mr. Glynn's reply therefore confirmed to SAI that he had been negotiating with Calpine for his own contingency fees, which had been rejected by SAI. (R. Membreño Decl. ¶¶ 31, 37, Exh. H at 2, Exh. J at 2, Exh. N). Rather than negotiating strictly for a recovery by SAI, Mr. Glynn's demands for attorneys' fees likely played a significant role in holding up settlement discussions and threatened the very possibility of a settlement. (R. Membreño Decl. ¶ 37).

In addition, SAI had no choice but to conclude that Mr. Glynn had indefensibly failed to understand the nature of the settlement offers and demands he had been exchanging with Calpine's counsel. (R. Membreño Dec. ¶ 34, Exh. N). Mr. Glynn even falsely denied to SAI that he had ever agreed with Calpine that a settlement would be for a general unsecured claim (Exh. F at 1-2), when he had confirmed exactly that as early as September 4, 2009 (Exh. A-1). Accordingly, SAI directed Mr. Glynn on February 5, 2009, to have no further contact with Calpine or perform any work on the matter unless specifically directed. (Exh. JJ). SAI eventually negotiated a settlement with Calpine with the assistance of counsel from California.

16

On April 21, 2010, SAI wrote to CG to inform it that would not be paying for unearned hourly fees and to detail the errors and omissions reflected in CG's legal work.  (Exh. N).

Mr. Glynn's serious errors and omissions threatened any recovery that SAI might have been able to collect from Calpine.  Prior to being informed by SAI, he had failed to comprehend that the general unsecured claim over which he had been negotiating since August 2009 did not represent a cash settlement, but shares of Calpine stock that had seriously devalued since the valuation date in the bankruptcy reorganization plan. (Exh. GG at 1).   He falsely stated to SAI that he had never agreed to negotiate for a general unsecured claim, even though he had expressly stated to Calpine's counsel in September 2009 that "SAI accepts that settlement will be in the form of an approved general unsecured claim".  (Exhibit A-1).  These errors were then compounded by his self-interested negotiations with Calpine over a non-existent contingency fee.  His actions provided ample cause to SAI to direct CG to have no further dealings with Calpine, so that CG's causes of action for *quantum meruit* and to under Section 475 of the Judiciary Act to enforce a charging lien must be dismissed.  Moreover, as set out in detail in Point IV immediately below, SAI paid CG more than it could properly have billed SAI, so that it has already been paid more than the reasonable value of its services, also precluding the *quantum meruit* count.  Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985)

**POINT IV      SAI IS ENTITLED TO A REFUND OF LEGAL FEES IMPROPERLY CHARGED FOR TIME SPENT WHILE MR. GLYNN WAS STILL EMPLOYED BY NHS AND WHILE CG WAS TRYING TO CONVINCE SAI TO AGREE TO A CONTINGENCY FEE**

In a gross breach of trust, Mr. Glynn attempted to bill SAI for legal fees for time spent while he was still employed as an associate by NHS.  Mr. Glynn was employed by NHS through October 7, 2009, and CG did not become counsel for SAI until any earlier than October 8, 2009. (Nicoletti Decl. ¶¶ 4-6; R. Membreño Decl. ¶¶ 12-14).  However, Mr. Glynn submitted invoices

to SAI for 21.1 hours in September 2009 and 6.8 hours in October prior to his departure from NHS.  (Exh. G, Exh. H at 1).  It was only when SAI received NHS's final invoice in January 2010 for time spent by Mr. Glynn through his departure that SAI became aware of the improper billing.  (M. Membreño Decl. ¶¶ 23-24, Exh. LL).  Although Mr. Glynn agreed to credit SAI the sum of $5,148, his total fees for the 27.9 hours of improperly billed time was $8,928.  (SAI Rule 56.1 Statement ¶87).

Thereafter, in December 2009, SAI and CG engaged in series of correspondence via e-mail regarding CG's attempts to get SAI to agree to a contingency fee.  (M. Membreño Decl. ¶¶ 10-13, Exhs. DD, EE; R. Membreño Decl. ¶¶ 23-30, Exh. E).  Such discussions should properly be considered overhead expenses that cannot be billed to a client.  According to its invoices, CG spent no fewer than 6.1 hours, for $1,952.00, in an attempt to procure SAI's agreement to its contingency fee proposal.[9]  (R. Membreño Decl. ¶ 47)

Including the improper invoice for September 2009 and the improper entries from the first week of October 2009, CG submitted invoices to SAI as follows:

| Invoice Date | Periods covered | Amount | |
|---|---|---|---|
| 10/8/2009 | 9/1/2000-9/22/2009 | $6,752.00 | (fees) |
| 11/2/2009 | 10/2/2009-10/31/2009 | $4,768.00 | (fees) |
| 12/2/2009 | 11/4/2009-11/30/2009 | $4,256.00 | (fees) |
| | | $19.38 | (disbursements) |
| 1/2/2010 | 12/3/2009-12/28/2009 | $11,296.00 | (fees) |
| | | $25.72 | (disbursements) |
| 2/4/2009 | 1/4/2010-1/25/2009 | $7,680.00 | (fees) |

---

[9] CG's February 4, 2010, invoice also contains a time entry of 1/6/2010 for 0.6 hours ($192.00), with the only description being "Attention to file; review and maintenance". (Exh. K at 2).  Such an entry provides no indication that CG actually performed any meaningful work on the matter, and should not be charged to SAI.

|          |                     | $75.60  | (disbursements) |
|----------|---------------------|---------|-----------------|
| 3/1/2010 | 2/2/2010-2/5/2010   | $4,736.00 | (fees)        |
|          |                     | $28.30  | (disbursements) |
|          | Total               | $39,637.00 |              |

Included in the total amount CG billed to SAI were the 21.1 hours billed in September, 6.8 hours billed in October 2009 before Mr. Glynn's departure from NHS, 6.1 hours in December 2009 while trying to convince SAI to agree to its contingency fee proposal, and 0.6 hours billed on February 4 for an undisclosed file "review and maintenance" time entry. Deducting these 34.6 hours (@$320/hr = $11,072.00) from the billings means that CG could properly have billed SAI no more than $28,565.00. However, SAI paid CG a total of $32,885.16, and is therefore entitled to a refund of the sum of no less than $4,320.16.

An attorney is obligated to refund legal fees paid in advance that are not earned. Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985); In re Wasserman, 845 N.Y.S.2d 127, 127 (2d Dep't 2012). Accordingly, SAI is entitled to summary judgment on its counterclaim in the amount of $4,320.16.

## CONCLUSION

As set out in detail above, CG can in no way demonstrate that SAI ever agreed to its proposal for a contingency fee. To the contrary, SAI expressly rejected the proposal, and CG "acquiesce[d] and agree[d]" to SAI's rejection. Moreover, even if a contingency fee arrangement ever existed, SAI had an absolute right to terminate such an arrangement. An attorney's sole remedy to collect legal fees is *quantum meruit*, which means that any causes of action for breach of contract, account stated, declaratory judgment, or an accord and satisfaction must necessarily be dismissed. To argue to the contrary would be frivolous. Under a *quantum meruit* analysis, CG has already been paid for more than the reasonable value of its services,

19

precluding the recovery of additional fees, even under a charging lien.  SAI actually overpaid CG

and is entitled to a refund.  Accordingly, SAI is entitled to summary judgment dismissing each

cause of action asserted by CG, and to judgment on its counterclaim in the amount of $4,320.16.


Respectfully submitted,

Dated:  New York, New York
        February 15, 2013

HILL RIVKINS LLP
Attorneys for Defendants/Counterclaim Plaintiffs
*SAI Trust and Robert Membreño*

By: _____
        John J. Sullivan
     45 Broadway – Suite 1500
     New York, New York 10006
     212-669-0600
     jsullivan@hillrivkins.com