**CARUSO GLYNN, LLC**
*Pro Se*
53-04 193rd Street
Fresh Meadows, New York 11365
(718) 570-3338
Attorney: Lawrence C. Glynn (LG-6431)
CG File No.:   88.071108.01

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
CARUSO GLYNN, LLC,

                                                   Case No.: 11 Civ. 4360 (VB)

        Plaintiff,

   -against-

SAI TRUST and ROBERT MEMBRENO,
Individually and as Trustee for SAI TRUST,

        Defendants.
---------------------------------------------------------------x

### DECLARATION OF LAWRENCE C. GLYNN
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

     LAWRENCE C. GLYNN, an attorney duly admitted to practice law in the State of New York, hereby declares under the penalty of perjury that I am a member of the firm of Caruso Glynn, LLC ("CG"), plaintiff herein, and am fully familiar with the facts and circumstances of this matter based upon my review of the file maintained by this office. This declaration is made in support of CG's Motion for Summary Judgment as against defendants SAI Trust ("SAI") and Robert Membreno, Individually and as Trustee of SAI Trust ("Membreno")(sometimes collectively referred to herein as "Defendants", "SAI" or "Clients").

1.      On October 8, 2009, Plaintiff entered into an agreement with SAI to handle its lawsuit involving a complex royalties dispute with Calpine Corp ("Calpine"), wherein Calpine unilaterally began charging "allocated expenses" to the monthly Net Profit Interest ("NPI") due to SAI in or about April 2001. These NPI payments flowed from a 1987 asset purchase agreement ("the 1987 Agreement) between SAI and Calpine's predecessor. A detailed substantive and procedural history of the underlying bankruptcy action is set forth in the Decision and Order of this Court dated June 9, 2009 in *Robert Membreno as trustee of SAI Trust v. Calpine Corp., et al.*, 406 B.R. 463 (S.D.N.Y. 2009),  ("Decision and Order") which is annexed hereto as Exhibit A and is hereby incorporated by reference.

2.      Under the terms of the engagement letter, Plaintiff agreed to handle the case against Calpine on a contingency fee basis of 22.5% of the gross amount recovered plus disbursements. A copy of the engagement letter has been annexed hereto as Exhibit B.

3.      On October 8, 2009, SAI had a choice of either 1) maintaining the action with prior counsel (Nicoletti Hornig & Sweeney); 2) finding new counsel, or 3) employing Plaintiff.

4.      This fee arrangement was submitted to SAI at the commencement of the attorney-client relationship between CG and SAI, and at a time when the matter was on appeal to the Second Circuit. Federal appeals are a time consuming and costly endeavor. This is especially true in cases such as this where the record on appeal was approximately 20,000 pages. The amount of time necessary to prepare this matter for appeal could have easily approached 200 hours and, had the Second Circuit reversed Judge Marrero, the matter would have been remanded back to the United States Bankruptcy Court for the Southern District of New York.

5. SAI was looking at potentially years worth of future litigation in October 2009 and potentially astronomical legal fees on a time basis.

6. In deciding to handle SAI's claims on a contingency fee basis, Plaintiff was willing to accept the uncertainty that goes with handling a matter on a contingency fee basis, including substantial out of pocket expenses and the possibility of getting absolutely no compensation had the matter been lost.

7. Given the three choices aforesaid, On October 8, 2009, SAI chose to have Plaintiff handle the matter.

8. SAI never objected to the contingency fee arrangement.

9. On October 20, 2009, Plaintiff responded to SAI's e-mail of even date informing that for the first time in over eight years, Calpine did not deduct allocated expenses from the monthly NPI statement for August 2009.  A copy of this email has been annexed hereto as Exhibit C.

10. Indeed, it was an improper deduction of allocated expenses for an eight year period that was the central issue to the ongoing litigation between SAI and Calpine. Specifically, SAI sued Calpine over the latter's unilateral deduction from NPI payments for unauthorized "allocated costs" for its joint operations and an unauthorized 15% "overhead" charge after Calpine acquired numerous power plants throughout Northern California.

11. In Plaintiff's October 20, 2009 response (Exhibit C), written 12 days after the initial engagement letter (October 8, 2009 email), Plaintiff noted that the threats of impending lawsuits against Calpine was undoubtedly the reason for Calpine's sudden compliance with the terms of the agreement.

12. Plaintiff also took the opportunity in that October 20, 2009 email to again request confirmation from Defendants to the contingency fee terms outlined in the October 8, 2009 email.

13. In response, on October 20, 2009, Marc Membreno, apparently on behalf of SAI and Robert Membreno, sent a second e-mail which stated:

> "I'm a little confused with your contingency proposal. We have thus far been invoiced by our previous counsel plus Nicoletti Hornig & Sweeney a total of $175,000.00. If the settlement were hypothetically $770,000.00, you would be entitled, under this scenario, to $173,250.00 (plus disbursements) - roughly equal to the amount already invoiced for the work up until now. The other option is continuing with the hourly rate which has now risen some 23% since your departure. Is my understanding correct?

A copy of this email has been annexed hereto as Exhibit D.

14. Aside from Marc Membreno being "a little confused," there is no evidence that either SAI or Robert Membreno were confused.

15. Aside from Marc Membreno being "a little confused," there was no objection to the contingency fee stated in this October 20, 2009 email.

16. Aside from Marc Membreno being "a little confused," there was no election made by Defendants to proceed under a time basis as opposed to a contingency fee basis.

17. Plaintiff responded to this email on October 20, 2009 and confirmed that Marc Membreno's understanding was correct. Exhibit D

18. Thereafter, neither Marc Membreno, Robert Membreno nor anyone else form SAI ever expressed a desire to continue on a time basis.

19. Thereafter, neither Marc Membreno, Robert Membreno nor anyone else form SAI ever expressed an objection to the 22.5% contingency fee.

20. By any fair reading of Plaintiff's October 8, 2009 engagement email and the follow up explanation provided on October 20, 2009, Defendants received an "explanation of attorney's fees to be charged, expenses and billing practices" as required under NYCCRR § 1215.1.

21. On October 30, 2009, having not received any objection to the contingency fee for three weeks, and following further explanation of the nature of the relationship on October 20, 2009, Plaintiff again referenced the contingency fee arrangement and even offered a lower contingency fee rate to 15% if the matter settled without having to go through appeal. A copy of this email has been annexed hereto as Exhibit E.

22. Thereafter, neither Marc Membreno, Robert Membreno nor anyone else form SAI ever expressed an objection to the contingency fee.

23. On November 2, 2009, Plaintiff sent an invoice confirming that the matter was being handled on a contingency fee basis. A copy of this invoice has been annexed hereto as Exhibit F.

24. Said invoice contained contemporaneous time records which demonstrated that while attorney's time was being recorded, there was **no** hourly charge for this work and instead, the words "**Contingency Fee - fee waived**" were inserted into the space where the dollar value of a time fee otherwise would have been inserted. Exhibit F.

25. At no time during the month of November 2009, nor at any time thereafter, did Marc Membreno, Robert Membreno or anyone else form SAI ever express an objection to the 22.5% contingency fee.

26. On November 23, 2009, Marc Membreno sent an e-mail which stated:

"Wondering why you have 'No Charge' listed on time sheet/invoice."

A copy of this email has been annexed hereto as Exhibit G.

27. On November 23, 2009, the contingency fee was explained, for a third time, in Plaintiff's response e-mail which states, in pertinent part:

> As of October 1, 2009, I'm handling the matter on a contingency fee basis going forward. You will recall that I will take my fee if and when we recover from Calpine. I did this because ultimately Calpine must pay my fee, not SAI. The fee I will insist Calpine pay is a very reasonable 22.5% of the recovery, not including any past attorney's fees/accounting fees ultimately recovered. I believe this is mutually beneficial to both myself and SAI as SAI will not be burdened with attorney's fees going forward. That is why there is "no charge" on the October invoice. Please note that I must still account for my time in the event that Judge Lifland decides that Calpine should onlyh pay my hourly rate and not a contingency fee.

Exhibit G.

28. On December 2, 2009, Plaintiff sent an invoice once again confirming that the matter was being handled on a contingency fee basis. A copy of this invoice has been annexed hereto as Exhibit H.

29. On December 8, 2009, Defendants stated in an email that "[w]e are very concerned...." A copy of this email has been annexed hereto as Exhibit H.

30. At no point in their December 8, 2009 email did Defendants ever object to the 22.5% contingency fee, but merely expressed 1) concern, 2) an explanation of their history with prior counsel, and 3) reasons why they felt a contingency fee would adversely impact them.

31. Neither in their December 8, 2009 email, nor at any time thereafter, did Marc Membreno, Robert Membreno or anyone else form SAI ever express an objection to the 22.5% contingency fee.

32. On December 8, 2009, Defendants admitted that "[o]n Ocotober 8th... we agreed that in the interest of continuity, it was best you represent us through the upcoming appeals process." Exhibit I.

33. On December 8, 2009, Defendants admitted that "[i]f the case were to start now, there may be some justification for acceptance of this [contingency] fee." Exhibit I.

34. On December 11, 2009, Defendants requested that the agreement be modified to reflect a time basis. A copy of this email has been annexed hereto as Exhibit J.

35. In this December 11, 2009 e-mail, Defendants stated:

> SAI Trust will honor Caruso Glynn's fees based on the hourly rate we agreed to, and will pay that fee out of a settlement or any court decision, whether positive or negative. For the settlement, Robert [Membreno] stated SAIT will pay all current invoices due, and agree to add a $10,000 performance bonus.

Exhibit J.

36. In response, on December 11, 2009, Plaintiff rejected Defendant's proposal but agreed to modify the terms of the engagement by accepting a blended rate which consisted of the following:

    1) payment on a time basis at the rate of $320 per hour;

    2) plus a contingency fee of 7.67%;

    3) plus a $25,000 performance bonus;

    4) plus any amount recovered from Calpine in excess of SAI's total damages to be treated as attorney's fees;

    5) plus all invoices to be paid in full within 30 days.

A copy of this email has been annexed hereto as Exhibit K.

37. In a second December 11, 2009 email (in response to Exhibit K), Defendants continued to cling to the untruth that they had sent a communication to Plaintiff choosing a time basis over contingency. Therein, Marc Membreno wrote:

"I too am looking for an email I sent regarding our going forward on a time basis."

A copy of this email has been annexed hereto as Exhibit L.

38. Defendants have produced no such e-mail because no such email exists. To the extent that such an email does exist, it certainly was not sent to Plaintiff.

39. In their second December 11, 2009 email, Defendants stated that they "have always insisted on a time basis for billing." (Exhibit L). However, in this instance Defendants were unable to produce any documentation to demonstrate that they insisted on time billing when CG commenced its representation.

40. In their second December 11, 2009 email, Marc Membreno drafted the libelous statement that:

> This is by no means the first (or probably be the last) time we will be defending our rights **against parties who choose to ignore a contract.**

Exhibit L, emphasis added.

41. In a December 12, 2009 email, Plaintiff reiterated that the matter was being handled from the beginning on a contingency fee basis and that there was no objection from Defendants. A copy of this email has been annexed hereto as Exhibit M.

42. Therein, Plaintiff further explained that for any modification of the fee agreement, SAI would have to pay $25,000.00. Exhibit M.

43. From October 8, 2009 forward, Plaintiff diligently represented Defendants in their action against Calpine by performing thorough legal research and analysis of the myriad issues, drafting numerous status reports to both the client and the Court, exchanging numerous detailed e-mail correspondence with Christopher Keegan, Esq. of Kirkland & Ellis, preparing exhaustive damage calculations, creating voluminous damage spreadsheets with multiple contingencies, devising legal theories and arguments to be presented to Calpine and the Bankruptcy Court, handling the matter for further litigation in accordance with the Judge Marrero decision which called for the determination of damages in the Bankruptcy Court, and continuing to craft arguments that may be necessary in the event of further appeals.

44. To date, Defendants have never discharged Plaintiff.

45. To date, Defendants can point to no termination notice, notice of change of attorney or substitution of counsel evidencing that CG was ever discharged as counsel for defendants.

46. At no time between October 2009 and April 2010 did SAI ever discharge CG as counsel.

47. Thereafter, in or about March 2010, SAI and Calpine settled the matter. A copy of an e-mail dated April 15, 2010 from Marc Membreno reporting to Plaintiff that the matter had been settled "after a long and arduous path," is annexed hereto as Exhibit N.

48. At the time of the settlement, Plaintiff was still counsel of record for SAI.

49. However, SAI and Membreno, in an attempt to prevent Plaintiff from recovering its rightful fee, surreptitiously consummated the settlement using new counsel, Campeau Goodsell.

50. The amount of the settlement between SAI and Calpine was $835,000.00 in cash and stock. A copy of the settlement agreement has been annexed hereto as Exhibit O

51.     For this firm's efforts in litigating SAI's claims and enforcing the terms of the 1987 Agreement and bringing the matter to a settlement, Plaintiff is entitled to its reasonable attorney's fees of 22.5% of the settlement.

52.     The settlement between SAI and Calpine consisted of the issuance of 48,863 shares in Calpine to SAI Trust valued at Calpine's closing share price on the date of execution of said agreement. [Exhibit O, §1(a)]

53.     The agreement is signed by both parties, but undated.

54.     The average share price for Calpine (stock symbol CPN) for the month of March 2010 was $11.53.

55.     The cash component of the settlement between Calpine and SAI was thus $835,000 less 48,863 shares x $11.53 ($563,390.39) or $271,609.61. [Exhibit O §1(b)]

56.     The share price of Calpine as of market's close on February 12, 2013, was $20.00[1].

57.     Accordingly, the settlement amount, valued as of February 11, 2013 is the aforementioned cash component of $271,609.61 plus 48,863 shares valued at $19.97 ($975,794.11) for a total of $1,247,403.72.

58.     Plaintiff's reasonable attorney's fees, based upon this settlement amount, total $280,665.84.

59.     To date, SAI has failed to pay Plaintiff its reasonable attorney's fees

60.     In light of the foregoing, Plaintiff has suffered damages in the amount of $280,665.84.

---

[1] *See http://finance.yahoo.com/q?s=cpn&ql=1*, last visited on February 12, 2013

61. Beginning in April 2001, Calpine began charging "allocated expenses" to the monthly Net Profit Interest ("NPI") payments that were due and owing to SAI under a 1987 Agreement for Purchase and Sale of Asset ("the 1987 Agreement).

62. By charging allocated expenses from other plants operated by Calpine, SAI's monthly NPI was effectively reduced.

63. In addition, in April 2001, Calpine began improperly charging 15% overhead to the monthly NPI.

64. These improper charges were the central issues to the litigation handled by CG.

65. CG repeatedly threatened Calpine's counsel, Kirkland & Ellis, that any improper, post-Bankruptcy charges by Calpine to SAI's NPI, including for allocated expenses and 15% overhead, would be subject to suit.

66. To date, Calpine has continued to make full payments to SAI for its monthly NPI.

67. CG is entitled to 22.5% of the difference in NPI payments attributable to Calpine's ceasing to charge allocated expenses and 15% overhead to NPI in futuro.

68. The 1987 Agreement will end in May 2017.

69. The undersigned is the sole member of CG and has been admitted to the practice of law in the States of New York and New Jersey since 1997.

70. I am also admitted to the United States District Courts for the Southern and Eastern Districts of New York, as well as the District of New Jersey.

71. I am also admitted to the United States Court of Appeals for the Second and Seventh Circuits.

72. I have litigated 290 cases in the United States District Court for the Southern District of New York alone[2]. A copy of the SDNY docket has been annexed hereto as Exhibit P.

73. In addition, I have litigated hundreds of other cases in the courts of New York and New Jersey State Courts, Eastern District of New York, District of New Jersey, Eastern District of Louisiana, Northern District of Indiana, Northern District of Illinois, Eastern District of Texas.

74. I have argued appeals in the United States Court of Appeals for the Second Circuit and Seventh Circuit, as well as in the First, Second and Third Departments of the New York State Appellate Divisions.

75. I have a Bachelors of Science in Civil Engineering from Manhattan College with a minor in environmental science.

75. The docket for the case *In re: Calpine* contains over 8,000 entries. Annexed hereto as Exhibit Q is an excerpt of the Calpine docket sheet.

76. At the time of its filing in 2005, the Calpine bankruptcy was the eighth largest bankruptcy in U.S. history. Annexed hereto as Exhibit R is an article from Bloomberg News.

77. As of 2008, the law firm of Kirkland & Ellis, counsel for Calpine, was ranked as the 7th largest firm in the country, and the 11th largest firm in the world, by revenue. See http://www.top-law-schools.com/kirkland-ellis.html, last viewed on February 11, 2013.

78. Annexed hereto as Exhibit S is Plaintiff's Amended Complaint.

---

[2] All but four cases were handled on a contingency fee.

79. Pursuant to Title 28 of the United States Code §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
February 15, 2013

                                  Yours, etc.,

                                  **CARUSO GLYNN, LLC**
                                  Attorneys for Plaintiff

                     By: /s/ *Lawrence C. Glynn*
                                  Lawrence C. Glynn (LG-6431)
                                  53-04 193rd Street
                                  Fresh Meadows, N.Y. 11365
                                  (718) 570-3338
                                  File No.: 88.071108.01