UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CARUSO GLYNN, LLC,

                                                    Case No.: 11 Civ. 4360 (VB)


                    Plaintiff,


          -against-


SAI TRUST and ROBERT MEMBRENO,
Individually and as Trustee for SAI TRUST,


                    Defendants.
-------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>


### C A R U S O   G L Y N N, LLC
#### Pro Se

53-04 193rd STREET
FRESH MEADOWS, N.Y. 11365
TELEPHONE: (718) 570-3338
FACSIMILE: (718) 767-2474
e-mail to lglynn@carusoglynn.com
www.carusoglynn.com

# Table of Contents

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

 Point I- Plaintiff and Defendants Had a Valid Contingency Fee Agreement. . . . . . . . . . 4

  A. Plaintiff Provided a Proper Letter of Engagement. . . . . . . . . . . . . . . . . . . 4

  B. Plaintiff's October 8, 2009 E-Mail Complied with New York's Rules Requiring a Written Letter of Engagement. . . . . . . . . . . . . 5

 Point II

  Defendants Never Discharged Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

 Point III

  Plaintiff Has a Valid Charging Lien.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

 Point IV

  Comparison: *Sanchez v. MTV Networks*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

 Point V

  Even under *Quantum Meruit*, the Court May Still Consider the Contingent Basis of the Fee Agreement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

 Point VI

  Plaintiff Has Established its *Prima Facie* Case for Account Stated. . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## Table of Authorities

**Federal Cases**

*Butler, Fitzgerald & Potter v. Sequa Corp.,* 250 F.3d 171 (2d Cir. 2001). . . . . . . . . . . . . . . . . 12

*Figueroa v. City of New York*, 05 CIV. 9594(JGK), 2011 WL 5547976 at *3 (S.D.N.Y. Nov. 15, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Johnson v. City of New York,* No. 08 Civ. 3673, 2010(TPG) WL 5818290, at *4 (E.D.N.Y. Dec.13, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lide v. Abbott House,* No. 05 Civ. 3790(SAS), 2008 U.S. Dist. LEXIS 13826, at *2–3, 2008 WL 495304 (S.D.N.Y. Feb. 25, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lidle & Roberts LLP v. Garrett*, 720 F.Supp.2d 417 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . 21, 22

*Rosenman & Colin v. Richard,* 850 F.2d 57 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Robert Membreno as trustee of SAI Trust v. Calpine Corp., et al.*, 406 B.R. 463 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Sanchez v. MTV Networks*, No. 10 Civ. 7854(TPG), 2012 WL 2094047 (S.D.N.Y. Jun. 11, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19, 20

*Sequa Corp. v. GBJ Corp.,* 156 F.3d 136 (2d Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Stair v. Calhoun,* 722 F.Supp.2d 258 (E.D.N.Y.2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sutton v. New York City Transit* Authority, 462 F.3d 157 (2d Cir. 2006). . . . . . . . . . . . . . . . . . 14

*Tops Mkts.,* Case No. 93 Civ. 0302, 2001 WL 392082, at *2 (W.D.N.Y., Apr. 4, 2001). . . . . . . 21

*Universal Acupuncture Pain Services, P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

*Weg & Myers, P.C. v. 126 Mulberry St. Realty Corp.*, 453 F. App'x 90 (2d Cir. 2011). . . . . . . . 21

**State Cases**

*Bay Ridge Lumber Co., Inc. v. Summit Renovation Corp.*, 271 A.D.2d 559 (2nd Dep't 2000). . . 25

*Bonamassa v. Estate of Bakos*, 30 Misc.3d 1218(A) (Queens Sup. Ct., Feb. 4, 2011). . . . . . . . 24

*Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 555 N.E.2d 611 (1990). . . . . . . . . . 9

*Corsi v. Ott,* 44 A.D.2d 906, 357 N.Y.S.2d at 747 (4th Dept. 1974). . . . . . . . . . . . . . . . . . . . . . 21

*Darby v. Darby. PC v. VSI International. Inc.*, 95 NY2d 308 (2000). . . . . . . . . . . . . . . . . . . . . 25

*Demov, Morris, Levin & Shein v. Glantz*, 53 N.Y.2d 553, 428 N.E.2d 387, 389 (1981). . . . . . . 9

*Duane Morris LLP v. Astor Holdings Inc.,* 61 A.D.3d. 418 (1st Dept 2009). . . . . . . . . . . . . . . . 25

*Ellenbogen & Goldstein, P.C. v. Brandes*, 641 N.Y.S.2d 28 (1st Dep't 1996), *appeal denied*, 89
N.Y.2d 806 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Fink Weinberger Fredman, Berman & Lowell. P.C. v. Petrides*, 80 A.D.2d. 781 (1st Dept 1981)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fischer–Hansen v. Brooklyn Heights R.R.,* 173 N.Y. 492, 66 N.E. 395 (1903). . . . . . . . . . . . . 12

*Friedman v. Mindlin*, 91 Misc. 473, 155 N.Y.S. 295 (1915). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ingber v. Sabato,* 229 A.D.2d 884, 645 N.Y.S.2d 918 (3d Dept. 1996). . . . . . . . . . . . . . . . . . . 14

*King v. Fox*, 7 N.Y.3d 181, 192, 818 N.Y.S.2d 833, 851 N.E.2d 1184 (2006). . . . . . . . . . . . . . 10

*Kramer Levin Naftalis & Frankel LLP v. Canal Jean Co. Inc.*, 73 AD3d 604 (1st Dept 2010)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lai Ling Cheng v. Modansky Leasing Co.,* 73 N.Y.2d 454, 541 N.Y.S.2d 742, 539 N.E.2d 570,
(1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*LMWT Realty Corp. v. Davis Agency,* 85 N.Y.2d 462, 626 N.Y.S.2d 39, 649 N.E.2d 1183 (1995)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Matter of Cohen v. Grainger,* 81 N.Y.2d at 658, 602 N.Y.S.2d at 790, 622 N.E.2d 288 (1993)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Matter of Jakobson,* 304 A.D.2d 579, 757 N.Y.S.2d 466 (2d Dept. 2003). . . . . . . . . . . . . . . . . 21

*Miller v. Nadler*, 60 AD3d 499 (1st Dept 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Morehouse v. Brooklyn Heights R. Co.*, 123 A.D. 680, 108 N.Y.S. 152 (1908), *aff'd without opinion* 195 N.Y. 537, 88 N.E.1126 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Morrison Cohen LLP v. Karl M. Parrish*, 2011 N.Y. Slip Op. 30354 (N.Y. Sup. Ct., Feb. 9, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Morrison Cohen Singer & Weinstein LLP v. Ackerman,* 208 A.D.2d. 355 (1st Dept 2001). . . . . 25

*Nebraskaland Inc. v. Best Selections*, 303 A.D.2d 662 (2nd Dep't 2003). . . . . . . . . . . . . . . . . . 25

*O'Connell & Aronowitz v. Gullo*, 229 A.D.2d. 637, 644 N.Y.S.2d 870 (3d Dep't 1996). . . . . . 25

*Roake v. Palmer*, 119 A.D. 64, 103 N.Y.S. 862 (1907).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ruggiero v. R.W. Gross Plumbing and Heating Inc.,* 226 A.D.2d 984, 641 N.Y.S.2d 189 (3d Dept. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ruskin. Moscou. Evans & Faltishek. P.C. v. FGH Realty Credit Corp.*, 228 A.D.2d. 294 (1st Dept 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 302 A.D.2d 183, 754 N.Y.S.2d 220 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21, 22

*Shaw v. Manufacturers Hanover Trust Co.,* 68 N.Y.2d 172, 507 N.Y.S.2d 610, 499 N.E.2d 864 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Smith v. Boscov's Dep't Store,* 192 A.D.2d 949, 596 N.Y.S.2d 575, (3d Dep't 1993). . . . 11, 21, 22

*Teichner v. W & J Holsteins,* 64 N.Y.2d 977, 489 N.Y.S.2d 36, 478 N.E.2d 177 (1985). . . . . . . 9

*Williams v. Ingersoll,* 89 N.Y. 508 (1882).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Zanani v. Schvimmer* 50 AD3d 445 (1st Dept 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Statutes**

*New York's Judiciary Law §475.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

**Regulations**

*N.Y. Comp. Codes R. & Regs. tit. 22, § 1215.1.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

**Treatises**

*Ernest Edward Badway Encyclopedia of New York Causes of Action: Elements and Defenses*, §5-2 at 37-38 [2[nd] ed. 2010 New York Law Journal Practice Series]. . . . . . . . . . . . . . . . . . . . . . . . . 25

## PRELIMINARY STATEMENT

Plaintiff Caruso Glynn, LLC (hereafter, "Caruso Glynn" or "Plaintiff") submits this Memorandum of Law in support of Plaintiff's motion for summary judgment as against defendants SAI Trust ("SAI") and Robert Membreno ("Membreno")(sometimes collectively referred to herein as "Defendants", "SAI" or "Clients").

### Jurisdiction

This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

This is an action to recover plaintiff's reasonable attorney's fees in accordance with a contingency fee agreement between Plaintiff and defendants Robert Membreno, as Trustee of SAI Trust, and SAI Trust. Glynn Aff., at ¶4. This action is also filed under and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201. Glynn Aff., at ¶5.

### Statement of Facts

On October 8, 2009, Plaintiff entered into an agreement with SAI to handle SAI's lawsuit involving a complex royalties dispute with Calpine Corp. A detailed substantive and procedural history of the underlying bankruptcy action and appeal to the Southern District of New York is set forth in the Decision and Order of this Court dated June 9, 2009 in *Robert Membreno as trustee of SAI Trust v. Calpine Corp., et al.*, 406 B.R. 463 (S.D.N.Y. 2009), ("Decision and Order"). See Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 ("L.R. 56.1") at ¶1 and Affirmation of Lawrence C. Glynn dated February 11, 2013, hereafter "Glynn Aff.", at ¶1 and Exhibit A thereto.

Under the terms of an engagement letter issued on October 8, 2009, plaintiff agreed to handle SAI's case against Calpine, and specifically the pending appeal to the Second Circuit and any proceedings thereafter, on a contingency fee basis of 22.5% of the gross amount covered plus disbursements.  L.R. 56.1, ¶2; Glynn Aff., ¶2, Ex. B.

This fee arrangement was submitted to SAI at the commencement of the attorney-client relationship between CG and SAI, and at a time when the matter was on appeal to the Second Circuit. Federal appeals are a time consuming and costly endeavor. This is especially true in cases such as this where the record on appeal was approximately 20,000 pages. The amount of time necessary to prepare this matter for appeal could have easily approached 200 hours and, had the Second Circuit reversed Judge Marrero, the matter would have been remanded back to the United States Bankruptcy Court for the Southern District of New York. With all of these unknown variables, SAI was looking at potentially years worth of future litigation in October 2009 and potentially astronomical legal fees on a time basis. L.R. 56.1, ¶¶4-5; Glynn Aff., ¶¶4-5.

From October 8, 2009 forward, Plaintiff diligently represented Defendants in their action against Calpine by performing thorough legal research and analysis of the myriad issues, drafting numerous status reports to both the client and the Court, exchanging numerous detailed email correspondence with Christopher Keegan, Esq. of Kirkland & Ellis, preparing exhaustive damage calculations, creating voluminous damage spreadsheets presenting multiple contingencies, devising novel legal theories and arguments to be presented to Calpine and the Bankruptcy Court, handling the matter for further litigation in accordance with the Judge Marrero decision, which called for the determination of damages in the Bankruptcy Court, and continuing to craft arguments that may be necessary in the event of further appeals. L.R. 56.1, ¶43; Glynn Aff., ¶43.

Thereafter, in or about March 2010, SAI and Calpine settled the matter. L.R. 56.1, ¶47; Glynn Aff., ¶47, Ex. N. At the time of the settlement, Plaintiff was still counsel of record for SAI. L.R. 56.1, ¶48; Glynn Aff., ¶48. However, SAI, in an attempt to prevent plaintiff from recovering its rightful fee, surreptitiously consummated the settlement with Calpine using new counsel and without plaintiff's knowledge or consent. L.R. 56.1, ¶49; Glynn Aff., ¶49. The on paper amount of the settlement between SAI and Calpine was $835,000.00 in cash and stock. L.R. 56.1, ¶50; Glynn Aff., ¶50, Ex. N. For this firm's efforts in litigating SAI's claims and enforcing the terms of the 1987 Agreement and bringing this matter to a settlement, Plaintiff is entitled to its reasonable attorney's fees of 22.5% of the settlement. L.R. 56.1, ¶51; Glynn Aff., ¶51.

The settlement between SAI and Calpine consisted of the issuance of 48,863 shares in Calpine to SAI Trust valued at Calpine's closing share price on the date of execution of said agreement. [Glynn Aff., Exhibit O, §1(a)]. L.R. 56.1, ¶52; Glynn Aff., ¶52. The average share price for Calpine (stock symbol CPN) for the month of March 2010 was $11.53. L.R. 56.1, ¶54; Glynn Aff., ¶54. The cash component of the settlement between Calpine and SAI was thus $835,000 less 48,863 shares x $11.53 ($563,390.39) or $271,609.61. [Exhibit N §1(b)] L.R. 56.1, ¶55; Glynn Aff., ¶55. The share price of Calpine as of market's close on February 11, 2013, was $20.00. L.R. 56.1, ¶56; Glynn Aff., ¶56.

Accordingly, the settlement amount, valued as of February 11, 2013, is the aforementioned cash component of $271,609.61 plus 48,863 shares valued at $20.00 ($977,260.00) for a total of $1,248,869.61. L.R. 56.1, ¶57; Glynn Aff., ¶57. Plaintiff's reasonable attorney's fees, based upon this settlement amount, total $280,995.62. L.R. 56.1, ¶58; Glynn Aff., ¶58. To date, SAI has failed to pay Plaintiff its reasonable attorney's fees. L.R. 56.1, ¶59; Glynn Aff., ¶59.

## Argument

### Point I

### Plaintiff and Defendants Had a Valid Contingency Fee Agreement

**A.      Plaintiff Provided a Proper Letter of Engagement**

SAI's primary argument throughout this ongoing dispute has been that it never entered into a valid agreement with Plaintiff regarding the terms of Plaintiff's representation of the client. This argument is without merit. On October 8, 2009, Lawrence C. Glynn, the sole member of Caruso Glynn, LLC,  upon departing his prior firm, advised SAI of his intention to leave. SAI had a choice of either maintaining the action with prior counsel, Nicoletti Hornig & Sweeney, finding new counsel, or employing Plaintiff. Glynn informed SAI that should it continue with Plaintiff handling the matter, given the dramatic shift in the nature of the action (it was on life support when Glynn first took it over from SAI's California counsel) and with the finding by Judge Marrero that Calpine, not SAI, was responsible to pay attorney's fees under the 1987 Net Profits Interest agreement, and facing the uncertainty of an appeal to the Second Circuit brought by Calpine to reverse Judge Marrero's decision, that any further handling by Plaintiff would be done on an extremely reasonable contingency fee of 22.5% as opposed to an hourly basis.

This fee arrangement was submitted to SAI at a time when SAI was looking at potentially years worth of future litigation. To be sure, the matter had been ongoing for seven years prior to Plaintiff's involvement, including numerous failed settlement meetings. In deciding to handle SAI's claims on a contingency fee basis, Plaintiff was willing to face such tremendous uncertainty that is the nature of contingency fee work - - potentially large, out of pocket expenses and the possibility of obtaining no compensation had the matter been lost.

4

With that, SAI chose to have Glynn continue handling the matter and never objected to the contingency fee arrangement despite numerous opportunities at the outset to do just that. The contingency fee arrangement was explained in no fewer than three separate emails in October 2009 and SAI received two monthly invoices in November 2009 and December 2009, both confirming that the matter was being handled on a contingency fee basis. In fact, the contemporaneous time records depicted in each of these invoices demonstrated that while attorney's time was being recorded, there was **no** hourly charge for this work and instead, the words "**Contingency Fee - fee waived**" were inserted into the space where the dollar value of a time fee otherwise would have been inserted. See L.R. 56.1, ¶¶24, 28; Glynn Aff., ¶¶24, 28; Exs. F and H, which are the November and December 2009 invoices sent by plaintiff to SAI Trust. The purpose of these invoices was to reinforce the terms of the engagement letter so as to eliminate any possible confusion. SAI never complained, or objected or questioned the November invoice. SAI was clearly on notice of the fee arrangement and is unable to offer any justification for failing to honor the fee agreement.

**B.    Plaintiff's October 8, 2009 E-Mail Complied with New York's Rules Requiring a Written Letter of Engagement**

N.Y. Comp. Codes R. & Regs. tit. 22, § 1215.1 ("NYCCRR") provides:

(a) Effective March 4, 2002, an attorney who undertakes to represent a client and enters into an arrangement for, charges or collects any fee from a client shall provide to the client a written letter of engagement before commencing the representation, or within a reasonable time thereafter:

(1) if otherwise impractible; or

(2) if the scope of services to be provided cannot be determined at the time of the commencement of representation.

For purposes of this rule, where an entity (such as an insurance carrier) engages an

attorney to represent a third party, the term *client* shall mean the entity that engages the attorney. Where there is a significant change in the scope of services or the fee to be charged, an updated letter of engagement shall be provided to the client.

(b) The letter of engagement shall address the following matters:

(1) explanation of the scope of the legal services to be provided;

(2) explanation of attorney's fees to be charged, expenses and billing practices; and

(3) where applicable, shall provide that the client may have a right to arbitrate fee disputes under Part 137 of this Title.

(c) Instead of providing the client with a written letter of engagement, an attorney may comply with the provisions of subdivision (a) of this section by entering into a signed written retainer agreement with the client, before or within a reasonable time after commencing the representation, provided that the agreement addresses the matters set forth in subdivision (b) of this section.

NYCCRR § 1215.1

Plaintiff fully complied with NYCCRR §1215.1 in its October 8, 2009 email to SAI which

advised, in pertinent part:

I am in the process of winding down my employment at Nicoletti Hornig & Sweeney. Please be advised that this will not effect my ability to provide you the same quality representation going forward. I will continue to personally work on all of my clients' cases, including yours, under my own firm whose details are set forth below.... I will continue to handle this matter on a contingency fee basis.... The contingency fee will be an extremely reasonable 22.5% of the gross recovery... plus necessary out of pocket expenses (for copying, printing, etc.).

See L.R. 56.1, ¶¶1-2; Glynn Aff. ¶¶1-2; Ex. B.

On October 20, 2009, Plaintiff responded to SAI's email of even date informing that for the

first time in over eight years, Calpine did not deduct allocated expenses from the monthly Net Profit

Interest statement for August 2009. See L.R. 56.1, ¶9, Glynn Aff., ¶9 and Ex. C. Indeed, it was an

improper deduction of allocated expenses for an eight year period that was the central issue to the

ongoing litigation between SAI and Calpine. In Plaintiff's October 20, 2009 response, written 12

days after the initial engagement letter (October 8, 2009 email), Plaintiff noted that the threats of

impending lawsuits against Calpine was undoubtedly the reason for Calpine's sudden compliance

with the terms of the agreement. Plaintiff also took the opportunity in that October 20, 2009 email

to again request confirmation of agreement to the contingency fee terms outlined in the October 8,

2009 email. See L.R. 56.1, ¶¶10-12, Glynn Aff., ¶¶10-12 and Ex. C.

      In response, Marc Membreno on behalf of SAI stated:

> "I'm a little confused with your contingency proposal. We have thus
> far been invoiced by our previous counsel plus Nicoletti Hornig &
> Sweeney a total of $175,000.00. If the settlement were hypothetically
> $770,000.00, you would be entitled, under this scenario, to
> $173,250.00 (plus disbursements) - roughly equal to the amount
> already invoiced for the work up until now. The other option is
> continuing with the hourly rate which has now risen some 23% since
> your departure. Is my understanding correct?

L.R. 56.1, ¶13, Glynn Aff., ¶13 and Ex. D.

      Plaintiff responded to this email on October 20, 2009 and confirmed that Marc Membreno's

understanding was correct and again reiterating that the matter would be handled on a contingency

fee basis. L.R. 56.1, ¶17, Glynn Aff., ¶17 and Ex. D. Thereafter, neither Marc Membreno, Robert

Membreno nor anyone else form SAI ever expressed a desire to continue on a time basis, nor did

anyone express an objection to the 22.5% contingency fee.    Defendants cannot be heard to argue that

they did not receive an "explanation of attorney's fees to be charged, expenses and billing practices"

as required under NYCCRR § 1215.1. L.R. 56.1, ¶¶18-20, Glynn Aff., ¶¶18-20 and Exs. C and D.

      On October 30, 2009, having not received any objection to the contingency fee for three

weeks, and following further explanation of the nature of the relationship on October 20, 2009,

Plaintiff again referenced the contingency fee arrangement and even offered a lower contingency fee rate of 15% if the matter settled without having to go through appeal. Neither Marc Membreno, Robert Membreno nor anyone else form SAI ever expressed an objection to the contingency fee. L.R. 56.1, ¶¶21-22; Glynn Aff., ¶¶21-22, Ex. E.

On November 2, 2009, Plaintiff sent an invoice confirming that the matter was being handled on a contingency fee basis. Said invoice contained contemporaneous time records which demonstrated that while attorney's time was being recorded, there was **no** hourly charge for this work and instead, the words "**Contingency Fee - fee waived**" was inserted into the space where the dollar value of a time fee otherwise would have been inserted. At no time during the month of November 2009, nor at any time thereafter, did Marc Membreno, Robert Membreno or anyone else form SAI ever express an objection to the 22.5% contingency fee. L.R. 56.1, ¶¶23-25; Glynn Aff., ¶¶23-25, Ex. F.

On November 23, 2009, Marc Membreno sent an email which stated:

Wondering why you have 'No Charge' listed on time sheet/invoice.

On November 23, 2009, the contingency fee was explained for a third time in Plaintiff's response email which states, in pertinent part:

As of October 1, 2009, I'm handling the matter on a contingency fee basis going forward.

L.R. 56.1, ¶¶26-27; Glynn Aff., ¶¶26-27, Ex. F.

On December 2, 2009, Plaintiff sent an invoice once again confirming that the matter was being handled on a contingency fee basis. L.R. 56.1, ¶28; Glynn Aff., ¶28, Ex. H. Given the numerous notifications aforesaid, there is no material issue of fact that Defendants did not receive

an "explanation of attorney's fees to be charged, expenses and billing practices" as required under NYCCRR § 1215.1. Having established that CG complied with this regulation, Defendants' argument that there was no valid contingency fee agreement is unavailing.

## Point II

### Defendants Never Discharged Plaintiff

Defendants' second recurring argument has been that regardless of whether or not there was a valid contingency fee agreement (there was), SAI effectively terminated that contingency fee agreement and CG would nevertheless be limited to recovery under *quantum meruit*. However, this argument is misguided and assumes too much. There is not a single case that supports the notion that the client has the ability to unilaterally change the fee agreement with the attorney. It is, however, "well established that notwithstanding the terms of the agreement between them, a client has an absolute right, at any time, with or without cause, to terminate the attorney-client relationship by discharging the attorney. *Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 43-44, 555 N.E.2d 611, 614 (1990); *Shaw v. Manufacturers Hanover Trust Co.,* 68 N.Y.2d 172, 177, 507 N.Y.S.2d 610, 499 N.E.2d 864 (1986); *Teichner v. W & J Holsteins,* 64 N.Y.2d 977, 979, 489 N.Y.S.2d 36, 478 N.E.2d 177 (1985); *Demov, Morris, Levin & Shein v. Glantz*, 53 N.Y.2d 553, 557, 428 N.E.2d 387, 389 (1981); *Crowley v. Wolf,* 281 N.Y. 59, 64–65, 22 N.E.2d 234 (1939); *Martin v. Camp,* 219 N.Y. 170, 176, 114 N.E. 46 (1916). Thus, for the client to "terminate" the contingency fee arrangement, the client must exercise her absolute right to terminate the attorney-client relationship altogether.

Herein lies the fatal flaw to Defendants' argument. Defendants never terminated the attorney-client relationship by discharging CG. L.R. 56.1, ¶¶44-48; Glynn Aff., ¶¶44-48. Defendants will

9

certainly attempt to put their best spin on their nefarious emails in an attempt to demonstrate some type of constructive termination. Such arguments are unavailing because, by any fair reading of the email exchanges, it is clear that Defendants never terminated the attorney-client relationship, either constructively or actually.

Defendants brief in support of their concurrently filed summary judgment motion will surely cite *King v. Fox*, 7 N.Y.3d 181, 192, 818 N.Y.S.2d 833, 840-841, 851 N.E.2d 1184, 1191-1192 (2006) which held that "it is well settled that the client may terminate the [contingent fee agreement] at any time, leaving the lawyer no cause of action for breach of contract, only *quantum meruit*." *Id.*. Defendants will also misapply the holding of this case by conveniently omitting the brackets around the phrase "contingency fee agreement," brackets that exist in the actual decision. The logic of *King v. Fox* is sound. It simply reaffirms settled law, i.e., that the client may terminate the attorney-client relationship at any time, and, by implication, the contingency fee agreement. However, the facts of this case demonstrate that there was no such discharge, and Defendants' argument is rendered moot.

In fact, since Defendants never discharged CG, the rule is well settled that an attorney having a contract for contingent fees who has not been discharged by his client during the litigation is not limited to a recovery of *quantum meruit*. *See Morehouse v. Brooklyn Heights R. Co.*, 123 A.D. 680, 108 N.Y.S. 152 (1908), *aff'd without opinion* 195 N.Y. 537, 88 N.E.1126 (1909); *Friedman v. Mindlin*, 91 Misc. 473, 155 N.Y.S. 295 (1915); *Roake v. Palmer*, 119 A.D. 64, 103 N.Y.S. 862 (1907).

Importantly, and as discussed in greater detail, *infra*, even if this Court determines that Defendants did actually discharge Plaintiff, which is denied, the Second Circuit has held that in

10

calculating *quantum meruit*, the contingency fee agreement between the client and attorney can be

used to establish the reasonable value of attorney's services:

> If the lawyer is discharged without cause and prior to the conclusion
> of the case, however, he or she may recover either (1) in *quantum
> meruit,* the fair and reasonable value of the services rendered, or (2)
> a contingent portion of the former client's ultimate recovery, but only
> if both of the parties have so agreed. *See Lai Ling Cheng v. Modansky
> Leasing Co.,* 73 N.Y.2d 454, 458, 541 N.Y.S.2d 742, 744, 539
> N.E.2d 570, 572 (1989); *see also Matter of Cohen v. Grainger,* 81
> N.Y.2d at 658, 602 N.Y.S.2d at 790, 622 N.E.2d 288, 290 (1993)
> ("Only if the client and attorney agree may the attorney receive a fee
> based on a percentage of the recovery."). "Recovery on a quantum
> meruit basis is called for even where the attorney discharged without
> fault was employed under a contingent fee contract." *Smith v.
> Boscov's Dep't Store,* 192 A.D.2d 949, 950, 596 N.Y.S.2d 575, 576
> (3d Dep't 1993); *see also Cohen,* 81 N.Y.2d at 658, 602 N.Y.S.2d at
> 790, 622 N.E.2d at 290 (discussing a discharged attorney's options for
> recovery in a case involving a contingency-fee agreement). In this
> case, immediately after the clients discharged Q & S and before the
> litigation was resolved, Q & S requested compensation in *quantum
> meruit.* Therefore, unless the clients discharged Q & S for cause, it
> was entitled to receive such compensation.

*Universal Acupuncture Pain Services, P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d

Cir. 2004). Accordingly, the Court would be justified in still using the contingency fee of 22.5% in

calculating *quantum meruit*.

## Point III

### Plaintiff Has a Valid Charging Lien

Plaintiff has a valid charging lien against the settlement proceeds received by SAI and Robert

Membreno. New York's Judiciary Law §475 states:

> From the commencement of an action, special or other proceeding in
> any court or before any state, municipal or federal department, except

11

a department of labor, or the service of an answer containing a counterclaim, or the initiation of any means of alternative dispute resolution including, but not limited to, mediation or arbitration, or the provision of services in a settlement negotiation at any stage of the dispute, the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien. *N.Y. Judiciary Law* § 475 (McKinney).

"The [charging] lien is predicated on the idea that the attorney has by his skill and effort obtained the judgment, and hence 'should have a lien thereon for his compensation, in analogy to the lien which a mechanic has upon any article which he manufactures' (*Williams v. Ingersoll,* 89 N.Y. 508, 517 [1882] )" *Butler, Fitzgerald & Potter v. Sequa Corp.,* 250 F.3d 171 (2d Cir. 2001); (*see also LMWT Realty Corp. v. Davis Agency,* 85 N.Y.2d 462, 467–8, 626 N.Y.S.2d 39, 649 N.E.2d 1183 [1995]). Further, enforcement of a charging lien is founded upon the equitable notion that the proceeds of a settlement are ultimately "under the control of the court, and the parties within its jurisdiction, [and the court] will see that no injustice is done to its own officers" (*Rooney v. Second Ave. R. Co.,* 18 N.Y. 368 (1858); *see also Fischer–Hansen v. Brooklyn Heights R.R.,* 173 N.Y. 492, 502, 66 N.E. 395 (1903); *Rosenman & Colin v. Richard,* 850 F.2d 57, 60 [1988]). However, an attorney's recovery under Judiciary Law § 475 is contingent upon his client reaching a favorable outcome, because the charging lien is a specific attachment to the funds which constitute the client's recovery (*Butler v. Sequa, supra* at 177).

*Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 302 A.D.2d 183, 187-88, 754 N.Y.S.2d 220, 223-24 (2002). In the case *sub judice*, a favorable outcome was undeniably achieved. As of December 11, 2009, Defendants' realistic possible recovery, including prior attorney's fees, stood at $726,710.43. Glynn Aff., Ex. K. By that point in time, CG had Calpine discussing settlement in the range of $800,000-$850,000 range, well in excess of SAI's actual damages.

Defendants, who will attempt to attack Plaintiff's competence to justify a faux "with cause" argument, will demonstrate that they have absolutely no idea what the terms of the Calpine Reorganization Plan were, or how SAI was to be treated under the plan, or the duplicitous nature in which counsel for Calpine was negotiating (despite CG's numerous reports to SAI and Membreno on each of these topics). Importantly, if asked, SAI would have absolutely no way of intelligently explaining its own damages, nor could it intelligently explain how or why they were able to achieve a settlement of $835,000 (now in excess of $1.2 million) which even in March 2010 was $100,000 more than its actual, hard, recoverable damages.

Defendants settled their claims with Calpine in March of 2010, while this firm was still attorney of record, for the amount of $835,000.00 in cash and stock. L.R. 56.1, ¶50; Glynn Aff. ¶50, Ex. O. The settlement consisted of the issuance of 48,863 shares in Calpine to SAI Trust valued at Calpine's closing share price on the date of execution of said agreement. L.R. 56.1, ¶52; Glynn Aff. ¶52 , Ex. O, §1(a). The average share price for Calpine (stock symbol CPN) for the month of March 2010 was $11.53. L.R. 56.1, ¶54; Glynn Aff. ¶54.  The cash component of the settlement between Calpine and SAI was thus $835,000 less 48,863 shares x $11.53 ($563,390.39) or $271,609.61. [Exhibit O, §1(b)]. The share price of Calpine as of market's close on February 11, 2013, was $19.97. L.R. 56.1, ¶56; Glynn Aff. ¶56 . Accordingly, the settlement amount, valued as of February 11, 2013 is the aforementioned cash component of $271,609.61 plus 48,863 shares valued at $19.97 ($975,794.11) for a total of $1,247,403.72. This is an increase of $520,693.29 from the amount of Defendants' actual damages as of December 2009. See Glynn Dec., ¶57 and Ex. K. By any objective view of the outcome of this case, the result was not merely favorable, it was outstanding.

13

Importantly, in determining whether the amount of the charging lien is fair, the Court looks to "the terms of the percentage agreement, the nature of the litigation, difficulty of the case, time spent, amount of money involved, results achieved and amounts customarily charged for similar services in the same locality." *Sutton v. New York City Transit* Authority, 462 F.3d 157 (2d Cir. 2006), quoting *Ingber v. Sabato,* 229 A.D.2d 884, 887, 645 N.Y.S.2d 918, 920 (3d Dept. 1996) (citations omitted); *see also Ruggiero v. R.W. Gross Plumbing and Heating Inc.,* 226 A.D.2d 984, 986, 641 N.Y.S.2d 189, 191 (3d Dept. 1996). Further, "[a]lthough the court is not bound by the parties' retainer agreement, **such an agreement may guide the court in determining the reasonable value of the services rendered**." *Figueroa v. City of New York*, 05 CIV. 9594(JGK), 2011 WL 5547976 at \*3 (S.D.N.Y. Nov. 15, 2011); emphasis added*; Stair v. Calhoun,* 722 F.Supp.2d 258, 268–69 (E.D.N.Y.2010). "This determination is one which is committed to the sound discretion of the trial court." *Id.*, citing *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 149 (2d Cir.1998).

Employing this analysis, Defendants must necessarily agree that this was an extremely complex royalties dispute brought by SAI against Calpine, one of the world's largest energy providers. The action was brought in the United States Bankruptcy Court for the Southern District of New York in what was, at that time, the eighth largest bankruptcy case in the history of the country. L.R. 56.1, ¶76; Glynn Aff., ¶76; Ex. Q. The royalties agreement (payment of Net Profit Interests or "NPI") dated back to 1987 and the litigation was premised upon what SAI argued, ironically, was an unauthorized, unilateral change in accounting practices after Calpine purchased numerous power plants throughout Northern California, including the power plant at issue, West Ford Flat, and consolidated operations. This breach began in April 2001 and continued for more than eight years.

14

At the time Plaintiff began his own practice, the matter was destined for the Second Circuit Court of Appeals and there was tremendous risk involved in handling the matter on a contingency fee basis. By leveraging the favorable appellate ruling of Judge Marrero reversing the Bankruptcy Court's grant of summary judgment to Calpine and also upholding the attorney's fees provision of the 1987 Agreement, Plaintiff was able to use the contingency fee to significantly increase the settlement value of the case. As a result, the settlement offer from Calpine increased from $740,000.00 in August of 2009 to $850,000.00 in December of 2009 and finally, a settlement, currently valued in excess of $1.2 million, was consummated. Clearly, while trying to oppose Plaintiff's entitlement to a contingency fee[1], SAI, presumably with the assistance of its California counsel but nevertheless while CG was still attorney of record in the Bankruptcy Court, concluded the settlement with Calpine for an amount that has resulted in a windfall in excess of $522,159.18.

In summary, SAI and Robert Membreno (and their California counsel) acquired Plaintiff's work product, strategy, legal analysis, expertise and negotiating tactics, used it all effectively against Calpine to conclude a substantially higher settlement than its damages ever warranted, refused to compensate Plaintiff in accordance with the exceedingly fair, reasonable contingency fee arrangement, and proceeded to impugn Plaintiff's competence and integrity for good measure.

SAI and Membreno have undoubtedly been unjustly enriched. Importantly, the amount of the unjust enrichment has now increased by more than 25% as the value of Calpine stock has increased from approximately $15 per share at the time of the commencement of this action, to $20 per share.

---

[1] Defendants could have simply chosen to stay with Nicoletti or gone back to Campeau Goodsell or found another attorney on October 8, 2009 if they didn't want a contingency fee arrangement.

The settlement, as structured, contemplated and crafted by Plaintiff, now exceeds $1.2 million. Yet SAI and Membreno still insist that Plaintiff is entitled to nothing.

**Point IV**

**Comparison: *Sanchez v. MTV Networks***

The facts of the instant case are most comparable to those in *Sanchez v. MTV Networks*, No. 10 Civ. 7854(TPG), 2012 WL 2094047 (S.D.N.Y. Jun. 11, 2012). In *Sanchez*, plaintiff, the former voice of Dora the Explorer, sought a reduction in her prior counsel's contingency fee in a similar royalties dispute, as well as a declaration precluding her prior firm from recovering any fees associated with audit rights which were awarded to the infant plaintiff and were attributable to the efforts of her prior counsel.

In finding prior counsel's contingency fee justified, the Court noted the general premise that a "'lawyer should receive 'suitable compensation ... for his services,' and the 'most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Id.* citing *Johnson v. City of New York,* No. 08 Civ. 3673, 2010(TPG) WL 5818290, at *4 (E.D.N.Y. Dec.13, 2010) (quotations omitted). Continuing, the Court held that:

> The court should consider "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved." *Lide v. Abbott House,* No. 05 Civ. 3790(SAS), 2008 U.S. Dist. LEXIS 13826, at *2–3, 2008 WL 495304 (S.D.N.Y. Feb. 25, 2008).

Importantly, Judge Griesa specifically held that "[t]he court should consider, but need not accept, the parties' contingency fee agreement. *Id.* citing *Johnson,* 2010 WL 5818290, at *4.

16

Finally, Judge Griesa held:

> Regarding the 37.5% of fees requested by the Firm in connection with the MTV settlement, the court finds that such an award is justified. **This was a complex lawsuit against a major corporate adversary with great resources and skilled attorneys**. During the case's duration, it rightly took up a great deal of time for Balestriere and the Firm. Although Sanchez now questions the wisdom of the settlement, it cannot be denied that she quickly obtained a substantial sum of money and valuable audit rights, and the court has repeatedly approved the reasonableness of the settlement. Balestriere is an experienced litigator who would generally command a high billing rate. Had the Firm charged Sanchez by the hour, it would be seeking substantially more fees than it is currently seeking. **Although the court recognizes that it is not bound by the amount set forth in the contingency fee agreement, the court finds that based on the factors above, 37.5% of the recovery from the MTV settlement represents a fair and reasonable fee for the Firm for its work on the MTV settlement. The Firm is entitled to $193,363.73 in connection with the MTV settlement.**

Id. at *3.

Thus, the *Sanchez* decision teaches that while the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," this simple formula of hours multiplied by a reasonable hourly rate cannot be the starting and endpoint of the inquiry. Importantly, *all* of the factors considered by the Court in *Sanchez* exist here. Further, and similar to *Sanchez*, SAI and Membreno have been greatly enriched due to the efforts of Plaintiff when Calpine finally reverted to the pre-2001 accounting procedures. SAI and Membreno cannot dispute that the drastic about face by Calpine was attributable to anything other than Plaintiff's relentless efforts and skillful litigation tactics.

Defendants also cannot deny that, like *Sanchez*, this was an extremely complex matter which required extensive forensic accounting on the part of counsel, complex legal arguments, and detailed

17

valuation analyses with numerous variables which were performed in an effort to facilitate settlement for the maximum possible amount, all of which were performed with expertise. Further, what appeared to be an extremely compelling factor for Judge Griesa in his decision was that Disney "was a major corporate adversary with extensive resources and skilled attorneys." Here, Calpine is certainly on par with Disney so far as major corporate adversaries go, with similarly expansive resources. Like Disney, Calpine had exceedingly skilled attorneys, Kirkland & Ellis, who has offices in Chicago, New York, San Francisco and around the globe, was ranked as the 7th largest firm in the country in 2008, and the 11th largest firm in the world by annual revenue.[2] See http://www.top-law-schools.com/kirkland-ellis.html, last viewed on February 11, 2013; L.R. 56.1 ¶77, Glynn Aff., ¶77.

In addition, as was the case in *Sanchez*, Plaintiff should be entitled to 22.5% of all past and future monthly NPI adjustments resulting from Calpine's honoring the original agreement, from August 2009 until the agreement lapses in 2017. This was undoubtedly a crucial victory for SAI as it was a substantial admission by Calpine that the unilateral change in accounting practices in 2001 was unacceptable and in violation of the original 1987 Agreement. Calpine, as a result of counsel's tireless efforts, changed course and ceased deducting operational expenses and overhead from its combined power plants. SAI completely ignores the role Plaintiff played in bringing about this

---

[2] By contrast, Caruso Glynn LLC proudly ranks near or at the bottom on both measures. Caruso Glynn has precisely one employee. Caruso Glynn operates out of the bottom floor of a two family house in the middle of "Nowheres-ville, Queens." Caruso Glynn has no secretary, paralegal, receptionist or bookkeeper. Yet, somehow, it wasn't the Nicoletti firm nor the Campeau Goodsell firm that was able to turn a case that was virtually worthless in 2008 into a settlement now in excess of $1.2 million. And, for this firm's efforts, SAI and Mr. Membreno feel that not only has Caruso Glynn been fairly compensated, in fact, they would like a refund of approximately $8,000.00. Or, perhaps Defendants believe that Caruso Glynn is so small and insignificant, that it isn't entitled to be fairly compensated in the same way that Kirkland & Ellis or even Nicoletti Hornig or Campeau Goodsell were.

change going forward until the agreement expires in May 2017. Addressing similar future audit

rights earned by the effort of counsel, the *Sanchez* court held:

> Finally, regarding the percentage of future recoveries sought by the Firm, the court accepts that, to the extent there is a future recovery as a result of an audit or audits pursuant to the settlement agreement, those recoveries were made possible by the able representation of the Firm. Thus, the Balestriere firm is entitled to some degree of compensation for helping Sanchez obtain these potential future recoveries. However, the Firm requests the court approve in advance an award of 30% of any future recovery. This fee appears excessive, given that the Firm has been terminated and will not be handling the audits, which are likely to require the time and legal skill of other attorneys. However, it would be appropriate to award the Firm 15% of the proceeds of any such audit. This would compensate the Firm for its work in securing the audit rights, but avoid giving the Firm a windfall as a result of audits that are being conducted by others.
>
> *4 In opposition to this fee request, Sanchez has generally argued that the settlement was improperly entered and should be vacated. However, the court has already denied a motion to vacate the settlement, and the court finds these arguments unpersuasive. Sanchez also argues that Sanchez did not actually sign the contingency fee agreement and that nobody acting on her behalf ever formally retained the Firm to represent her. Thus, they argue that the Firm should be entitled to no fees at all. However, Balestriere filed a lawsuit as Sanchez's attorney, achieved a settlement on her behalf, presented the settlement agreement to the court as her attorney (after she and both of her parents signed it), and Sanchez accepted the benefits of that settlement, which the court has approved. Nobody ever objected that the Firm did not represent Sanchez until now. Given these facts, it would be a strange result for the court now to find that the Firm did not actually represent Sanchez and is entitled to no fees simply because Sanchez herself did not sign the contingency fee agreement, which the court did not even treat as binding.

*Sanchez v. MTV Networks*, 10 CIV. 7854 TPG, 2012 WL 2094047 at **3-4, (S.D.N.Y. June 11,

2012).

19

Here too, SAI has argued that it never signed a retainer agreement. SAI and its counsel dismisses the October 8, 2009 email (which as discussed herein is an acceptable engagement letter compliant with New York's requirements) out of hand, but can cite to no compelling legal or factual basis of why the terms of the October 8, 2009 engagement letter should not be enforced, other than the same failed argument posed in *Sanchez*, *to wit*, that nobody ever signed a retainer agreement. As noted by Judge Griesa, counsel "filed a lawsuit as Sanchez's attorney, achieved a settlement on her behalf, presented the settlement agreement to the court as her attorney (after she and both of her parents signed it), and Sanchez accepted the benefits of that settlement, which the court has approved. Nobody ever objected that the Firm did not represent Sanchez until now. Given these facts, it would be a strange result for the court now to find that the Firm did not actually represent Sanchez and is entitled to no fees simply because Sanchez herself did not sign the contingency fee agreement, which the court did not even treat as binding."

This passage is extremely prescient of the facts of this case. There, the court did not even find the contingency fee agreement binding per se, yet still determined that, for all of the other factors discussed therein, a 37.5% contingency fee was fair, reasonable and warranted. Aside from repeating the same arguments made in its motion to dismiss and in their arbitration brief, SAI will not be able to provide any direct substantive response to the logic, reasoning and tenets of equity displayed by Judge Griesa in the *Sanchez* decision. Plaintiff believes that this Court must be guided by these same principles and rule that Plaintiff is entitled to a 22.5% contingency fee (substantially less than the "reasonable" 37.5% upheld in *Sanchez*) for both the total current amount of the settlement, plus 22.5% of all excess monies recovered by SAI from October 2009 through May 2017 as a result of Calpine reverting to the original accounting practices used prior to April 2001.

## POINT V

### Even under *Quantum Meruit*, the Court May Still Consider the Contingent Basis of the Fee Agreement

Defendants have repeatedly argued that even if there was a valid retainer agreement for a 22.5% contingency fee,  Plaintiff would nevertheless be entitled to only receive *quantum meruit* based upon the actual number of hours worked on the case. See e.g., *Lidle & Roberts LLP v. Garrett*, 720 F.Supp.2d 417 (S.D.N.Y. 2010). However, the rule in *Lidle* is at odds with the well settled proposition in this Circuit that "[n]o hard and fast rule exists by which it can be determined what is reasonable compensation for an attorney in any given case." See *Weg & Myers, P.C. v. 126 Mulberry St. Realty Corp.*, 453 F. App'x 90, 92 (2d Cir. 2011) *citing Matter of Jakobson,* 304 A.D.2d 579, 579, 757 N.Y.S.2d 466, 466 (2d Dep't 2003).

Defendants argument is further incorrect as it truly misconstrues the law in this State. Under New York law, in determining such [*quantum meruit*] amount, a court may consider, *inter alia,* (1) the contingent nature of the representation, *Tops Mkts.,* Case No. 93 Civ. 0302, 2001 WL 392082, at *2 (W.D.N.Y., Apr. 4, 2001); *Lai Ling Cheng,* 73 N.Y.2d at 459, 541 N.Y.S.2d at 745, 539 N.E.2d at 573; *Smith,* 192 A.D.2d at 950–51, 596 N.Y.S.2d at 576; *Corsi v. Ott,* 44 A.D.2d 906, 357 N.Y.S.2d at 747 (4th Dept. 1974), (2) the results achieved by the attorney before discharge, *Tops Mkts.,* 2001 WL 392082, at *2; *Schneider,* 302 A.D.2d at 189, 754 N.Y.S.2d at 224; *Smith,* 192 A.D.2d at 950–51, 596 N.Y.S.2d at 576, and (3) the client's actual chance of success at the time the attorney was discharged, *see Corsi,* 44 A.D.2d at 906, 357 N.Y.S.2d at 747 (holding that a court should consider the "likelihood of [the client's] recovery" in determining a *quantum meruit* fee).

21

*Universal Acupuncture Pain Services, P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 265 (2d Cir. 2004). These factors were completely ignored in *Lidle*. *Id.* It has been further held that:

> In determining the value of the attorney's services provided to the client prior to discharge, a number of variables are considered. [W]hile the terms of the percentage agreement is one factor that may be taken into account ..., it is not to be considered the dispositive factor (citation omitted). Other factors, such as the nature of the litigation, the difficulty of the case, the time spent, the amount of money involved, the results achieved and amounts customarily charged for similar services in the same locality, for example, should also be considered (citations omitted). *Smith v. Boscov's, supra* at 950–51, 596 N.Y.S.2d 575.

*Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 302 A.D.2d 183, 189, 754 N.Y.S.2d 220, 224 (2002).

Thus, putting aside the written contingency amount of 22.5% which was set forth in Plaintiff's engagement letter at the outset of handling this case, the fee is nevertheless appropriate given that this case involved complex legal issues, extensive forensic accounting and valuation analyses. As for the amount of money involved, the amount in controversy was a substantial one which, through the efforts, analysis, acumen and strategy of Plaintiff grew to in excess of $1.2 million when all was said and done, and exceeded Defendants' actual damages by over $500,000.00.

With respect to amounts customarily charged for similar services, a 22.5% contingency fee is extremely reasonable, as this Circuit has recognized and accepted contingency fees as high as 50%. Finally, SAI and Membreno, in attempting to dicker over the terms of the contingency fee, actually admitted to the reasonableness of the a contingency fee. See L.R. 56.1, ¶33; Glynn Aff., ¶33, Ex. I, wherein Defendants conceded that "[i]f the case were to start now, there may be some justification for acceptance of this fee, but at this late stage of the case, we do not agree with

22

adopting a contingency fee." Defendants ignore four crucial facts. First, insofar as the relationship between SAI/Membreno and Caruso Glynn, LLC was concerned, in October 2009, the case was indeed "starting now." SAI and Membreno were free to remain with the Nicoletti firm, or they could have found new counsel to handle the matter or returned the matter to their California counsel prior to engaging my firm to perform the work. Defendants affirmatively chose to use my firm and continued to reap the benefits of my representation.

Second, when presented with the new terms on which this matter would be handled by CG and when presented with the option between contingency or time, Defendants remained silent for two months which included multiple emails referencing and explaining the contingency fee and two invoices. L.R. 56.1, ¶¶1-33; Glynn Aff., ¶¶1-33; Exs. B-I. Plaintiff argues that 1) this objection was not made within a reasonable time, 2) was made well after the parties had established a course of dealing, and 3) for purposes of determining a fair value, either under a charging lien or in *quantum meruit*, it is indeed permissible for this Court to consider the contingency fee.

Third, Defendants ignore the fact that Plaintiff offered to handle this matter on a contingency fee when its outcome was far from certain and its status lingered somewhere in the murkiness between the United States Bankruptcy Court for the Southern District of New York and the Second Circuit Court of Appeals. Plaintiff took the case in October 2009 knowing full well that nothing in litigation is guaranteed and that the value of the case, if fully litigated, could have gone to zero had the Second Circuit opted to reverse Judge Marrero's decision on myriad bases. The risk involved was tremendous and Plaintiff was willing to accept that risk and be paid commensurate with the ultimate outcome.

23

Finally, Defendants ignore the fact that Plaintiff's handling of the matter on a contingency fee basis inured to Defendants' benefit, as it factored in the client's explicit reluctance to expend much more in attorney's fees in prosecuting its claims. Using the guidance provided by the Marrero decision, i.e., that ultimately it would be Calpine who was responsible for paying SAI's attorney's fees, handling the matter on a contingency fee basis seemed to be the most equitable and cost-effective for the client, as they were contractually entitled to indemnification for attorney's fees from Calpine. Not only would it save Defendants from having to expend money up front on further attorney's fees, it was Plaintiff's strategy to leverage a reasonable contingency fee of 22.5% to exact an even higher settlement from Calpine, without impacting SAI's ultimate recovery. As of October 2009, with the conclusion of the matter no where in sight, SAI could easily have been subjected to significant litigation expenses had the case continued for years on end. In hindsight, even SAI and Membreno would have to agree that the strategy worked quite well for them as the ultimate settlement of in excess of $1.2 million exceeded their provable damages by more than $500,000.

Given the plethora of equitable considerations which overwhelmingly favor Plaintiff's position, combined with the sound case law supporting Plaintiff's position, the Court would be more than justified to award attorney's fees in the amount of 22.5% of Defendants' recovery, even under a *quantum meruit* analysis.

### Point VI

### Plaintiff Has Established its *Prima Facie* Case for Account Stated

Under New York law, which governs the agreement between SAI and Caruso Glynn, LLC, the elements for account stated are the rendering of an account and the failure of the responsible party to object within a reasonable period of time. *Bonamassa v. Estate of Bakos*, 30 Misc.3d

24

1218(A) (Queens Sup. Ct., Feb. 4, 2011) citing *Ernest Edward Badway Encyclopedia of New York Causes of Action: Elements and Defenses*, §5-2 at 37-38 [2[nd] ed. 2010 New York Law Journal Practice Series]; *Nebraskaland Inc. v. Best Selections*, 303 A.D.2d 662 (2nd Dep't 2003); *Bay Ridge Lumber Co., Inc. v. Summit Renovation Corp.*, 271 A.D.2d 559 (2nd Dep't 2000).

In New York, a lawyer may assert a cause of action for account stated against a client "with proof that a bill, even if unitemized, was issued to a client and held by the client without objection for an unreasonable period of time. It is not necessary to establish the reasonableness of the fee since the client's act of holding the statement without objection will be construed as acquiescence as to its correctness." *O'Connell & Aronowitz v. Gullo*, 644 N.Y.S.2d 870, 871 (3d Dep't 1996) (citations omitted), *appeal denied*, 89 N.Y.2d 803 (1996). Significantly, an account stated will be enforced regardless of whether there was an initial retainer agreement between the attorney and client. *See, e.g., Ellenbogen & Goldstein, P.C. v. Brandes*, 641 N.Y.S.2d 28, 29 (1st Dep't 1996), *appeal denied*, 89 N.Y.2d 806 (1997)

Further, even if this were at the summary judgment stage, SAI would be unable to defeat a such a motion.

> The law is well settled that to defeat a motion for summary judgment on an account stated cause of action for legal fees, defendant client must make a sufficient evidentiary showing that he objected within a reasonable time to the invoices he received from plaintiff, and self-serving, bald, conclusory and unsubstantiated allegations of oral protests or objections do not satisfy this standard. See *Darby v. Darby. PC v. VSI International. Inc.*, 95 NY2d 308, 315 (2000); *Kramer Levin Naftalis & Frankel LLP v. Canal Jean Co. Inc.*, 73 AD3d 604 (1st Dept 2010); *Duane Morris LLP v. Astor Holdings Inc.*, 61 A.D.3d. 418 (1st Dept 2009) *supra*: *Miller v. Nadler*, 60 AD3d 499 (1st Dept 2009); *Zanani v. Schvimmer* 50 AD3d 445 (1st Dept 2008); *Levisohn Lemer Bereer & Langsam v. Gottlieb*, 309 AD2d 668 (1st Dept 2003), *appeal denied,* 1 N.Y.3d 509 (2004); *Morrison Cohen Singer & Weinstein LLP v. Ackerman,* 208 A.D.2d. 355 (1st Dept 2001); *Ruskin. Moscou. Evans & Faltishek. P.C. v. FGH Realty Credit Corp.*, 228 A.D.2d. 294 (1st Dept

1996); *Fink Weinberger Fredman, Berman & Lowell. P.C. v. Petrides*, 80 A.D.2d. 781 (1st Dept 1981), *app dism* 53 NY2d 1028 (1981). As the court previously determined, defendant's conclusory and unsubstantiated allegations that he objected to and complained about plaintiffs services and fees, are insufficient to raise a triable issue as to whether he in fact disputed plaintiffs statement of account.

*Morrison Cohen LLP v. Karl M. Parrish*, 2011 N.Y. Slip Op. 30354 (N.Y. Sup. Ct., Feb. 9, 2011)

Here, SAI did not object within a reasonable time to the invoices. SAI learned of the contingency fee terms on October 8, 2009, was reminded of the terms on October 20, 2009, sought clarification of those terms on October 20, 2009 and then made no objection, written, oral or otherwise. It was only after SAI received its second invoice that it raised a concern about the contingency fee on December 8, 2009. L.R. 56.1, ¶29, Glynn Aff. ¶29, Ex. I.  In that December 8, 2009 email, Marc Membreno wrote on behalf of Robert Membreno as follows:

> We are very concerned with your statement that as of October 1, 2009, you are handling the matter on a contingency fee basis. We have always had and will continue to work with our counsel on a time basis. In your October 8th email, you stated: "If you would prefer to stay with a time basis, please advise." We notified you that we would prefer to continue on a time basis, even at the new, higher hourly rate.

First, this does not meet the requirement of having objected within a reasonable amount of time - this is neither an objection (it's a concern at best) nor was it within a reasonable amount of time (more than two months after the October 8, 2009 engagement letter was received by SAI, nearly two months after Plaintiff provided further clarification to Marc Membreno on October 20, 2009, and more than one month after the first invoice dated November 2, 2009 was received by SAI, an invoice which indicated in clear language that the matter was being handled on a  contingency fee basis).

Most problematic for SAI is the fact that Mr. Membreno's statement that "[w]e notified you that we would prefer to continue on a time basis, even at the new, higher hourly rate" is simply untrue. In fact, Defendants are unable to come forth with any such evidence to support this statement. Defendants NEVER notified Plaintiff that it would prefer to continue on a time basis.

## CONCLUSION

SAI's dispute with Calpine began in April of 2001 when Calpine unilaterally and improperly began to deduct from monthly NPI payments for unauthorized expenses that were never contemplated in the 1987 Agreement. At its core, that case was more than just a breach of contract, it was about one company arbitrarily deciding it was no longer going to pay another company what the latter was rightfully owed under a valid agreement. SAI spent nine years fighting for its rights against Calpine. When SAI knew they were wronged, they fought. Now, SAI has taken a page from the Calpine play book, and the irony should not be lost on the Court. In December 2009, SAI attempted to unilaterally alter the agreement it had with CG in an effort to deny CG that which was rightfully owed. SAI then took CG's work product, research, analysis, damage calculations, litigation strategy and negotiating tactics and used them for their gain without compensation. CG has now spent three years fighting for its own rights against these Defendants. CG has consistently sought only to receive the fair and reasonable legal fees that it was duly entitled to receive, while SAI has done everything possible to defend its indefensible position, from making unfounded statements tending to impugn Plaintiff's reputation, to concluding a secretive settlement in an improper bid to preclude CG from earning its fee.

CG offered Defendants a fair, reasonable contingency fee arrangement and Defendants have been rewarded with a settlement of in excess of $1.2 million due entirely to the proverbial (and at

times literal) blood, sweat and tears of this "one man show." One would be hard pressed to find a litigated commercial case with a more favorable outcome than that which was provided as a result of Plaintiff's efforts.

The equities in this case strongly favor Plaintiff's position. Moreover, Plaintiff has demonstrated that the weight of the law also strongly favors its position. In light of the foregoing, Plaintiff seeks an Order granting summary judgment: 1) awarding damages in the amount of $280,665.84 plus interest from March 15, 2010 at the rate of 9% per annum; 2) for a declaration that Plaintiff is entitled to 22.5% of all excess monies received by SAI from October 2009 through the expiration of the 1987 Agreement (May 2017) representing the difference in monthly NPI payments made from Calpine to SAI when Calpine reverted to the pre-2001 accounting methodology which was due entirely to the efforts, legal strategy and expertise of Plaintiff, and for such other and further relief as this Court deems just and proper.

Dated: New York, New York
       February 15, 2013

                                        Respectfully submitted,

                                        **CARUSO GLYNN, LLC**
                                        Attorneys for Plaintiff

                                        By:   /s/ *Lawrence C. Glynn*
                                        Lawrence C. Glynn (LG-6431)
                                        53-04 193rd Street
                                        Fresh Meadows, N.Y. 10035
                                        (718) 570-3338
                                        File No.: 88.071108.01