Page 1

```
 1
 2      ----------------------------------------
 3      In the Matter of the Fee Dispute
        Arbitration between:
 4
        SAI TRUST and ROBERT MEMBREÑO,
 5      Individually and As Trustee For
        SAI TRUST,
 6
                    Clients,
 7                                  Case No. 247
            -and-
 8
        CARUSO GLYNN, LLC,
 9
                    Respondents.
10
        ----------------------------------------
11
                            11 Plandome Road
12                          Manhasset, New York
13                          October 22, 2012
14
        BEFORE:  VINCENT NICOLOSI, Chairman
15               SUSAN CHEMTOB, Arbitrator
                 DAVID ROSEN, Arbitrator
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2                A P P E A R A N C E S :
 3       HILL RIVKINS LLP
                 Attorneys for Claimants
 4       45 Broadway, Suite 1500
         New York, New York 10006-3793
 5
                 BY:   JOHN J. SULLIVAN, ESQ.
 6
 7       LAWRENCE C. GLYNN, ESQ.
                 Attorney for Respondents
 8       36 Peck Slip
         New York, New York 10038
 9
10       ALSO PRESENT:
11           MARC G. MEMBREÑO
12           ROBERT MEMBREÑO
13                       *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2       Whereupon,

3             R O B E R T   M E M B R E Ñ O,

4   having been first duly sworn/affirmed,

5   was examined and testified as follows:

6       Whereupon,

7             J O H N   J.   S U L L I V A N,

8   having been first duly sworn/affirmed,

9   was examined and testified as follows:

10      Whereupon,

11            L A W R E N C E   C.   G L Y N N,

12   having been first duly sworn/affirmed,

13   was examined and testified as follows:

14            MR. NICOLOSI:  Good morning,

15       everybody.  My name is Vincent

16       Nicolosi.  To my right is Susan

17       Chemtob.  To my left is David Rosen.

18       We will be the three arbitrators that

19       are going to hear the fee dispute.

20            It has been our policy before we

21       commence to ask a very general

22       question.  Have both the client and

23       the attorney attempted to amicably

24       resolve the issue of what the fee is?

25            At the outset I want to just

```
 1                    Proceedings
 2          tell you, we are not here to judge the
 3          quality of Mr. Glynn's work, whether
 4          you agree or disagree with whether he
 5          was successful or not.  Our primary
 6          and only purpose is to discuss and
 7          determine the validity of the claim
 8          for legal fees.  Nothing else.
 9                    So, I know in the package we
10          received, or I received anyway, a copy
11          of the decision from the Southern
12          District.  All well and good.  But we
13          are not judging your entitlement to
14          the fee based upon your success in the
15          action.  Okay?  It's whether you guys
16          had a meeting of the minds as to what
17          the fee was and whether or not you, in
18          fact, did the work you said you did.
19                    Does everybody understand that?
20                    MR. SULLIVAN:  Understood.
21                    MR. GLYNN:  Understood.
22                    MR. NICOLOSI:  Now, I have made
23          it my policy over the last 15 years of
24          doing this to ask if you would like us
25          to step out and for you people to
```

1               Proceedings

2      decide whether you can resolve it

3      without our intervention.  It's

4      entirely up to you.

5           MR. SULLIVAN:  We're prepared to

6      go forward, Mr. Chairman.

7           MR. GLYNN:  Agreed.

8           MR. NICOLOSI:  I, in reading the

9      papers, I have a question as to what

10     the amount is.  There was an amount of

11     11,000 and change and there was also

12     an amount of 16,000 and change.  I

13     never saw anything from the client

14     either accepting or denying which

15     figure is the accurate figure that we

16     are going on.

17          You submitted two numbers.

18          MR. GLYNN:  Correct,

19     Mr. Chairman.

20          MR. SULLIVAN:  From our

21     perspective, Mr. Chairman, neither

22     number is accurate.  In fact, the

23     position we are taking today and

24     submit the evidence will support was

25     that not only was counsel paid

```
 1                    Proceedings
 2      everything he was entitled, but in
 3      fact he collected more than he
 4      properly should have billed for.
 5            MR. NICOLOSI:  That brings me
 6      then -- and the procedure is going to
 7      be the client will make a statement,
 8      you can ask the client a question and
 9      then arbitrators can chime in and ask
10      questions as well.
11            In the package that I received,
12      I did not receive a retainer agreement
13      of any kind.
14            Did you get any?
15            MR. ROSEN:  No.
16            MR. NICOLOSI:  I don't have any.
17      Other than an e-mail that you
18      forwarded to the client back on
19      October 8th of '09, I believe it was,
20      where you were suggesting a
21      contingency fee basis --
22            MR. GLYNN:  That's correct.
23            MR. NICOLOSI:  They didn't
24      respond until December, some two
25      months after.
```

1                    Proceedings

2             MR. GLYNN:  Correct.

3             MR. NICOLOSI:  Putting that

4     aside, can you give to any of the

5     arbitrators a single retainer

6     agreement that was entered into

7     between you and the client?

8             MR. GLYNN:  Other than what was

9     submitted, no.

10            MR. NICOLOSI:  Other than what

11    was submitted. Do you have any?

12            MR. SULLIVAN:  No, sir.

13            MR. GLYNN:  There was none.  I

14    can represent there was no written

15    formal retainer agreement.  It was a

16    proposal in the e-mail you mentioned

17    and it was followed up by two invoices

18    for accounts stated.  There is no

19    formal retainer agreement.

20            MR. NICOLOSI:  Well, you also

21    gave us a list as Exhibit B, I

22    believe, was the summary -- or Exhibit

23    C, a summary of the invoices.  It was

24    the last page in your document.

25            MR. GLYNN:  Correct.

1               Proceedings

2          MR. NICOLOSI:  And you

3     acknowledge payments that were made.

4     Correct?

5          MR. GLYNN:  Correct.  I may

6     offer some background.

7          It was our understanding that

8     this was a contingency fee; that it

9     was proposed and it was never objected

10    to and that by following up with two

11    invoices we established an account

12    stated and their time to object to it

13    had long passed.  So we were operating

14    on the belief that it was a

15    contingency fee arrangement.

16         As an accord to the client, we

17    agreed to accept, under certain

18    conditions, to go forward on a time

19    basis.  Those conditions were never

20    met and still have not been met.

21         So, they wanted to modify what

22    we believe to have been a meeting of

23    minds as to the contingency fee under

24    certain conditions, specifically that

25    all invoices would be paid within

1                   Proceedings

2        30 days; they agreed to the higher

3        hourly rate than what they had been

4        paying when --

5              MR. NICOLOSI:  You are basing

6        this on an implied acknowledgement on

7        their part.  There is nothing in

8        writing?

9              MR. GLYNN:  Other than the

10       e-mail that was proposed.

11             MR. NICOLOSI:  Right.

12             MR. GLYNN:  And the lack of any

13       objection thereto or timely objection.

14             MR. NICOLOSI:  One last question

15       and then I will ask the client to make

16       a statement.  But the invoices that

17       you have submitted as exhibits that I

18       believe run from September of '09, you

19       have some from prior years but were

20       those from September of '09 going

21       forward, which is within the

22       contingency fee period that you just

23       described, assuming there was such a

24       period, were those invoices prepared

25       as they had been prepared previously

```
 1                    Proceedings
 2      when you were on an hourly basis?
 3           MR. GLYNN:  No.  The invoices
 4      for the months of October and
 5      November -- October invoice was sent
 6      on November 2nd.  I can submit that.
 7      And the November invoice was sent on
 8      December 2nd.  Both of those indicate
 9      no charge.  They do show the time that
10      was worked but no charge, there is no
11      fee.
12           MR. NICOLOSI:  My question is,
13      the time that is shown on those
14      invoices -- because you do, in fact,
15      come up with an amount that would be
16      based on a non-contingency basis.
17           MR. GLYNN:  Correct.
18           MR. NICOLOSI:  Are those fees
19      based upon prior billings when you
20      were not on a contingency basis?
21           MR. GLYNN:  No.
22           MR. NICOLOSI:  They are on an
23      increased basis, an increased hourly
24      rate?
25           MR. GLYNN:  Correct.
```

1              Proceedings

2          MR. NICOLOSI:  Do you guys have

3      anything you want to ask?

4          MR. ROSEN:  No.  Fine.

5          MR. NICOLOSI:  Go ahead.

6          MR. SULLIVAN:  Thank you,

7      Mr. Chairman.

8          Unfortunately, it is a rather

9      tortured path that brings us here

10     today.  It began with the underlying

11     litigation, progressed through a Civil

12     Court Complaint in Queens County,

13     which was supposed to have been

14     dismissed by stipulation referring the

15     matter to this arbitration panel.

16         But then the next thing that

17     counsel did was file suit against

18     Calpine, who was SAI's adversary in

19     the bankruptcy proceeding, on the

20     basis somehow that counsel was a

21     third-party beneficiary of the

22     underlying settlement agreement

23     between SAI and Calpine, trying to

24     collect a contingency fee from

25     Calpine.

```
 1                  Proceedings
 2            MR. NICOLOSI:  250,000-plus.
 3            MR. SULLIVAN:  The amount was
 4       something in the middle two's, yes,
 5       Mr. Chairman.
 6            That matter was voluntarily
 7       dismissed and refiled directly against
 8       SAI Trust in the Southern District of
 9       New York in the summer of 2011.  In
10       opposition to that filing we moved to
11       dismiss as well as alternatively to
12       stay the matter pending arbitration in
13       accordance with the original
14       stipulation from the Civil Court in
15       April 2011, which finally brings us
16       here today.
17            SAI never agreed to a
18       contingency fee.  The first thing we
19       will ask the panel to determine is to
20       make a declaration that there never
21       was a contingency fee agreed upon.
22       New York law is very clear that there
23       has to be an express agreement.  A
24       contingency fee can never be implied.
25       Court of Appeals said so, 1972 DeGraff
```

1              Proceedings

2    v. McKesson & Robbins, 31 N.Y.2d 862.

3         There was no express agreement

4    for a contingency fees.  Counsel

5    proposed it on October 8th, when he

6    first formed his own firm, followed by

7    a few weeks later questioning from the

8    client as to "What does contingency

9    fee mean?"

10        The two principals -- I should

11   have introduced them first beside

12   me -- Robert Membreño, at the end of

13   table, sole trustee of SAI Trust, a

14   trust organized under California law;

15   his son, Marc Membreño, oversees some

16   of the day-to-day operations.

17        Mr. Marc Membreño is vice

18   president of SAI Geothermal, Inc.,

19   which is a corporation operating out

20   of California, and the offices for SAI

21   Trust are with the offices for SAI

22   Geothermal, so Mr. Marc Membreño

23   provides administrative services over

24   the trust in his father's absence.

25        Mr. Robert Membreño resides in

1                    Proceedings

2          Nicaragua and has for the last several

3          years.

4                    Between the time lag with Robert

5          Membreño being in Nicaragua and Marc

6          being in California, the questions

7          were posed to counsel as to what a

8          contingency fee meant.  There was

9          discussions on this end and, again,

10         never an express agreement or remotely

11         an express agreement.

12                   Counsel, in November, on or

13         about November 3rd, e-mailed his first

14         invoice or second invoice, I should

15         say, saying, "Fee waived.  Contingency

16         fee waived."

17                   Mr. Marc Membreño asked what

18         that meant on about November the 23rd.

19         Again more e-mails back and forth

20         between client and attorney, and then

21         discussion on this end on December the

22         8th an explicit rejection of

23         contingency fee.

24                   SAI had never operated under a

25         contingency fee on any litigation it

```
 1              Proceedings
 2      has been involved in. They are in the
 3      power generation business.  There is a
 4      lot of litigation in the power
 5      generation business, real estate
 6      issues, environmental issues.
 7      Litigation is quite common.  They
 8      never had a case handled other than on
 9      an hourly basis.
10           There was some more back and
11      forth between December 8th and
12      December 12th.  On December the 8th,
13      the client proposed -- not proposed.
14      Said, "We are only going to do an
15      hourly basis."  After arguments from
16      counsel on December 11th, the client
17      proposed going forward solely on an
18      hourly basis, however in the event
19      that counsel was able to settle the
20      case promptly, they would offer a
21      $10,000 performance bonus.
22           Counsel made a counter-offer of
23      $25,000 performance bonus plus any
24      portion of a recovery beyond $850,000,
25      counsel proposed that be solely for
```

1                    Proceedings
2        his account.  In other words, an
3        additional bonus, if you will, above
4        the $25,000.
5            That was not agreed to on this
6        end.  Nevertheless, they began
7        resubmitting bills and keeping time on
8        an hourly basis.  At the end of the
9        day, on an hourly basis, counsel
10       billed in the neighborhood of $35,000
11       in time bills, a little over 35,688.
12           MR. NICOLOSI:  What period?
13           MR. SULLIVAN:  Here is the
14       problem.  Beginning September 1, 2009
15       through February 5, 2010.  The problem
16       with the bills beginning
17       September 1st, counsel wasn't counsel
18       of record on September 1st, had no
19       right to bill client for anything.
20           Client was still represented by
21       its prior counsel, counsel's former
22       employer, Nicoletti Hornig & Sweeney.
23       Counsel resigned from Nicoletti Hornig
24       & Sweeney on or about October 7th and
25       October 8th formed his own firm and

1                Proceedings

2     that was the first contact that the

3     client had that Mr. Glynn was going

4     out and forming his own firm and

5     taking the case with him.

6          Before that they had no

7     knowledge he was leaving Nicoletti's

8     office.  To their understanding,

9     Nicoletti was the only firm

10    representing them in the New York

11    bankruptcy case.

12         MR. NICOLOSI:  Was there a

13    retainer agreement with the old firm?

14         MR. SULLIVAN:  There was.

15         MR. NICOLOSI:  Signed?

16         MR. SULLIVAN:  Signed agreement.

17    With the rates and expected work to be

18    performed.

19         Then, so you have an amount of

20    billings -- in that 35,688 are fees

21    that were improperly billed from

22    September 1, 2009 through October 7th.

23    Actually October 5th is the last day

24    referenced in the bills.

25         MR. ROSEN:  Excuse me.  Was

```
 1                Proceedings
 2      there ever a formal substitution of
 3      counsel in the action?  When did
 4      Nicoletti stop being attorney of
 5      record and when did this attorney
 6      start being attorney of record?
 7              MR. GLYNN:  October 2009.
 8              MR. ROSEN:  A formal
 9      substitution?
10              MR. GLYNN:  Yes.
11              MR. SULLIVAN:  The status of the
12      litigation at that time, it was in the
13      process of being appealed to Second
14      Circuit or remanded to Bankruptcy
15      Court to the extent to which Calpine
16      either realized or did not realize the
17      Appellate District had jurisdiction
18      over what otherwise would have been an
19      interlocutory order.
20              It is our position that no fees,
21      hourly fees or otherwise, could have
22      been billed by Caruso Glynn, LLC prior
23      to October the 8th.  The Nicoletti
24      firm did, in fact, submit a final bill
25      to SAI Trust in January of 2010,
```

```
1              Proceedings
2      through October.  It basically covered
3      September into the early part of
4      October when Mr. Glynn left the
5      Nicoletti firm.
6              MR. NICOLOSI:  And was that the
7      6,000 amount that was referenced in
8      Mr. Glynn's e-mail that they would pay
9      the outstanding balance to Nicoletti?
10             MR. SULLIVAN:  Correct.  It
11     wasn't quite that much.  Two reasons.
12     Nicoletti's firm was billing Mr. Glynn
13     out at 260 an hour, whereas when
14     Mr. Glynn when he went on his own
15     raised the rate to 320 an hour.  So
16     there was a spread between the
17     different hourly rates.
18             There were a few time entries
19     that appeared in Mr. Glynn's bill that
20     did not appear in the Nicoletti bill.
21             MR. NICOLOSI:  Was that bill
22     paid to Nicoletti?
23             MR. SULLIVAN:  That bill was
24     paid to Nicoletti, yes.
25             MR. NICOLOSI:  When?
```

1              Proceedings

2          MR. SULLIVAN:  It was paid early

3     part of 2010, I believe in April.

4          MR. NICOLOSI:  And how much?

5          MR. SULLIVAN:  The full amount

6     of the bill, which was $5,148.

7              And in response to that bill

8     having been submitted by Nicoletti,

9     counsel objected to it, said Nicoletti

10    had no right to bill it even though

11    they were counsel of record and the

12    only counsel of record for that

13    period, and then said, "Fine. Pay that

14    and deduct the amount from the balance

15    you owe me."

16             But that didn't account for the

17    different hourly rate or the

18    additional time that appeared in the

19    Caruso Glynn bill that didn't appear

20    in the Nicoletti bill, as well as at

21    least two time entries for the first

22    week of October, one on October 2nd

23    and one on October the 5th.

24             In total you have the amount of

25    6,752 that Caruso Glynn billed for the

1                    Proceedings

2       month of September, all of which we

3       submit is unrecoverable because it

4       should have properly been billed by

5       the Nicoletti firm and was.

6               Then for the entries for

7       October 2nd and October 5th we have an

8       additional $1,312 on October 2nd and

9       $864 on October 5th.

10              MR. NICOLOSI:  How much?

11              MR. SULLIVAN:  864 on

12      October 5th.

13              MR. NICOLOSI:  And on

14      October 2nd was what?

15              MR. SULLIVAN:  1,312.

16              MR. NICOLOSI:  That was billed

17      by whom?

18              MR. SULLIVAN:  Those were the

19      amounts that were billed by Caruso

20      Glynn to SAI.  And again we submit

21      every one of those hours was

22      improperly billed because only the

23      Nicoletti firm could bill for that

24      time and did bill for that time.

25              There was additional time spent

1                 Proceedings

2       that we object to in December, between

3       December 8th and December 12th, when

4       there was the discussion over is there

5       a contingency fee or is there not a

6       contingency fee?

7             All of the time that counsel

8       spent appeared in his bill even though

9       it had nothing to do with the Calpine

10      litigation.  It was solely

11      discussions, e-mail discussions back

12      and forth among counsel and client

13      over what the proper terms of the fee

14      would be.

15            MR. NICOLOSI:  But not legal

16      work for services rendered in

17      connection with any pending

18      litigation?

19            MR. SULLIVAN:  Correct, sir.  It

20      was only discussions back and forth

21      about would there be a contingency

22      fee, would there be a performance

23      bonus, what would the performance

24      bonus be?

25            We have time entries we have

```
 1              Proceedings
 2     listed, three actually on December 8th
 3     and three on December 11th of 2009.
 4     The three entries for December 8th add
 5     up to $348 and then the three entries
 6     for December 11th, you have $128 for
 7     one entry, 448 for another and 928 for
 8     the third.
 9              Two more items that we object to
10     on the time basis, the time billings:
11     On January the 6th there is a
12     six-tenths of an hour and all the
13     entry says is "File maintenance."  It
14     is hard to figure out what, if any,
15     work was done on the matter.
16              And then finally when counsel
17     was ultimately directed to take no
18     further action on or about February
19     the 5th of 2010, there were another
20     two separate one-tenth of an hour
21     entries, $32 each, counsel
22     acknowledging receiving that
23     instruction and acknowledging same.
24              So, we have added up all those
25     objectionable hours and we submit that
```

1                    Proceedings

2        number comes to $11,136.

3              Then we turn to the so-called

4        performance bonus, which was proposed

5        by the client on or about December the

6        11th.  It was $10,000.  The background

7        of that circumstance were Calpine

8        was -- had filed a notice of appeal

9        for the Second Circuit.  Rather -- in

10       consideration, perhaps, of the time

11       and money and expense of an appeal,

12       the client proposed a $10,000 bonus if

13       the case could be settled.

14             Counsel counter-offered with a

15       $25,000 performance bonus request as

16       well as any fee above the 850 that

17       might be recovered.  That

18       counter-offer operated, under Black

19       Letter contract law, to terminate or

20       reject the initial $10,000 performance

21       bonus proposal.  Nothing coming back

22       from client after that about the

23       $10,000 bonus.

24             Now, unfortunately, even if

25       there was an agreement, counsel never

```
 1                  Proceedings
 2       satisfied the prerequisite for it in
 3       that he was unable to settle the case,
 4       and the reason he was unable to settle
 5       the case was because there was a
 6       complete misunderstanding of the
 7       nature of the offer that was being
 8       made.  Basically, you had counsel
 9       talking about apples and Calpine
10       talking about oranges.
11            Counsel believed he was
12       negotiating for an all-cash bankruptcy
13       settlement.  Calpine, on the other
14       hand, because it was a Chapter 11
15       debtor-in-possession, could only reach
16       a settlement with a creditor in
17       accordance with its reorganization
18       plan.
19            As it turned out, the
20       reorganization plan called for
21       issuance of stock to the unsecured
22       general creditor based on a specific
23       date.  The stock was priced at a
24       specific date.  It basically worked
25       backward.
```

1                    Proceedings

2          If we settle for X dollars on

3     the given settlement date, we then

4     figure out how many shares of stock

5     that number equals based on a price at

6     a given day.  The problem was the

7     price wasn't current.  The price the

8     bankruptcy plan required was a time in

9     the past, which called for valuation

10    on the date that it emerged from

11    bankruptcy.

12          Problem was, once it emerged

13    from bankruptcy, the stock price went

14    down.  Even if you were to liquidate

15    all the shares, you basically would

16    only be getting about 70 percent of

17    the dollar amount of your unsecured

18    claim.

19          SAI was the one that figured

20    this out on its own.  What they had to

21    do was have California counsel reach

22    out to Calpine to find out exactly

23    what the terms of the proposal were.

24    Only then did they find out, not from

25    counsel but from their own California

1                    Proceedings
2        counsel, that the proposal, the offer
3        was a general unsecured claim.
4               Now, that was discussed between
5        them, that it was a general unsecured
6        claim, but it was never explained by
7        counsel to client that a general
8        unsecured claim with regard to Calpine
9        meant a share of stock -- shares of
10       stock rather than cash.
11              They found that out themselves,
12       figured out, did their own
13       calculations and then gave counsel a
14       specific settlement direction,
15       worded -- "This is the offer we want
16       you to make."  Called for a mixture of
17       cash and stock depending on what date
18       the deductions and expenses were
19       calculated on.
20              Counsel came back, beginning
21       February 2010, and said, you know,
22       "They never responded to our last
23       demand of $975,000," to which client
24       said, "When did you make a demand for
25       975 and how did you figure out 975

```
 1              Proceedings
 2      because the numbers before that
 3      were --" Calpine had been offering in
 4      the neighborhood of 740,000.  SAI had
 5      been demanding 825, 850.
 6              Counsel for the first time
 7      informed SAI that he had made a demand
 8      for $975,000.
 9              When SAI asked, "When did you
10      make that and how did you calculate
11      it," the answer they received on
12      February 4, 2010.  The demand had been
13      made back on December the 5th of '09
14      and the 975 number included a very
15      large contingency fee that counsel
16      expected Calpine to pay to him as
17      opposed to money going to SAI, the
18      beneficiaries of SAI Trust.
19              By that point in time, SAI had
20      no doubt that counsel was not
21      negotiating for his client's benefit
22      but more for his own benefit to
23      negotiate a larger fee for himself.
24      They gave him specific instructions to
25      take no further steps.  At that point,
```

1                Proceedings

2       they had to fully instruct California

3       counsel to try and negotiate and

4       salvage a settlement agreement with

5       Calpine, which was done.

6            That was consummated in March.

7       I think it was eventually signed

8       around the end of March, early April

9       of 2010 and based on those -- the fact

10      that counsel was unable to consummate

11      the settlement with Calpine, any

12      performance bonus that might have been

13      agreed upon was not earned because the

14      settlement wasn't reached.  The

15      performance that was contemplated

16      wasn't done.

17           So, what we have was billings

18      over a period of time that added up to

19      about $35,000.  35,866, plus another

20      10 that appeared in his last invoice

21      for $45,000.

22           SAI, to date, has paid the

23      amount of $32,885.16. We have

24      calculated that of the 35,688 billed,

25      11,136 was not collectible and we

```
 1                    Proceedings
 2      calculated a net overpayment of
 3      $8,184.16.
 4           MR. GLYNN:  8,000, what was it?
 5           MR. SULLIVAN:  8,184.16, the
 6      very last page of our statement.
 7           MR. NICOLOSI:  Part of the
 8      package that I received indicates
 9      payments by SAI between October 26,
10      '09 and April 22, 2010 of 33,075.
11           MR. SULLIVAN:  The records are a
12      little off between the two.
13           MR. NICOLOSI:  Not a lot.
14           MR. SULLIVAN:  Not a lot.  The
15      amount that was paid -- could have
16      been wire transfer expenses that might
17      have been one way or the other.
18           MR. NICOLOSI:  But from what I
19      am reading here, there was on
20      October 22nd of '10 a $15,000 plus
21      payment made.  Is that correct?
22           MR. SULLIVAN:  Yes.  15,089.78
23      we have from our records.
24           MR. NICOLOSI:  What invoices was
25      SAI paying at that point?  For what
```

1                    Proceedings
2       professional services that he rendered
3       were you paying for?
4              MR. SULLIVAN:  They paid for the
5       time that was the sum that was still
6       outstanding on what SAI calculated was
7       owed between October and February.
8              MR. NICOLOSI:  So they are
9       acknowledging, up until the point that
10      they said, "No further action are you
11      to take in connection -- you are
12      discharged as our attorney,"
13      basically.
14             MR. SULLIVAN:  Essentially, yes.
15             MR. NICOLOSI:  So up to that
16      point they acknowledged that there was
17      some 15,000 in legal fees that were
18      due to counsel?
19             MR. SULLIVAN:  Through that
20      point in time, yes.  Well, that he had
21      billed for.  When they went back and
22      looked at it afterwards, they realized
23      there was a lot of items in there that
24      were objectionable.  Had the matter
25      not gone forward, they were prepared

```
 1              Proceedings
 2    to drop hands.  However, counsel
 3    insisted on proceeding --
 4         MR. NICOLOSI:  But the invoices
 5    were based not on a contingency basis.
 6    An hourly rate?
 7         MR. SULLIVAN:  Correct.
 8         MR. NICOLOSI:  What was the
 9    hourly rate that brought the
10    April 22nd invoice to 15,089.78?
11         MR. SULLIVAN:  They didn't pay
12    each invoice as a single amount.  They
13    would pay 2,000 here, 5,000 here.
14    That is the way they made payments to
15    Nicoletti and the way they kept making
16    payments to Caruso Glynn.
17         We have a collection of exhibits
18    that we're prepared to provide for the
19    panel with copies for everyone that
20    lists the breakdowns and the checks
21    that go with them.
22         The first payment, for example,
23    was for $2,000.  Second payment was
24    $2,000.  Third was $2,000.  The fourth
25    payment was 9,795.  The next payment
```

1           Proceedings

2    was 2,000 and the final payment was

3    15,089.78.

4           MR. NICOLOSI:   That is

5    consistent with what he has submitted

6    to the panel.

7           MR. SULLIVAN:   So they weren't

8    paying -- the way they made their

9    payments, they would send a rough

10   amount.   There would still be a

11   balance outstanding on an hourly bill.

12          And then, in April, final

13   payment was made based on what they

14   understood at the time they owed.

15   Turns out, as I said, in review later

16   they realized there were a number of

17   items in the bills that were

18   objectionable, primarily the time from

19   September the 1st through October the

20   5th.

21          MR. NICOLOSI:   Again, going back

22   to the exhibit that counsel attached

23   to his response to your request for

24   arbitration, he listed a payment of

25   6,752 for September 1st of '09.

Page 34

```
 1                  Proceedings
 2       That's the amount that was due to
 3       Nicoletti?  Is that your position, and
 4       that was paid to Nicoletti?
 5              MR. SULLIVAN:  There is a
 6       difference because Nicoletti had a
 7       lower rate for Mr. Glynn as well as
 8       additional hours.  But that bill
 9       roughly --
10              MR. NICOLOSI:  Corresponds to
11       the 5,000 --
12              MR. SULLIVAN:  5,148.
13              MR. NICOLOSI:  5,148.  Right.
14       So, if you take off that amount, you
15       paid 33.  If -- and I understand your
16       position.  I haven't heard counsel
17       yet -- that that 67 comes off of his
18       49, you are down to like 32,000 it
19       appears.  I am just looking at the
20       numbers.  It appears that it is close
21       to being a wash.
22              But okay.  Do you want to --
23              MR. GLYNN:  Well, the important
24       aspect that Mr. Sullivan omitted was
25       the fact that SAI did receive a credit
```

1               Proceedings
2      for 5,000 and change for that billing
3      by the Nicoletti firm.
4              MR. NICOLOSI:  But do you have
5      that on your chart?  Did you recognize
6      that credit of 5,148 on your chart?
7              MR. GLYNN:  Yes.  It is included
8      in -- it was in one of the invoices --
9              MR. NICOLOSI:  No, no.  On the
10     chart that you prepared have you
11     reflected a credit of 5,148 against
12     that 49,000?
13             MR. GLYNN:  Yes.  That is how we
14     get to the 49,000.  That number of 51
15     has been taken out of the amount owed.
16             MR. NICOLOSI:  But the first
17     number on your chart is 6,000 and
18     change?
19             MR. GLYNN:  Correct.
20             MR. NICOLOSI:  And that
21     coincides with the number of 5,148?
22             MR. GLYNN:  Right.  But there
23     was a credit -- there was a credit
24     given in one of the invoices.
25             MR. NICOLOSI:  But it is not

```
 1                  Proceedings
 2     reflected on that chart?
 3          MR. GLYNN:  It is not.  I don't
 4     see where it is right now.  I would
 5     have to look through each individual
 6     invoice to show it.
 7          MR. NICOLOSI:  Do you have any
 8     questions that you want to direct to
 9     the client?
10          MR. GLYNN:  Well, absolutely.
11          MR. NICOLOSI:  Again, please
12     avoid getting into the quality of your
13     work.  We are restricting this to the
14     fee dispute only.
15          MR. GLYNN:  I have exhibit
16     binders for the panel.  If you would
17     turn to Exhibit A?  This is directed
18     to Robert Membreño.
19          Whereupon,
20          R O B E R T   M E M B R E Ñ O,
21     having been previously duly
22     sworn/affirmed, was examined and testified
23     as follows:
24     EXAMINATION BY
25     MR. GLYNN:
```

1                    Proceedings

2        Q.     Mr. Membreño, do you recognize

3    Exhibit A?  A decision and order from

4    Southern District of New York?

5        A.     Counsel, this is first time I

6    see this, quite frankly, or at least that

7    I recall seeing it.  But let's assume that

8    it is a correct document from the Court.

9        Q.     It is a decision and order from

10   settlement and release agreement the

11   Southern District of New York and is dated

12   June 9, 2009.  I would turn your attention

13   to page 28 of the decision.

14       A.     Yes, Counsel.

15       Q.     Section Number 6, "Attorney's

16   fees."  I will direct your attention to

17   that section.  Do you see it?

18       A.     Yes, I see it.

19       Q.     Then reading just a little more

20   than halfway through, you see where it

21   says, "Because the Court has determined

22   that Calpine has breached the agreement

23   for purchase such that SAI Trust should be

24   granted summary judgment and Calpine

25   should be denied summary adjudication on

```
 1                 Proceedings
 2    the issue of the use of allocated expense
 3    line items, SAI Trust is entitled to
 4    attorney's fees and other costs with
 5    respect to litigations at issue."
 6              Do you see that?
 7    A.    Yes, I see it.
 8    Q.    Did I fairly and accurately read
 9    that into the record, sir?
10              MR. NICOLOSI:  We have a copy of
11         the document.  All three of us can
12         read pretty well I think.
13              MR. GLYNN:  I would like to move
14         Defendant's Exhibit A into evidence.
15              MR. NICOLOSI:  Okay.  Anybody
16         have any objection?  No objection?
17         For the limited purpose of what
18         you have referenced and for no other
19         purpose.
20              MR. GLYNN:  Just to establish
21         that there was the decision that SAI
22         was entitled to attorney's fees to be
23         paid by Calpine.
24              MR. NICOLOSI:  Can I just, for
25         my own edification, what does that
```

```
1                    Proceedings
2        have to do with the client's
3        obligation to pay you for your fees?
4              MR. GLYNN:  If I can go through
5        the next exhibits, hopefully I will be
6        able to clarify.
7              MR. NICOLOSI:  Stay with this
8        because you introduced it.  What does
9        that statement in the Judge's decision
10       have to do with their obligation to
11       pay you the fees that you billed?
12             MR. GLYNN:  I offer it to
13       establish that there was a distinction
14       between what was owed to SAI for
15       allocated line expenses which had been
16       improperly taken out and attorney's
17       fees.
18             MR. NICOLOSI:  Wouldn't you have
19       to enforce this against your
20       adversary?
21             MR. GLYNN:  Correct,
22       Mr. Chairman.  Exactly, yes.  It would
23       be something that would have to be
24       enforced against Calpine.
25             MR. NICOLOSI:  My only question
```

```
 1                    Proceedings
 2         is why are you addressing that now if
 3         it has nothing to do with their
 4         obligation to pay you something
 5         separate and apart from your recovery
 6         against a defaulting party?
 7               MR. GLYNN:  To lay a foundation
 8         which I will get to.
 9               If you'd like, I will answer
10         that question right now.
11         Q.    If you would turn to Exhibit M.
12    Mr. Membreño, do you have that in front of
13    you?
14         A.    Yes, I have it.
15         Q.    Do you recognize this document?
16         A.    I have signed it.  Yes, I
17    suppose.  Yes.
18         Q.    If you could turn to page 7 --
19    sorry.  Page 8.  There is two page 8's.
20    The signature page for Respondent's
21    Exhibit M.  Do you recognize that to be
22    your signature, sir?
23         A.    Yes.  It is my signature.
24         Q.    And this is a settlement and
25    release agreement that was entered in
```

1              Proceedings

2    March of 2010.  It is not dated.  Do you

3    see that?

4        A.    On behalf of the trust I signed

5    this agreement.  Yes.

6        Q.    And this was an agreement

7    between what parties?

8        A.    I have to go back and see who

9    is --

10           MR. NICOLOSI:  We'll take notice

11       that it is between your client and

12       Calpine.

13           MR. GLYNN:  Various Calpine

14       entities.

15           MR. NICOLOSI:  There was a

16       separate page.

17       Q.    Turn to page 7, Mr. Membreño.

18       A.    Yes.

19       Q.    Paragraph 17, do you recognize

20    that paragraph?  Have you seen that

21    paragraph before?

22       A.    Well, let's assume it was -- I

23    have seen it before.  Yes.

24       Q.    It says, "Nothing in this

25    agreement is intended to or does create

1                    Proceedings

2      any rights in third parties."

3               Did you negotiate that

4      particular paragraph?

5           A.      Apparently we did because it is

6      included in the final agreement.

7           Q.      Do you know what the basis for

8      that particular paragraph was?

9           A.      No, I don't.  I am not an

10     attorney so I would not know.

11               MR. NICOLOSI:  Counsel, we are

12          going a little far afield here.  What

13          does that paragraph 17 have to do with

14          their responsibility to pay you a

15          legal fee?

16               MR. GLYNN:  Then going to

17          Calpine for the unpaid attorney's fees

18          under the contingency fee, this

19          settlement agreement was specifically

20          raised by them in reference to the

21          fact that there was no third party --

22          that they specifically settled this --

23               MR. NICOLOSI:  Did this

24          exculpate them from the provision of

25          the decision you just referenced?

1                    Proceedings
2           MR. GLYNN:  I believe it did.
3           MR. NICOLOSI:  So how -- so did
4     you represent them in this agreement?
5           MR. GLYNN:  No.  At that point
6     the client decided that they were
7     going to --
8           MR. NICOLOSI:  This is
9     California counsel did this?
10          MR. GLYNN:  California counsel
11    did this basically behind my back.
12          MR. NICOLOSI:  Not behind your
13    back.  You were discharged by that
14    time.
15          MR. GLYNN:  That is the problem.
16    I wasn't discharged.  I was still
17    attending conferences and still
18    providing status reports. They never
19    actually --
20          MR. ROSEN:  Did you receive a
21    letter from the client saying you were
22    discharged, to take no further action?
23          MR. GLYNN:  No.  No such letter
24    was ever sent saying, "You are
25    discharged and take no further

```
 1                  Proceedings
 2     action."  In those terms, no.
 3           MR. ROSEN:  In any terms?
 4           MR. GLYNN:  I know there was a
 5     limited e-mail that made some mention
 6     of it.  Unfortunately, thereafter they
 7     were still sending numerous e-mails
 8     and requests for services to be
 9     performed.  There was no formal
10     discharge.
11           MR. NICOLOSI:  But again, the
12     fact that it was part of the
13     settlement agreement that they were
14     let off the hook, so to speak, as to
15     pay the obligations pursuant to the
16     decision and order of the District
17     Court -- how does that inure to your
18     benefit to -- let me withdraw that.
19           Are you implying that because
20     they did that they are now obligated
21     to pay what Calpine was going to be
22     obligated to pay?
23           MR. GLYNN:  Yes.
24           MR. NICOLOSI:  Okay.
25           MR. GLYNN:  Yes.  If we can turn
```

1                    Proceedings

2        to Exhibit B?

3                I would like to move Exhibit M

4        in evidence.

5                MR. NICOLOSI:  Yes.  For

6        whatever value.  Sure.

7                MR. NICOLOSI:  March of 2010,

8        undated other than March 2010.

9    BY MR. GLYNN:

10       Q.    Mr. Membreño, do you recognize

11   Exhibit B?

12       A.    Yes, I do recognize it.

13       Q.    You have seen this before today?

14       A.    Yes, I see it.

15       Q.    Did you see that before today?

16       A.    I might have seen it in the form

17   of e-mails.

18       Q.    The date is October 8, 2009.  Do

19   you see that at the top?

20       A.    Yes.

21       Q.    Do you recall receiving this

22   e-mail on October 8, 2009?

23       A.    Yes.  I recall.

24       Q.    And in this e-mail I was

25   proposing that going forward under my new

1                    Proceedings

2    firm, that we would be a 22-and-a-half

3    percent contingency fee.  Correct?  You

4    see that in the body of the e-mail?

5         A.    At the bottom I see -- I think

6    that there are two e-mails.  Is that

7    correct?  One is --

8         Q.    We are just looking at Exhibit

9    B.  This is one e-mail.  Correct?

10        A.    Yes.  There is -- you are

11   proposing a 22-and-a-half percent

12   contingency fee.

13        Q.    Correct.  And you recall

14   receiving that on or about October 8,

15   2009.  Correct?

16        A.    Yes.

17             MR. NICOLOSI:  Let the record

18        indicate that the panel has received a

19        copy of this e-mail with other

20        documents that were provided by the

21        Court.  The client has indicated that

22        he recognizes it and did receive it.

23             Do you want to mark that?

24             MR. GLYNN:  Can we move this

25        into evidence?

1                    Proceedings

2            Let's move Exhibit B into

3     evidence, please.  That is the

4     October 8, 2009 e-mail.

5            MR. NICOLOSI:  You know what?

6     Move the whole book in.  You went to

7     the trouble of preparing it.

8            MR. GLYNN:  I appreciate that.

9            MR. SULLIVAN:  We have our own

10    book.  We have some duplication.  A

11    lot of the exhibits are the same.  I

12    doubt there is much issue over

13    authenticity or foundation for any of

14    them except in one of our exhibits is

15    a calculation that I performed myself

16    that counsel is obviously permitted to

17    take issue with.  It is more legal

18    argument than anything else.

19            MR. NICOLOSI:  Maybe it is

20    easier for the reporter if we say the

21    book prepared by counsel that contains

22    Exhibits A through N will be received

23    in evidence as one exhibit

24    collectively, Exhibit AA.

25            (So marked for identification as

```
 1                    Proceedings
 2         Respondent Exhibit AA.)
 3              MR. GLYNN:  If I can ask
 4         Mr. Membreño about one particular
 5         exhibit?
 6              MR. NICOLOSI:  Sure.
 7         Q.    If you could turn, Mr. Membreño,
 8    to Exhibit L?
 9              MR. SULLIVAN:  Your book was A
10         through N.
11              MR. NICOLOSI:  Make it AA.
12              MR. GLYNN:  The book is AA?
13              MR. NICOLOSI:  Yes.
14         Q.    Mr. Membreño, do you have
15    Exhibit L in front of you?
16         A.    I do.
17         Q.    That is the December 12, 2009
18    e-mail from myself to you and Marc
19    Membreño.  Correct?
20         A.    Yes.
21         Q.    Did you receive this e-mail on
22    or about December 12, 2009?
23         A.    Okay.  Let's assume we did.
24         Q.    I am not asking you to assume.
25    I am asking if you did.
```

```
 1                    Proceedings
 2       A.     If you sent it, I must have
 3    received it.
 4              MR. SULLIVAN:  December 12th.  I
 5       think you said December 9th.
 6              MR. GLYNN:  December 12, 2009.
 7              MR. NICOLOSI:  What exhibit is
 8       that?
 9              MR. GLYNN:  Exhibit L.
10       Q.     I will read from the middle
11    paragraph about the fourth line down.
12    "Robert, please be advised that I will
13    agree to modify the fee and proceed on a
14    time basis for all past and future
15    invoices but will insist that in
16    consideration for this modification of the
17    agreement SAI pay to my firm the amount of
18    $25,000.  If you want to refer to this as
19    a performance bonus, that is acceptable."
20              Do you see that sir?
21       A.     Yes, I do.
22       Q.     Did you have any objection to
23    that at the time that was sent to you?
24       A.     I did object to that.
25       Q.     When?
```

1                     Proceedings

2       A.      Immediately after that.

3       Q.      And how so did you object to it?

4       A.      I don't recall.

5       Q.      Did you send an e-mail?

6       A.      I don't remember.

7       Q.      Did you call?

8       A.      I don't remember.

9       Q.      Do you have an e-mail that shows

10   that you objected to that?

11      A.      Am I being cross-examined about

12   this thing, or what?

13              MR. NICOLOSI:  He has the right

14      to ask you questions.

15      A.      No.  I didn't -- I don't recall.

16      Q.      Thank you.  So that's a no.

17              MR. NICOLOSI:  It is not a no.

18      He is saying he doesn't recall.

19      Q.      Do you have an e-mail that shows

20   that you objected to that?

21      A.      No, I don't have an e-mail.

22      Q.      I would like to direct your

23   attention to Exhibit I, sir.  This is a

24   December 8, 2009 e-mail, again from myself

25   to -- I correct that.  This is a

```
 1                   Proceedings
 2   December 8, 2009 e-mail from Mgm9@aol.com.
 3   Do you recognize that e-mail address?
 4        A.      Yes, I do.
 5        Q.      Whose e-mail address is that?
 6        A.      That is my son's, Marc.
 7        Q.      That is sent to L. Glynn at
 8   Carusoglynn.com.  Correct?
 9        A.      Yes.
10        Q.      You are cc'd on that.  Correct?
11        A.      Yes.
12        Q.      The e-mail that is under the cc
13   line is Skipperjm@yahoo.com?
14        A.      That is mine.
15        Q.      Do you recall receiving this
16   e-mail, sir, on or about December 8, 2009?
17        A.      Probably have.  I don't recall
18   but I probably did.
19        Q.      Looking at the first paragraph,
20   it says, "Dear Larry, we are very
21   concerned with your statement that as of
22   October 1st you are handling the matter on
23   a contingency fee basis.  We have always
24   and will continue to work with our counsel
25   on a time basis.  In your October 8th
```

1                    Proceedings
2    e-mail you stated, 'If you would prefer to
3    stay with a time basis, please advise.'
4    We notified you that we would prefer to
5    continue on a time basis even at the new
6    higher hourly rate."
7                Do you see that, sir?
8         A.    Yes, I do.
9         Q.    Did you author this e-mail or
10   was this from Marc Membreño?
11        A.    We probably talked about it and
12   came to this offer or this conclusion.
13        Q.    Where it states, "We notified
14   you that we would prefer to continue on a
15   time basis," do you have any evidence to
16   support that you did, in fact, notify that
17   you would prefer to continue on a time
18   basis?
19        A.    Would you ask the question
20   again, please?
21        Q.    Yes.  Do you have any evidence
22   to support that statement that you
23   notified me that you preferred to continue
24   on a time basis?
25        A.    Maybe I do, maybe I don't.

1                    Proceedings

2        Q.    Do you recall sending any e-mail

3   specifically objecting to the contingency

4   fee?

5        A.    I must have communicated that to

6   Marc, to convey it to you.

7        Q.    Do you have any e-mail, as we

8   sit here today --

9        A.    I don't know.  Maybe we just

10  talked on the telephone.

11       Q.    Do you recall speaking with me

12  on the telephone about --

13       A.    No, not with you.

14       Q.    Who did you speak with, sir?

15       A.    I must have spoken with Marc, to

16  convey the message to you.  Otherwise you

17  wouldn't have written.

18            MR. GLYNN:  May I go -- there

19       are two witnesses here, to speed

20       things along, would it be okay to

21       question Mr. Marc Membreño

22       contemporaneously?

23            MR. NICOLOSI:  I have one

24       question.  In your response that you

25       typed to request the fee arbitration,

1                    Proceedings
2        did you not concede that it was in
3        December of '09 that your suggestion
4        of a contingency fee basis was
5        disavowed by your client?
6                MR. GLYNN:   It was an accord to
7        the client.  I don't concede it was
8        disavowed.  It was an accord to the
9        client under certain conditions, to
10       wit, number one, payment of all
11       invoices within 30 days.  They did not
12       do that.
13               Number two, payment of $25,000.
14       If they want to refer to it as a
15       performance bonus, that was fine.
16       They never paid that.
17               So we were looking at modifying
18       what was an existing contingency fee
19       agreement.  They breached the
20       modification.  I am able to elect my
21       remedy and I have now withdrawn any
22       claim that I am entitled to time and
23       relying specifically on the initial
24       agreement, which was for contingency,
25       followed up by two invoices in

1        Proceedings
2    November and December which both set
3    up an account stated.
4            New York law is very clear.
5    This is an account stated.  They never
6    timely objected to it. We tried to
7    work out a modification and we were
8    never able to come to agreement on a
9    modification of the agreement because
10   they did not pay timely in 30 days,
11   did not pay all bills in full and did
12   not pay the $25,000 performance bonus.
13           Now we are going back to what
14   the initial agreement was.  There is
15   no objection.  The Membreños cannot
16   point to any objection.  They say they
17   have concerns, they ask for
18   explanations, but they don't have any
19   objections.  They received two
20   invoices that showed no charge, fee
21   waived, contingency fee.
22           Apparently at some point they
23   started going back to their California
24   counsel, who I do believe is also
25   significantly involved in this,

```
 1                Proceedings
 2       especially given the settlement
 3       agreement, Exhibit M, which was
 4       conveniently hammered out by
 5       California counsel after I had done
 6       three years' worth of work and about
 7       nine months under the new firm in
 8       shaping this settlement to get a case
 9       that was worth zero when it came to my
10       office to in excess of a million
11       dollars when they were only entitled
12       to roughly 780,000 to begin with.
13             That is a $230,000-plus windfall
14       that these folks got.
15             MR. NICOLOSI:  I have to repeat,
16       whether you were successful or whether
17       you got zero, that is not why we are
18       here.
19             Did there come a point, and
20       based upon the submissions that you
21       gave us and the papers that you filed
22       with the Court, are you suggesting
23       that the invoices that you attached as
24       exhibits in this book and in what you
25       gave the Court was an alternative
```

1               Proceedings
2       method of billing in the event that
3       the contingency basis was not
4       established?
5           MR. GLYNN:  My position was at
6       that time when I submitted the initial
7       arbitration, notice of arbitration
8       rights, I was willing at that time,
9       for these clients, to let them off the
10      hook and just collect the time amount
11      that they owed me, which they never
12      paid, including the $25,000.
13          I was willing to do that.  They
14      refused and have decided to delay --
15      they didn't even timely respond to the
16      arbitration within time.  I had to sue
17      them in Civil Court.  They delayed.
18      You know, motions, obfuscation.
19          I mean, at some point, I am
20      done.  I am not going to be a nice
21      person to these people anymore --
22          MR. ROSEN:  Counsel, putting
23      aside your feelings, how does this
24      establish the amount that you are
25      actually owed at the present time?

1                    Proceedings

2            MR. GLYNN:  The amount I am

3       actually owed at the present time

4       cannot be determined in this forum

5       because my --

6            MR. ROSEN:  We are here, sir,

7       and that is our job.  If you want to

8       say that, you certainly seem to tie

9       our hands.

10           MR. GLYNN:  I believe that given

11      the jurisdictional limit of this

12      forum, $50,000, that this matter

13      cannot be arbitrated here.  I would

14      ask that the panel dismiss the

15      arbitration because we do have a

16      Southern District action pending for

17      the entire amount of the contingency

18      fee that we believe is owed based on

19      the final settlement --

20           MR. NICOLOSI:  But you submitted

21      to the jurisdiction by putting in your

22      response to the fee dispute.

23           MR. GLYNN:  That was prior.

24           MR. NICOLOSI:  Whether it was

25      prior or whatever, you in fact

1              Proceedings

2      submitted to the jurisdiction.  And as

3      was just stated by Mr. Rosen, you have

4      sort of tied our hands.

5           What we have before us is what

6      we have to consider.  What you do

7      later on to establish your entitlement

8      to 257,000 on a theory of a

9      contingency fee established by

10     non-action on the part of the client,

11     that's another issue but that is not

12     before us.

13          MR. ROSEN:  I might add, you

14     understand the basic principle here

15     that the burden of proof to establish

16     the fee is always on the attorney.

17          MR. GLYNN:  And I believe that

18     we have established the properness of

19     the time charges, although we rely

20     that there was a contingency fee which

21     was breached, a contingency

22     arrangement which was breached by this

23     client and that the actual amount of

24     fees due and owing as set forth in our

25     petition, which was also rejected, is

1                    Proceedings

2       in excess of $257,000.

3            MR. SULLIVAN:  If I may,

4       Mr. Chairman?

5            MR. NICOLOSI:  Yes.

6            MR. SULLIVAN:  The entire

7       concept of a contingency fee can be

8       addressed and rejected by the panel.

9       New York law could not be any more

10      clear.  The argument that counsel just

11      made really borders on frivolous.

12           Quoting the New York Court of

13      Appeals from 2006. Even if there was

14      ever somehow a contingency fee

15      agreement in place, whether explicit

16      or implicit, New York law is clear.

17           "It is well settled that the

18      client may terminate the contingent

19      fee agreement at any time, leaving the

20      lawyer no cause of action for breach

21      of contract, only quantum meruit.

22      King v. Fox, 7 N.Y.3d, 181, page 192,

23      New York Court of Appeals 2006.

24           MR. NICOLOSI:  That stands for

25      after a contingency fee agreement is

1                    Proceedings

2        signed by the parties?

3              MR. SULLIVAN:   Correct.   Even if

4        there was in place, which we

5        vigorously dispute because one cannot

6        be created by implication, it can be

7        terminated at any time by the client.

8              At best for counsel -- he even

9        admitted under oath in Civil Court

10        that in December 2009 -- in one of our

11        exhibits in the binder before you is

12        an affidavit counsel signed -- an

13        affirmation I should say -- to the

14        Civil Court of Queens dated

15        January 10, 2011.

16              MR. GLYNN:   There is a typo in

17        there.

18              MR. SULLIVAN:   Paragraph 8.

19        "SAI then decided that it objected to

20        a contingency fee and offered a

21        $10,000 performance bonus in lieu of

22        the contingency fee plus payment of

23        all hours worked on a time basis.   The

24        undersigned acquiesced."

25              Therefore, no matter what

```
 1              Proceedings
 2      happened, even if there was an
 3      agreement, as I said we dispute
 4      because New York law is also clear it
 5      cannot be created by implication;
 6      there has to be an express agreement.
 7              If there ever was one, it was
 8      terminated in December of 2009 and
 9      counsel has absolutely no claim to a
10      contingency fee.  To assert otherwise,
11      as I said, borders on if not exceeds
12      the barrier of what frivolous is.
13              To say that an account stated
14      was created because they didn't object
15      to the invoices, they did object to
16      the invoice.  He admitted under oath
17      and admitted here again they objected
18      to the invoices in December.  The
19      first invoice purporting to a be
20      contingency fee --
21              MR. GLYNN:  Has to be a timely
22      objection, John.
23              MR. SULLIVAN:  -- could not have
24      matured yet because even if there was
25      a contingency fee, it hadn't been
```

1              Proceedings

2      earned yet because there was

3      no recovery.

4           MR. GLYNN:  It has to be timely.

5           MR. SULLIVAN:  It was objected

6      less than five weeks later.

7           MR. GLYNN:  When are you stating

8      there was an objection?

9           MR. SULLIVAN:  You are basing

10      the account stated on an invoice dated

11      November the 3rd.

12           MR. GLYNN:  Well, the agreement

13      was --

14           MR. ROSEN:  Please, gentlemen,

15      address arguments to us.  We don't

16      need to hear you go back and forth.

17      We'll hear that tonight, I promise

18      you.

19           MR. NICOLOSI:  Nine o'clock.

20           MR. SULLIVAN:  As I said, we

21      submit that the panel can address in

22      the general area was there a

23      contingency fee that could be

24      recovered on?  The panel can answer in

25      the negative without having to

1               Proceedings
2       determine what an amount would be
3       because clearly the law is against
4       counsel.   The argument cannot be made.
5           To try to say account stated
6       somehow gets around the Court of
7       Appeals saying the only theory they
8       can recover on is quantum meruit.
9           MR. NICOLOSI:  Let me ask you, I
10      somehow, from what you have submitted
11      and what you have stated, that for
12      that period, say from October to
13      December, your client made payments?
14          MR. SULLIVAN:  Right.
15          MR. NICOLOSI:  On a time basis.
16      And what I am getting is -- if you
17      subtracted the 67 from the 49, which
18      is his claim of total billable hours
19      from that period to April of 2010.
20      From October '09 to April '10 it comes
21      to 42,885.
22          He is saying you paid 33,075,
23      which leaves a balance of 9,880 that
24      is, according to his numbers, due and
25      owing.

1                    Proceedings

2              MR. SULLIVAN:  That is his

3        claim, yes.

4              MR. NICOLOSI:  On a time basis.

5        Forget contingency.

6              MR. SULLIVAN:  Understood.  But

7        that time includes a couple of items

8        that, again, we object to.  One is the

9        two entries from the first week of

10       October when he was still employed by

11       the Nicoletti firm.

12             MR. NICOLOSI:  I took that off.

13             MR. SULLIVAN:  You have the

14       roughly $2,000 of time in December

15       when they are going back and forth

16       over whether the fee is hourly or

17       contingency.

18             MR. NICOLOSI:  I got 1,500 on

19       that.  The three payments on

20       December 8th and three payments on

21       December 11th.  That, I got roughly at

22       1,500, rounded.

23             MR. SULLIVAN:  It is a little

24       more than that, Mr. Chairman.  It is

25       closer to 2,000.  I can go over it

1                  Proceedings

2      again.

3            MR. NICOLOSI:  You gave me 448,

4      128 and 928.

5            MR. SULLIVAN:  That was just on

6      December 11th.  There were three

7      entries on December 8th as well.

8            MR. NICOLOSI:  348 on

9      December 8th.

10            MR. SULLIVAN:  I believe it was

11      448.

12            MR. GLYNN:  348.

13            MR. NICOLOSI:  348 are the

14      entries.  348, 128, 498 and 928 on

15      December 11th.

16            MR. SULLIVAN:  On December 8th

17      we have three entries.  A $32 entry, a

18      $160 entry plus a 256 entry, is 448

19      for December 8th, plus the 1,500

20      roughly for December 11th takes us

21      over $2,000.

22            MR. NICOLOSI:  Okay.  Let's

23      accept those numbers.

24            MR. SULLIVAN:  The other

25      difference comes down to is there a

1              Proceedings

2    performance bonus.

3          MR. GLYNN:  They say 10,000.  I

4    say it was 25.

5          MR. SULLIVAN:  His 49

6    calculation assumes it was 10.

7          MR. GLYNN:  It doesn't even

8    assume it was 25.

9          MR. SULLIVAN:  It assumes it was

10   10.  If you take it off, you take it

11   down to 39 less what we paid and what

12   we overpaid and what should have been

13   deducted, you are getting below the

14   amount we have paid.

15         MR. NICOLOSI:  Anything else?

16         MR. SULLIVAN:  Start with 49,

17   deduct 10, deduct the 11 we say should

18   have come off, you get under 30 and we

19   paid over 30.

20         MR. NICOLOSI:  Anything else?

21         MR. GLYNN:  No, Mr. Chairman.

22         MR. NICOLOSI:  Mr. Sullivan?

23         MR. SULLIVAN:  Just if I may

24   take you through the exhibits, I can

25   explain what the exhibits are before

```
 1                    Proceedings
 2        you.  This would be clients' list of
 3        exhibits book, Exhibits 1 through 20.
 4             Exhibit 1 is apparently the last
 5        e-mail that counsel sent to client
 6        while he was still employed by the
 7        prior firm.  That is October 7th.  The
 8        bottom of the page of Exhibit 1, "Very
 9        truly yours, Nicoletti Hornig and
10        Sweeney by Lawrence Glynn."
11             Exhibit 2, our copy of what we
12        already discussed as the October 8th
13        e-mail.
14             Exhibit 3 is an October 20th
15        e-mail exchange wherein client raised
16        the issue, what does the contingency
17        fee mean?  I discussed it earlier when
18        I did my opening argument.  Exhibit 3
19        is the e-mail exchange that covers
20        that issue when we questioned, "What
21        do you mean by a contingency fee
22        agreement?  What does it entail?"  And
23        client replied later in the day.
24             Exhibit 4 is a follow-up in the
25        context of both the settlement
```

```
 1              Proceedings
 2    negotiations and the contingency fee.
 3    Again, by October 30th they are
 4    talking about "How do we settle?  What
 5    are we doing?"
 6              December 11th was another
 7    various proposal to reduce the
 8    proposed contingency fee.
 9              Exhibit 5 is clients' response
10    when they first noted the invoice that
11    was issued on November 3rd that said
12    contingency fee waived.  On
13    November 23rd they questioned, "What
14    does that mean?"  That is when counsel
15    explained, "I am going forward on
16    contingency.  Didn't you know?"
17              That's the e-mail at the top of
18    the page, which leads us to the
19    exchange on December 8th, where client
20    rejected the contingency fee. Attorney
21    tried to persuade client to keep it,
22    trying to say it would all come out of
23    Calpine's pocket anyway.
24              Exhibit 7, part of the same
25    exchange.  We covered it.  Exhibit 7
```

Case 7:11-cv-04360-VB   Document 63-2   Filed 03/22/13   Page 70 of 75

Page 70

1                    Proceedings
2          actually is the one, if you go to the
3          third page of Exhibit 7, that is where
4          counsel proposed not only a $25,000
5          performance bonus but also wrote --
6          this is an e-mail that was sent on
7          12/11/09 at 1:06 p.m. Pacific time,
8          4:06 New York time.
9               Third paragraph, second
10         sentence:  "Please also advise Robert
11         that in the event of a settlement any
12         amount that Calpine does agree to pay
13         above $850,000 will be exclusively for
14         the account of Caruso Glynn, LLC as
15         attorney's fees, which Calpine must
16         pay under the terms of the purchase
17         agreement as upheld by the decision
18         and order of Judge Victor Marrero."
19              At this point in time, very
20         briefly, Mr. Chairman, I would like
21         Mr. Robert Membreño to explain what
22         his reaction was when he first read
23         that.
24              MR. GLYNN:  That's fine.
25              MR. MEMBREÑO:  Mr. Chairman, I

212-267-6868          www.veritext.com          516-608-2400

```
 1                  Proceedings
 2       have been in the consulting
 3       business -- I am an engineer and been
 4       in the consulting business for many,
 5       many years and, therefore, involved in
 6       litigations of various types from time
 7       to time.
 8            My firm was very successful in
 9       the consulting business and we hold
10       very high ethical values as important
11       to our profession. As a matter of
12       fact, as a consultant we have to rely
13       on those values, those ethical values
14       to maintain and grow a firm in that
15       business.
16            So we are very clear when we
17       negotiate an agreement with anybody,
18       including attorneys.  And under no
19       circumstances in any of the legal
20       operations with other attorneys we
21       have had contingency fees.  Always
22       took the risks involved in defending
23       our positions because, quite frankly,
24       I felt, in directing my company, that
25       we would always be honest and ethical
```

1                    Proceedings
2          with everybody.
3                    So, I was very much concerned
4          that even though we had, with Calpine,
5          a disagreement on the issues, I would
6          never take advantage of the position
7          granted to us in obtaining the
8          attorney's fees.  I would not increase
9          it except for the fact that we, you
10         know, had negotiated the fee structure
11         as adequately as we had.
12                   I had a fiduciary responsibility
13         to my trustees, my other trustees and
14         also I felt I had a responsibility to
15         Calpine to make sure that the costs
16         would not be excessive.  I mean, that
17         has been my practice and that is why I
18         think I was very successful.
19                   So, therefore, the issue of the
20         contingency fee and adding on to a fee
21         above the amount was automatically
22         contrary to my position.  And that is
23         why I immediately told Mr. Caruso not
24         to continue providing services because
25         he increased the fees to Calpine

1              Proceedings

2      without even our authorization.  And

3      that is why we went back to

4      California's attorneys.

5              By the way, they had recommended

6      the firm Nicoletti to handle the case

7      because they had already started the

8      case in California before it went into

9      bankruptcy.  So the claims were

10     already ongoing before the bankruptcy

11     proceedings.

12             So when we hired the Nicoletti

13     firm and we stayed with them -- and

14     they did most of the work.  As a

15     matter of fact, we had already gotten

16     a judgment from the District Court

17     saying that -- reversing the order of

18     the Bankruptcy Court.  So the case was

19     concluded.  It was just a question of

20     now putting the numbers together to

21     justify the claims.  And I wasn't

22     about to now increase any claims

23     beyond those that were legitimately

24     paid by us or due.

25             MR. NICOLOSI:  I take it it's

```
 1                  Proceedings
 2      your contention that you always
 3      intended to proceed on a time basis?
 4              MR. MEMBREÑO:  Yes.  Yes,
 5      Mr. Chairman.
 6              MR. NICOLOSI:  Gentlemen, thank
 7      you.  The arbitrators will confer
 8      amongst themselves.
 9              MR. SULLIVAN:  Mr. Chairman, I
10      prepared written statements that
11      summarize, if you would like to take
12      them as well for each of the members
13      of the panel.  Counsel already has a
14      copy.
15              MR. GLYNN:  Yes.
16              MR. SULLIVAN:  This includes our
17      legal argument, the case citations I
18      mentioned earlier on the record are in
19      the submission.
20              (So marked for identification as
21      Exhibit BB; so marked for
22      identification as Exhibit CC.)
23              (Time noted:  11:23 a.m.)
24
25
```

Page 75

1

2          E X A M I N A T I O N S

3    Witness                              Page

     R. Membreño

4

        By Mr. Glynn                        36

5

6

7              E X H I B I T S

8    Exhibit     Description              Page

9    AA          Respondent Exhibit Book  47

     BB          Client Exhibit Book      74

10   CC          Summary Statement        74

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25