UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CARUSO GLYNN LLC,                          :
                    Plaintiff,             :
                                           :          **MEMORANDUM DECISION**
v.                                         :
                                           :          11 CV 4360 (VB)
SAI TRUST and ROBERT MEMBRENO,             :
Individually and as Trustee for SAI Trust, :
                    Defendants.            :
------------------------------------------------------------x

Briccetti, J.:

Plaintiff Caruso Glynn LLC ("CG"), a law firm whose sole member is Lawrence Caruso

Glynn, Esq. ("Glynn"), brings this action to recover legal fees under a contingency fee

arrangement it purportedly entered into with defendants SAI Trust and Robert Membreño, its

trustee, as part of a lawsuit arising out of a royalties dispute between SAI Trust and Calpine

Corporation.  See In re Calpine Corp., 406 B.R. 463 (S.D.N.Y. 2009).

On July 9, 2012, the Court granted defendants' motion to stay the action pending

completion of arbitration.  (Doc. #20).  The parties concluded arbitration on October 29, 2012,

and the Court lifted the stay by order dated December 21, 2012.  (Doc. #25).

Plaintiff then moved for summary judgment on the claims in its complaint, and

defendants cross-moved for summary judgment on the claims in plaintiff's complaint, and for

summary judgment on their counterclaim for a refund of fees allegedly improperly charged by

plaintiff.  (Docs. #31, 39).  In addition, plaintiff has moved for leave to file an amended

complaint to add a cause of action to enforce a charging lien under New York Judiciary Law §

475.  (Doc. #54).

For the reasons set forth below, plaintiff's motions for summary judgment and for leave

to amend are DENIED, and defendants' motion for summary judgment is GRANTED.

The Court has jurisdiction under 28 U.S.C. § 1332.

## BACKGROUND

The parties have submitted briefs, statements of facts, and declarations with supporting exhibits, which reflect the following factual background.[1]

In 2004, defendants retained the law firm Nicoletti Hornig & Sweeney ("NHS") to represent SAI Trust as part of Calpine's bankruptcy proceeding in the Southern District of New York.  After the bankruptcy court denied defendants' claims, they timely appealed to the district court in 2008.  On July 9, 2009, defendants prevailed on their appeal in the district court.  As a result, the court held Calpine was responsible for paying defendants' attorneys' fees and remanded the case to the bankruptcy court for computation of damages.  See In re Calpine Corp., 406 B.R. at 477.  Glynn, an employee of NHS from April 10, 2000, to October 31, 2009,[2] had performed most of the firm's work on defendants' district court appeal.

Calpine timely appealed the district court's decision to the Second Circuit.  During August, September, and early October 2009, Glynn continued working on defendants' behalf on the Second Circuit appeal and discussing settlement with Calpine.

On October 8, 2009, Glynn informed defendants by email that he was "in the process of

---

[1]  The Court disregards plaintiff's Local Rule 56.1 counter statement of material facts to the extent it fails to cite admissible evidence, or couches argument and analysis as fact.  See Local Civ. R. 56.1 ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); Epstein v. Kemper Ins. Cos., 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (disregarding Local Rule 56.1 statement's conclusory, argumentative, and unsupported assertions).

[2]  Defendants provide a declaration from John A.V. Nicoletti, NHS's managing partner, indicating Glynn was an associate at NHS during this period.  Plaintiff offered a declaration from Lawrence Munck indicating Glynn was of counsel to NHS beginning in 2008, but, as explained in the Court's order dated March 28, 2013 (Doc. #67), Munck's declaration is no longer part of the record at summary judgment.  In any event, the Court finds Glynn's title at NHS immaterial for purposes of summary judgment.

winding down" his employment with NHS, and offered to continue working on the Calpine

matter for defendants from his own firm, CG.  Glynn's email continued:

> [A]s the Southern District Court has ruled that Calpine is ultimately responsible
> for all attorneys' fees, I propose that going forward, I will continue to handle this
> matter on a contingency fee basis. . . .  The contingency fee will be an extremely
> reasonable 22.5% of the gross recovery . . . .  Please confirm your agreement to
> these terms.  If you would prefer to stay with a time basis, please advise.
> However, please note that my fee in this matter has increased from $260.00 to
> $320.00 per hour.

Glynn reminded defendants that they owed NHS $9,847.64 for legal work done through August

2009, and attached an invoice from CG for $6,752, based on 21.1 hours Glynn had worked

during September 2009.  Defendants did not immediately respond to Glynn's email.

On October 20, 2009, Marc Membreño, the son of Robert Membreño and president of

SAI Geothermal, Inc., whose shareholders are the beneficiaries of SAI Trust, paid plaintiff

$2,000 by check, and emailed Glynn to discuss an issue in the Calpine case.  Glynn replied that

day, addressing the substantive issue and asking Marc to "please confirm that SAI has no

objection to my handling the matter on a contingency fee basis going forward (22.5% of the

gross recovery plus disbursements)."  Marc responded that he was "a little confused with [CG's]

contingency proposal" because defendants had already paid NHS hourly fees of $175,000 and

CG's proposed contingency fee, based on a settlement of $770,000, would be an additional

$173,250.  Marc also sought confirmation that "[t]he other option is continuing with the hourly

rate which has now risen some 23% since your departure."  Glynn replied that the applicable

22.5% contingency fee would be calculated based on damages but not fees and costs, his fee had

increased because he was "charging a partner rate, not associate," and "under either [a]

contingency or on a time basis, it is ultimately Calpine who will pay, not SAI Trust."  Marc then

thanked Glynn for the clarification and noted "we have always worked with a straight time basis

with our various counsel, so I was trying to understand how the contingency fee worked."  Marc

states in his declaration that he and his father then discussed CG's proposed contingency fee and agreed SAI Trust could not retain CG on a contingency basis.  But they apparently did not inform plaintiff of their decision.

On October 30, 2009, plaintiff wrote the Membreños to update them on settlement discussions and inform them about the briefing schedule in the Second Circuit appeal.  In that message, Glynn volunteered that if the case settled without having to go through the appeals process, "I will lower my contingency fee to 15% and, if it will assist in completing any settlement, will consider a lower fee."

On November 2, 2009, CG sent defendants and Marc Membreño an invoice for time worked during October 2009.  The invoice listed the fee for each time entry as "No Charge," and at the bottom listed the charge for "14.9 hours at $320 per hour" as "Contingency Fee; Fee Waived."  Marc Membreño responded the following day seeking a copy of the invoice in a different electronic format.  On November 23, 2009, Marc Membreño wrote Glynn, copying Robert Membreño and Lisaholdaway@aol.com, to inquire why the invoice listed "No Charge."  Glynn responded that "[a]s of October 1, 2009, I'm handling the matter on a contingency fee basis going forward. . . .  I did this because ultimately Calpine must pay my fee, not SAI. . . . That is why there is 'no charge' on the October invoice."  Glynn further clarified that he still accounted for his time in the event the bankruptcy court "decides Calpine should only pay [CG's] hourly rate and not a contingency fee."  Robert Membreño states in his declaration that he and his son then discussed CG's proposed contingency fee and agreed SAI Trust could not retain CG on a contingency basis.  But, again, they apparently did not inform plaintiff of their decision.  By check dated November 23, 2009, defendants paid plaintiff another $2,000.

On December 2, 2009, CG sent defendants an invoice for time worked in November.

4

This invoice, like the one sent on November 2, listed the fee for each time entry as "No Charge,"

and at the bottom listed the charge for "13.3 hours at $320 per hour" as "Contingency Fee; Fee

Waived."  On December 8, 2009, Marc Membreño sent Glynn the following message from

Robert Membreño regarding CG's "proposed contingency fee":

> We are very concerned with your statement [via email dated November 23, 2009,]
> that as of October 1st, you are handling the matter on a contingency fee basis.  We
> have always and will continue to work with our counsel on a time basis.  In your
> October 8th email, you stated: "If you would prefer to stay with a time basis,
> please advise."  We notified you that we would prefer to continue on a time basis,
> even at the new, higher hourly rate.

Robert explained that a contingency fee may have been justified at the outset, "but at this late

stage of the case, we do not agree with adopting a contingency fee."  Glynn responded that day,

arguing a contingency fee was appropriate under the circumstances because the outcome

remained uncertain, Calpine (not SAI Trust) would pay CG's fees, and a contingency fee would

benefit defendants' bargaining position.  Glynn also promised to provide defendants a settlement

analysis and proposal in which he "lowered the fee . . . to something in the order of 8%."

Approximately fifteen minutes later, Glynn sent defendants a memorandum analyzing

damages scenarios based on Calpine's offer to settle the matter for "$850,000.00, inclusive of

my contingency fee."  In the memorandum, plaintiff concluded a settlement for $850,000 would

be "an excellent result as this would pay SAI $800,000.00 and I will lower my contingency fee

from 22.5% to 7.67% taking only $50,000.00 as my fee from Calpine."  Plaintiff explained he

was "continuing to try to get Calpine to pay an even higher amount which would result in a

larger net to SAI as well as increasing the fee that they will pay to me. . . .  I am not sure if

Calpine will be willing to increase from $850,000.00, but I feel it is in all of our best interest[s]

for me to at least try."  In closing, plaintiff asked for authority to settle for "no less than

$850,000.00, with a net to SAI of no less than $800,000.00, and an understanding that I will

make an attempt to raise this settlement slightly higher."

Robert Membreño says he and his son spoke by telephone on the morning of December 11, 2009, three days later, and again agreed SAI could not pay CG a contingency fee. Robert then instructed Marc to write CG to confirm they had not agreed to a contingency fee. That afternoon, Marc wrote Glynn the following:

> [Robert] is receptive to settling the matter for the proposed $850,000.00. However, he reiterated he will not accept payment of a contingency fee. The agreement between Caruso Glynn and SAl Trust was for payment on a time basis (as with all previous firms in the case), and to change to a different methodology is unacceptable "because it changes the professional contractual relationship between the parties". We accepted the increase in hourly fees when the two different options were proposed.

In addition, Marc wrote that SAI Trust would honor CG's new hourly rate, "pay all current invoices due, and agree to add a $10,000.00 performance bonus."

Glynn responded that day, stating he was "quite dismayed by Robert's position but will nevertheless acquiesce and agree to remain on a time basis." Still, Glynn noted his view that defendants had not previously disagreed with CG's contingency fee proposal, "never affirmatively stated that it wished to continue on a time basis and implicitly agreed to the contingency arrangement." Glynn also asked Marc to "inquire with Robert if he will consider increasing the performance bonus to $25,000" and "advise Robert that in the event of a settlement, any amount that Calpine does agree to pay above $850,000.00 will be exclusively for the account of Caruso Glynn, LLC as attorney's fees." Finally, plaintiff asked that all outstanding invoices be paid in full within thirty days.

Marc Membreño replied with his own version of the facts related to the contingency fee issue, promised to forward plaintiff's email to his father, and agreed to pay all outstanding invoices within thirty days. Marc said he was "puzzled" by plaintiff's statement regarding settlement above $850,000, because defendants had agreed to settle for that amount, and asked

Glynn whether he was "negotiating further with Calpine to collect more attorney's fees." Glynn responded by forwarding Marc their October 20, 2009, correspondence about contingency fees, in which Glynn had asked him to "confirm that SAI has no objection to my handling the matter on a contingency fee basis going forward." Glynn then stated he had "advised [defendants] that it would be a contingency <u>unless</u> you chose to continue on a time basis." (emphasis in original).

The electronic argument continued into December 12, 2009. First, Marc Membreño informed plaintiff that he and his father had decided to choose the hourly rate proposal on October 20, 2009, and had read the invoices listing "Contingency Fee Waived" to mean plaintiff had waived the contingency fee—in other words, that there was no contingency fee arrangement. Plaintiff replied that he had not been previously informed that defendants had chosen the hourly rate option, but he was "willing to go forward on a purely time basis (for past and future invoices)" if SAI, as consideration for modifying what CG viewed as a contingent fee retainer agreement, increased the proposed performance bonus to $25,000. Defendants did not immediately respond to plaintiff's proposal.

On the morning of December 21, 2009, Marc Membreño wrote plaintiff to respond to Glynn's phone call and to inquire about the status of settlement negotiations with Calpine. Membreño also addressed the contingency fee issue, writing:

> SAI Trust has never agreed to making any modifications to the approved rate payment structure [with California counsel, NHS, or CG]. Accordingly, our fee agreement with all our counsel has been strictly on an hourly basis. SAI Trust views the proposed changes to a contingency basis for payment as unacceptable. As previously indicated, SAI Trust does not agree to any payment plan based on a contingency.

Glynn responded later that morning that he "will acquiesce to SAIT's position that this be handled on a strictly time basis," "would be willing to accept" the $10,000 performance bonus Robert had previously offered, and "would ask for nothing further other than what I am owed on

a time basis." By check dated December 21, 2009, defendants paid plaintiff another $2,000.

At some point in December 2009, CG sent defendants revised invoices reflecting hourly billing for time worked in October and November, charging $4,768 and $4,256, respectively. On January 2, 2010, plaintiff submitted an invoice for time worked in December 2009. The invoice reflected 35.3 hours, for a fee of $11,296, including 6.1 hours Glynn spent communicating with defendants about receiving a contingency fee. By check dated January 5, 2010, defendants paid plaintiff another $9,795.38.

On January 19, 2010, defendants received a final invoice from NHS, reflecting $5,148 for 19.8 hours worked by Glynn, at $260 per hour, between September 1 and October 5, 2009. Marc Membreño informed Glynn about the invoice, and requested that Glynn "inform [NHS] that fees for your services during the September 1 2009 to October 5 2009 [sic] have already been paid to you in full" because defendants had paid CG $8,328 for Glynn's legal work during that period. Glynn responded that "[NHS] had no basis for charging you for these hours whatsoever. However, to avoid any further unpleasantness, please pay [NHS's] invoice in full and then deduct the corresponding amount from your current invoice from me." Defendants did not ask for, and Glynn did not offer, a refund of the additional $3,180 defendants had paid CG for Glynn's legal work while he was employed at NHS during that period.

On February 2, 2010, defendants requested that plaintiff present a demand to Calpine of a $548,000 general unsecured claim in Calpine's still-pending bankruptcy, and $340,000 in cash. Glynn acknowledged defendants' request, but counseled for waiting to present the demand because Calpine had not yet responded to his previous demand of $975,000 in cash. Marc Membreño responded that day with confusion, stating defendants had never agreed to such a demand, wondering when GC made the demand, and inquiring about CG's basis for it. On

February 4, 2010, Glynn reported that he made the $975,000 all-cash settlement demand on December 5, 2009, when he "was still operating under the good faith belief that my fee would be contingent.  That is the basis for this substantially higher amount."  That day, Glynn also submitted an invoice for 24 hours worked in January 2010, at a total cost of $7,680, with a credit of $5,148 for fees defendants had paid to NHS.

The following day, February 5, 2010, Marc Membreño informed plaintiff that "[f]rom this day forward, SAI Trust will not authorize payments for services rendered by Caruso Glynn without prior approval of hours to be billed, and specific activity to be conducted.  [CG is] to cease communications with Calpine counsel unless authorized by SAI Trust, nor conduct any further analysis of legal matters pertaining to the case."  Glynn responded, "Of course.  Understood."

Plaintiff sent defendants a final invoice on March 1, 2010, listing 14.5 hours worked between February 2 and February 5, at a total cost of $4,736, plus $28.30 in disbursements.  The invoice listed $13,709.90 as past due, and, for the first time, listed a $10,000 charge for an "Agreed Performance Bonus."  As a result, CG reported defendants' outstanding balance as $28,474.20.  By check dated March 22, 2010, defendants paid plaintiff another $2,000.

Later in March, defendants' California counsel consummated a settlement with Calpine that included stock to resolve claims covered by Calpine's bankruptcy reorganization plan, and cash to resolve post-petition claims.

On April 21, 2010, Robert Membreño wrote Glynn a letter stating "SAI Trust . . . is prepared to pay for only hours charged for services rendered as reflected in your [January, February, and March invoices] as the stated services appear to relate to SAI Trust's pending claims before the Bankruptcy Court and after the withdrawal of Calpine's appeal."  The letter

further explained SAI Trust would not pay CG any contingency fee, any fees related to

negotiating a contingency fee, any performance bonus, or $6,752 for hours worked while Glynn

was employed at NHS.  Membreño continued that SAI Trust "will pay, as a full and final

payment to [CG], the amount of $15,089.78."  SAI Trust paid that amount by wire transfer on

April 22, 2010.  Including this amount, defendants had paid plaintiff $32,885.16, and had

received an additional credit for $5,148 paid to NHS.

On June 23, 2010, CG commenced an action against SAI Trust in New York City Civil

Court in Queens, seeking to collect attorney's fees and the performance bonus allegedly earned

in the Calpine matter.  In an affirmation in support of CG's motion for default, signed on January

10, 2011, Glynn stated he originally took the case on a contingency fee, but, in December 2009,

after two months of work, SAI Trust "objected to a contingency fee and offered a $10,000

performance bonus in lieu of the contingency fee plus payment of all hours worked on a time

basis.  The undersigned acquiesced and agreed to instead bill the client on a time basis

retroactive to October 1, 2009 for all time worked on this matter."  Glynn summarized his claim

as follows:

> [T]he amount SAI now owes is $16,561.84 plus interest.  SAI should consider
> itself fortunate that this firm has not sought to enforce the original terms of the
> retainer which called for this matter to be handled on a contingency fee basis.
> Given that the value of the claim now stands at $1,000,000.00 . . . plaintiff would
> be entitled to **$225,000.00 plus out of pocket expenses** under the original retainer
> agreement.

(emphasis in original).  Plaintiff ultimately withdrew the civil court action and, on June 27, 2011,

commenced this suit in federal court seeking the amount owed under the purported contingency

fee agreement, but not seeking the $10,000 performance bonus.[3]

---

[3]  Plaintiff's complaint does not contain reference to the performance bonus offered by
defendants.  In addition, plaintiff states in its response to defendants' Local Rule 56.1 statement
that it "no longer wishes to accept the $10,000 [performance bonus] and has instead elected to

## DISCUSSION

I.      Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law

. . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See id.  The Court "is not to

resolve disputed issues of fact but to assess whether there are any factual issues to be tried."

Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving

party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of

Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element

of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex

Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits evidence which is "merely

colorable," summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at

249-50.  The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated

speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations

---

pursue judgment for the amount properly owed to SAI under the original 22.5% contingency fee
agreement."  Accordingly, the Court finds plaintiff has waived any claim to any bonus payment.

omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party.  Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011).  If there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

II.     Breach of Contract Claims

To form a valid and binding contract, there must be an offer, the offer must be accepted, and there must be consideration to bind the parties to their bargain.  See Forest Park Pictures v. Universal TV Network, Inc., 683 F.3d 424, 432 (2d Cir. 2012).  Silence in response to an offer does not constitute acceptance, unless (i) the offeree has an opportunity to reject the offer and accepts services knowing the offeror expects compensation; (ii) the offeror states, or the offeree understands, that silence constitutes acceptance; (iii) the offeree has previously indicated silence is acceptance; or (iv) the offeree exercises dominion over an item.  See, e.g., Karlin v. Avis, 457 F.2d 57, 61-62 & n.8 (2d Cir. 1972) (citing Albrecht Chem. Co. v. Anderson Trading Corp., 298 N.Y. 437, 440 (1949)); see also Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004).

"[C]ourts as a matter of public policy give particular scrutiny to fee arrangements between attorneys and clients, casting the burden on attorneys who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully known and understood by

their clients." Shaw v. Mfrs. Hanover Trust Co., 68 N.Y.2d 172, 176 (1986) (citing Jacobson v.

Sassower, 66 N.Y.2d 991, 993 (1985)); see also Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 838-

39 (2d Cir. 1993).  "In attorney-client contracts, the burden is on the attorney 'to establish

affirmatively that [the contract] was made by the client with full knowledge of all the material

circumstances known to the attorney, and was in every respect free from fraud on his part, or

misconception on the part of the client, and that a reasonable use was made by the attorney of the

confidence reposed in him.'"  King v. Fox ("King I"), 418 F.3d 121, 135 (2d Cir. 2005) (quoting

Greene v. Greene, 56 N.Y.2d 86, 92 (1982)).  "[I]f the attorney has reason to believe that the

client does not have a complete understanding of a purported contract between them . . . the

attorney must, in order to make the agreement enforceable, discuss the terms with the client to

ensure that the client is 'fully and fairly informed of the consequences.'"  Mar Oil, S.A. v.

Morrissey, 982 F.2d at 839 (quoting Greene v. Greene, 56 N.Y.2d at 93).

        "Contingency fee agreements entered into between an attorney and his client, as a matter

of public policy, are of special concern to courts."  Matter of Thompson, 66 A.D.3d 1035, 1036

(2d Dep't 2009) (internal quotation marks omitted).  An attorney may not unilaterally impose a

contingent fee structure on a client; "[o]nly if the client and attorney agree may the attorney

receive a fee based on a percentage of the recovery."  Cohen v. Grainger, Tesoriero & Bell, 81

N.Y.2d 655, 658 (1993); see also Nabi v. Sells, 70 A.D.3d 252, 253-54 (1st Dep't 2009) ("[A

contingency fee] cannot be compelled by the attorney; it can only be reached with the consent of

the client.").  And, even if the client agrees to pay a contingent fee, "it is well settled that the

client may terminate the contingent fee agreement at any time, leaving the lawyer no cause of

action for breach of contract[,] only quantum meruit."  King v. Fox ("King II"), 7 N.Y.3d 181,

192 (2006) (internal quotation marks, alterations, and citations omitted) (answering questions

13

certified to the New York Court of Appeals by the Second Circuit, in <u>King I</u>).

Here, the text of plaintiff's purported "engagement letter"—Glynn's email dated October 8, 2009—makes clear that defendants had not agreed to pay a contingency fee as of that date.  In the email, Glynn states, "I <u>propose</u> that going forward, I will continue to handle this matter on a contingency fee basis. . . .  Please <u>confirm your agreement</u> to these terms.  If you would prefer to stay with a time basis, please advise."  (emphasis added).  Although plaintiff's papers repeatedly excise the word "propose" and the language seeking defendants' assent, such alterations do not change the underlying text of the document, which unambiguously indicates plaintiff proposed a contingency fee on October 8, 2009, and sought defendants assent to such a fee.

Plaintiff argues defendants assented to paying a contingency fee because they remained silent for two months after the October 8, 2009, email.  First, even if defendants had remained silent, such silence could not have constituted acceptance of plaintiff's contingency fee proposal because plaintiff sought defendants' assent to the arrangement, and defendants never assented. <u>See</u> <u>Karlin v. Avis</u>, 457 F.2d at 61-62 & n.8 ("An offeror has no power to transform an offeree's silence into acceptance when the offeree does not intend to accept the offer.").

Second, the parties' communications on October 20, 2009, make plain they had not agreed to a contingency fee arrangement as of that date; defendants were "confused with [Glynn's] contingency proposal" and sought confirmation they could retain plaintiff on a contingency or hourly fee, and plaintiff confirmed they could choose either option.  <u>See</u> <u>Mar Oil, S.A. v. Morrissey</u>, 982 F.2d at 839 (finding no retainer agreement when the client does not understand its material terms).

Finally, even if defendants' initial failure to reject plaintiff's proposal somehow bound them to pay a contingent fee, and defendants' professed confusion did not indicate they

14

misunderstood the retainer's terms, defendants' clear rejection of a contingency fee on December 8, 11, and 20, 2009, served to terminate any purported contingent fee agreement.  See King II, 7 N.Y.3d at 192; see also Karlin v. Avis, 457 F.2d at 61-62 ("These rejections hardly constitute silence within [plaintiff's] theory of silence constituting acceptance.").  Moreover, the uncontested evidence shows Glynn ratified defendants' termination of any contingency fee (if one ever existed) when he acquiesced to remaining on a time basis on December 11 and 20, 2009, and February 4, 2010; submitted revised invoices reflecting hourly billing for time worked in October and November, and thereafter submitted hours-based invoices; and affirmed, as part of the New York City Civil Court lawsuit, that CG had agreed to be paid on a time basis.  See King II, 7 N.Y.3d at 190-91 (holding client may ratify agreement with attorney during the representation "so long as a client has full knowledge of the relevant facts (including the terms of the agreement and the choice to disavow it) and has acquiesced"); see also King I, 418 F.3d at 132-33 (discussing ratification under New York law and certifying question about application to attorney-client contracts to the New York Court of Appeals).

Plaintiff points out in its papers, and in the underlying evidence at summary judgment, that its offer to work for defendants on a contingency fee basis was to the benefit of all parties because the case was complex and uncertain, and because Calpine would be paying defendants' attorney's fees.  Glynn also notes he could have proposed a higher contingency percentage, did "everything that could humanly have been done" to explain the contingency fee arrangement to defendants, and customarily handles cases on a contingency basis.  These arguments do nothing to change the uncontested facts outlined above, which make clear defendants never affirmatively agreed to pay a contingency fee, defendants repeatedly rejected plaintiff's contingency fee proposal, and plaintiff "acquiesced" to defendants' rejection of a contingency fee by agreeing to

remain on a time basis, submitting hours-based invoices, and accepting payment based on hours worked.

Accordingly, as a matter of law, defendants did not agree to pay plaintiff a contingency fee and they are not bound to pay plaintiff 22.5% of their recovery from Calpine.  Defendants are therefore entitled to summary judgment on plaintiff's breach of contract claims, and on plaintiff's claim for a declaratory judgment that it is entitled to 22.5% of defendants' recovery against Calpine.

III.   Non-Contract Remedies

Plaintiff argues that even if defendants did not agree to pay a contingency fee, it is still entitled to fees in an amount commensurate with the 22.5% contingency fee under the non-contract theories quantum meruit and account stated.

A.   Quantum Meruit

To recover in quantum meruit under New York law, plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (quoting Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000)).  To determine the "reasonable value of services," the Court looks to, among other things, whether the client agreed to pay a contingency fee, the complexity and difficulty of the litigation, the time spent by the attorney, and the results achieved.  See, e.g., Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C., 370 F.3d 259, 265 (2d Cir. 2004); Nabi v. Sells, 70 A.D.3d at 255.

Here, the parties agree plaintiff performed legal services and defendants accepted its legal services.  Plaintiff argues the reasonable value of his services is 22.5% of defendants' recovery. However, as discussed above, such a fee would be an unreasonable recovery in quantum meruit because defendants never agreed to pay plaintiff a contingency fee.  See Universal Acupuncture Pain Servs. P.C. v. Quadrino & Schwartz, P.C., 370 F.3d at 263 (citing Lai Ling Cheng v. Modansky Leasing Co., 73 N.Y.2d 454, 458 (1989)) (noting a discharged attorney "may recover either (1) in quantum meruit, the fair and reasonable value of the services rendered, or (2) a contingent portion of the former client's ultimate recovery, but only if both of the parties have so agreed."); Nabi v. Sells, 70 A.D.3d at 253-54; see also Sanchez v. MTV Networks, 2012 U.S. Dist. LEXIS 80810, at *7 (S.D.N.Y. June 11, 2012) (noting the Court need not accept the parties' valid agreement for a contingency fee when considering attorney's reasonable fee). Rather, the reasonable value of plaintiff's services can be calculated using the lodestar method, in which the Court multiplies the attorney's reasonable hourly rate by the number of hours expended.  See Weg & Myers, P.C. v. 126 Mulberry St. Realty Corp., 453 F. App'x 90, 92 (2d Cir. 2011) (summary order) (upholding district court's application of lodestar method to determine quantum meruit recovery for an attorney whose client terminated contingency fee agreement); see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d 110, 117 (2d Cir. 2007) (discussing factors for determining reasonable hourly fee).

Between September 1, 2009, and February 5, 2010, plaintiff billed defendants for 123.4 hours at $320 per hour, plus $149 in disbursements, for a total of $39,637.  Defendants concede plaintiff's $320 hourly rate is reasonable.  They argue, however, plaintiff is not entitled to recover for fees improperly billed.  Specifically, defendants contend plaintiff improperly billed for 27.9 hours between September 1 and October 7, 2009, when Glynn was working at NHS, 6.1

hours in December 2009 that Glynn spent trying to get defendants to pay a contingency fee, and 0.6 hours in February 2010 for file "review and maintenance."  In total, defendants contend plaintiff improperly billed them for 34.6 hours at a cost of $11,072, and thus that the most plaintiff could recover in quantum meruit is $28,565—$39,637 plaintiff billed minus $11,072 in allegedly improper billings.

Plaintiff does not address the propriety of its billing in its own motion for summary judgment or in response to defendants' motion.  For example, plaintiff does not contend it was appropriate to bill defendants for time Glynn worked while employed at NHS, for hours Glynn spent negotiating the terms of the representation, or for vague file "review and maintenance." Given the apparent absence of opposition from plaintiff, defendants are not obligated to pay plaintiff for the 34.6 hours to which they object.  See Lipton v. County of Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").  Cf. Mar Oil, S.A. v. Morrissey, 982 F.2d at 838-39 (noting retainer agreement unenforceable if client does not agree to its terms); Thai-Lao Lignite Co. v. Gov't of the Lao People's Democratic Republic, 2012 U.S. Dist. LEXIS 164261, at *30-34 (S.D.N.Y. Nov. 14, 2012) (citing cases rejecting attorney's fees based on vague and generalized time entries).

Accordingly, because the parties agree defendants actually paid plaintiff $32,885.16, which is more than the $28,565 which plaintiff could theoretically recover in quantum meruit, defendants are entitled to summary judgment on plaintiff's quantum meruit claim.

B.    Account Stated

"[T]he very meaning of an account stated is that the parties have come together and agreed upon the balance of indebtedness, insimul computassent, so that an action to recover the

balance as upon an implied promise of payment may thenceforth be maintained." Newburger-Morris Co. v. Talcott, 219 N.Y. 505, 512 (1916) (Cardozo, J.).  Under New York law, to recover on an account stated theory plaintiff must offer evidence showing "(1) an account was presented, (2) it was accepted as correct, and (3) debtor promised to pay the amount stated." IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009); see also LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 64 (2d Cir. 1999) (noting contract between attorney and client may be the basis for an account stated claim).  Plaintiff may satisfy the latter two elements by showing defendants received and retained invoices without objecting to them in a reasonably timely manner, or made partial payment on the invoices. LeBeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d at 64 (citation omitted); Liddle & Robinson, LLP v. Garrett, 720 F. Supp. 2d 417, 426 (S.D.N.Y. 2010).  On the other hand, defendants may defeat a claim for account stated by showing they timely objected to the reasonableness of the fees listed in the invoice, or showing silence was appropriate under the circumstances.  See, e.g., Stephen Feldman, P.C. v. Talon Paint Prods., Inc., 2002 U.S. Dist. LEXIS 20110, at *12-13 (S.D.N.Y. Oct. 22, 2002) (citing Carey v. Mui-Hin Lau, 140 F. Supp. 2d 291, 298 (S.D.N.Y. 2001)).

Although it is generally for the jury to decide "whether the alleged debtor retained a statement of account without objecting within a reasonable time," the court may decide the issue as a matter of law when the facts "give rise to only one reasonable inference in respect of whether there was assent to the statement of account."  Genuity Solutions, Inc. v. Nortel Networks, Inc., 2002 U.S. Dist. LEXIS 23849, at *1 (S.D.N.Y. Dec. 13, 2002) (citing Epstein v. Turecamo, 258 A.D.2d 502, 503 (2d Dept. 1999)).

Here, as detailed above, the uncontested evidence indicates defendants timely questioned plaintiff's invoices listing a contingency fee, ultimately rejected plaintiff's attempt to charge a contingency fee, and agreed to pay plaintiff's increased rate of $320 per hour.  The undisputed evidence also shows plaintiff "acquiesced" to defendants' rejection of contingency billing on multiple occasions, accepted defendants' desire to pay by the hour, and submitted or resubmitted invoices reflecting CG billed on a time basis.

Accordingly, as a matter of law, the only assent between the parties was for defendants to pay plaintiff an hourly rate for time worked on the Calpine matter.  Therefore, defendants are entitled to summary judgment on plaintiff's claim for a contingency fee based on an account stated theory.

IV.    Motion for Leave to Amend the Complaint

Plaintiff moves for leave to amend the complaint to add a claim to enforce a charging lien under New York Judiciary Law § 475.

Rule 15(a)(2) instructs that courts "should freely give leave" to amend a complaint "when justice so requires."  The court may deny leave to amend for "good reason," such as futility, bad faith, undue delay, or undue prejudice to the opposing party.  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200-01 (2d Cir. 2007).  When a plaintiff moves for leave to file an amended complaint in response to a defendant's motion for summary judgment, and the parties have fully briefed and presented evidence on the claims in the proposed amended complaint, "the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under Fed. R. Civ. P. 56(c)."  Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001) (citations omitted).

20

Under Judiciary Law § 475, "the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come."  The value of an attorney's charging lien is limited to the amount due to that attorney under the applicable retainer agreement.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 453 (2d Cir. 1998) (citation omitted); Jin Zhao v. State Univ. of N.Y., 2011 U.S. Dist. LEXIS 90502, at *21 (E.D.N.Y. Aug. 15, 2011) (noting Section 475 entitled attorney to "compensation in accordance with the terms of the retainer agreement and commensurate with her work in [the] case"); see also Sutton v. N.Y.C. Transit Auth., 462 F.3d 157, 161 (2d Cir. 2006) ("A charging lien, although originating at common law, is equitable in nature, and the overriding criterion for determining the amount of a charging lien is that it be fair." (internal quotation marks and citations omitted)).

The undisputed evidence outlined above indicates defendants agreed to pay plaintiff $320 per hour for all legal work, plus disbursements, plaintiff properly billed defendants $28,565, and defendants actually paid plaintiff $32,885.16.  Therefore, defendants would be entitled to summary judgment on plaintiff's proposed charging lien claim under Judiciary Law § 475 because plaintiff has already recovered the full amount due under its retainer agreement with defendants.  See, e.g., Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d at 453.

Accordingly, granting plaintiff leave to amend the complaint to add such a claim would be futile.[4]  Plaintiff's motion for leave to amend the complaint is therefore denied.

---

[4] Because the Court finds amendment would be futile, it need not address defendants' arguments that plaintiff waived any claim to a charging lien or could not recover on such a claim because it was terminated for cause.  See, e.g., Petition of Harley & Browne, 957 F. Supp. 44, 48 (S.D.N.Y.

V.   <u>Defendants' Counterclaim for a Refund</u>

Defendants move for summary judgment on their counterclaim for a refund, arguing in its reply brief that, despite "deductions [defendants] made in its payments to CG, [they are] still owed a net refund of $4,320.16," because they paid plaintiff more than the fair value of its services.[5]  Plaintiff's papers do not address defendants' motion, other than stating in a heading that the counterclaim is without merit.  But, as discussed above, the undisputed evidence at summary judgment indicates plaintiff earned fees of $28,565 and defendants paid plaintiff $32,885.16.

Defendants are therefore entitled to a refund for fees they paid to plaintiff which plaintiff did not earn and to summary judgment on their counterclaim for a refund of $4,320.16.  <u>See Sanchez v. MTV Networks</u>, 2012 U.S. Dist. LEXIS 80810, at *6 (citing <u>In re Austrian & German Bank Holocaust Litig.</u>, 317 F.3d 91, 98-99 (2d Cir. 2003) ("Courts may order attorneys to return fees the client has paid pursuant to contract.")); <u>see also</u> <u>Jacobson v. Sassower</u>, 66 N.Y.2d at 993; <u>Matter of Wasserman</u>, 96 A.D.3d 132, 133 (2d Dep't 2012) (noting attorney committed professional misconduct by "fail[ing] to refund portions of legal fees, paid in advance, which had not been earned").

## **CONCLUSION**

Defendants' motion for summary judgment is GRANTED, and plaintiff's motion for summary judgment is DENIED.  Plaintiff's motion for leave to amend the complaint is DENIED, as futile.

The Clerk is instructed to terminate the motions (Docs. #31, 39, 54), enter Judgment for

---

1997) ("It is well-settled that an attorney loses his right to enforce a charging lien if the attorney withdraws or is discharged for cause.").

[5] Plaintiff does not argue the parties reached an accord and satisfaction when, on April 22, 2010, defendants wired, "as a full and final payment to [CG], the amount of $15,089.78."

defendants on their counterclaim in the amount of $4,320.16, and close this case.

Dated:  September 9, 2013
         White Plains, NY

                              SO ORDERED:

                              _____
                              Vincent L. Briccetti
                              United States District Judge